1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY


_____
LAUREN COYLE, on behalf of
Herself and all others similarly
Situated,

          Plaintiffs,

     vs.                              CIVIL ACTION
                                      NO. 08-2797 (JBS)

HORNELL BREWING CO., and ARIZONA
BEVERAGE COMPANY, LLC,


          Defendants.
_____

                              UNITED STATES COURTHOUSE
                              ONE JOHN F. GERRY PLAZA
                              4TH AND COOPER STREETS
                              CAMDEN, NEW JERSEY 08101
                              MONDAY, FEBRUARY 23, 2009


B E F O R E:      THE HONORABLE JEROME B. SIMANDLE,
                    UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:


   WILENTZ, GOLDMAN & SPITZER
   DANIEL R. LAPINSKI, ESQUIRE
   PHILIP A. TORTORETI, ESQUIRE
   ATTORNEYS FOR PLAINTIFFS

   McELROY, DEUTSCH, MULVANEY & CARPENTER
   ROBERT P. DONOVAN, ESQUIRE
   LISBETH CLOAD, ESQUIRE
   ATTORNEYS FOR DEFENDANTS

                              LISA MARCUS, C.S.R.
                              CERTIFICATE # 1492
                              OFFICIAL U. S. REPORTER


*United States District Court*
*Camden, New Jersey*

DEPUTY CLERK:  All rise.

THE COURT:  Be seated, please.

Good morning.

MR. LAPINSKI:  Good morning.

MR. DONOVAN:  Good morning.

MR. TORTORETI:  Good morning.

MS. CLOAD:  Good morning.

THE COURT:  This is the date for oral argument in Coyle vs. Hornell Brewing, Civil No. 08-2797.  I'll ask counsel to please enter your appearances for the record beginning with plaintiff.

MR. LAPINSKI:  Good morning, your Honor.  My name is Daniel Lapinski, I'm an attorney with the firm of Wilentz, Goldman & Spitzer, here on behalf of plaintiff Lauren Coyle.

MR. TORTORETI:  Good morning, your Honor.  Philip Tortoreti, Wilentz, Goldman & Spitzer, on behalf of Lauren Coyle in opposition.

MR. DONOVAN:  Good morning, your Honor.  Bob Donovan from the firm of McElroy, Deutsch, Mulvaney & Carpenter representing defendants Hornell Brewing Co. and Arizona Beverage Company.

MS. CLOAD:  Good morning, your Honor.  Lisbeth Cload from the firm of McElroy, Deutsch, Mulvaney & Carpenter also representing defendants.

THE COURT:  Good morning, everybody.

All right.  I've set aside some time for oral argument. I think I'd most appreciate hearing your arguments with respect to conflict preemption, you're free to argue all the other points, but I think the topic of preemption presents a very close issue here.  And so, obviously, you're free to argue express preemption and field preemption, I don't think those issues in the end will have the same traction as conflict preemption.

And, finally, there wasn't much attention paid to it, but primary jurisdiction and whether this matter should be referred to the FDA for a more formal opinion is something I'm considering.  Okay?

So, Mr. Donovan?

MR. DONOVAN:  Thank you, your Honor.

I will do my best, your Honor, to focus on the conflict and the primary jurisdiction, but I did want to just take a step back and just kind of give a view from overhead about this case.

This is a beverage labeling case.  The plaintiffs claim that the defendant's beverage products in New Jersey are falsely labeled as all natural because the product contains high fructose corn syrup, an ingredient the plaintiff argues is not from nature.  Their allegation, your Honor.

I don't think there's any dispute that the Federal Food, Drug, and Cosmetic Act governs food labeling and that

the congressional purpose of that act, which is really the touchstone of a preemption analysis, is uniform labeling. Because at the end of the day, whether it be express preemption, your Honor, field preemption, or conflict preemption, the plaintiffs are seeking to have a jury decide what is natural or not rather than the expert, the FDA, which I will touch upon later.  The FDA has a policy on this precise issue and has shown that it's been involved in the field exactly at issue here that deals with high fructose corn syrup.

Plaintiff's claim is really one in which the plaintiff is seeking adjudication, an adjudication that HFCS, my short term, your Honor, for high fructose corn syrup, is artificial.  They've artfully not pled that specifically in the complaint, your Honor.  They have not said HFCS is artificial.  But common sense, the net effect of a ruling that it's not from nature would be a jury deciding in New Jersey that HFCS is in fact artificial.

Why is that important?  I'd first like to show the Court one of the operative parts of the complaint.  This is from Paragraph -- I'm sorry, your Honor.  This is from Paragraph 2 of the plaintiff's complaint, your Honor, highlighted.  The term 100 percent natural is regularly used by manufacturers who describe a product that does not have chemically altered or man-made ingredients.  However, HFCS is

a highly processed sugar substitute that does not exist in nature. That is the plaintiff's definition, the definition that they want the jury to embrace.

Why is that important? Well, that's important, Judge, in large part because the FDA regulates, there's no dispute, they regulate what's artificial and what's natural flavor. Under the NLEA, 21, U.S.C., Section 343-1, I'm quoting here, your Honor, Section A, "no state or political subdivision of a state may directly or indirectly establish any requirement for the labeling of food required by Subsection, amongst other subsections, of the FFDCA, Section 343(k). Section 343(k) deals with mislabeling of artificial flavoring. So express preemption is a viable issue here, your Honor, that's worthy, we respectfully submit, of some consideration.

Now, with respect to the issue of natural, that term, the FDA has specifically enacted a policy, Judge, that deals with that issue. And I'm showing, your Honor, 58 Federal Register 2302, Page 2407, this is the policy. This is the policy that the plaintiff, I anticipate, is going to argue is, quote, informal. The plaintiff has to say that, Judge, because under Fellner, if this policy, which we respectfully submit, is the product of rulemaking, notice and comment, deliberation, and is a binding federal act. Whether or not it's a regulation, whether or not it's a rule, it's a binding FDA regulatory act, which we respectfully submit under

Fellner, is worthy of preemption.  You'll see here, your Honor, that the policy says that the agency will maintain its current policy not to restrict the use of the term natural except for added color, synthetic substances and flavor as provided in 21, C.F.R., 101.22, that's the reg that deals with artificial flavor and natural flavor.  Why is that important?  Because this policy is incorporating regulations.

Additionally, the agency will maintain its policy regarding the use of the term natural as meaning that nothing artificial or synthetic has been included in, has been added to a food that would not normally be expected in the food.  So the FDA in its expertise has tied the definition of natural with artificial and has incorporated the regulations therein.  And again, with respect to the issue of preemption, the question before this Court with respect to the FDA policy, at least in the defendant's view --

THE COURT:  Well, isn't that a partial quote?  Doesn't the same, I think the same page, 2407 say because of resource limitations and other agency priorities, FDA is not undertaking rulemaking to establish a definition for natural at this time?

MR. LAPINSKI:  That's here, your Honor, yes.  That's absolutely true.  But just because they are not undertaking rulemaking, your Honor, doesn't divorce this policy from preemption analysis.  That's correct that they have stated --

and I believe it's here, your Honor.

THE COURT:  Yes, I see.

MR. DONOVAN:  I did not pull that out, the full record, that your Honor's absolutely right.  And I was -- that is undoubtedly not a quiver in favor of preemption if you just look at that sentence as to resource limitations.  They're maintaining the policy after due deliberation, after receiving hundreds of comments on this issue, your Honor.  They are the expert on this issue, which -- frankly, you know, we did brief the issue of primary jurisdiction, and I'm not going to jump ahead, I'll deal with that later on, Judge, but with respect to that issue, when you look at Fellner, and you look at the Altria case that just came down from the Supreme Court, there is without doubt an import plague upon the existence of a long-standing policy, your Honor.  Remember, in real world what we're dealing with here.  We have a 15-year, this is 1993, your Honor, a 15-year policy, which is unchanged and is binding on the FDA.  You have businesses, your Honor, which are relying on this policy, namely, my client.  And after six years, they are going to be hailed into court and called for a six-year alleged window of damages saying regardless of whether you complied with this policy or not, your product is not natural and you committed a fraud.  I submit, your Honor, under Fellner and Colacicco -- I'm mispronouncing that name.

THE COURT:  Colacicco.

MR. DONOVAN: Colacicco. I'm sorry, your Honor. And under Altria the touchstone of those cases dealt with the due deliberation, the expertise -- the due deliberation and the fairness of a policy. At the end of the day, Fellner had four documents, they were unilateral, they were not the product of due deliberation. Some of them came up after the lawsuit was filed. None of them were the product of due deliberation and a long-standing policy. That's not my term, your Honor, that's a term that appears in Altria and Fellner and Colacicco.

Your Honor, it's significant, we submit, that the policy, which is long-standing, has remained unchanged. We've also submitted to your Honor, and there's no dispute in the record, and this is significant also because it's post Holk, your Honor, the July, the post Holk vs. Snapple decision, the July 3, 2009, letter from the FDA. That is evidence, your Honor, that the FDA is in this, this precise field as to determining whether HFCS is natural or not. I can just imagine if that letter said the FDA said, well, listen, we are not going to entertain this question or some other issue came up. But the FDA -- what I imagine is that the plaintiff would be arguing that is evidence that they're not in the field. The July 3rd letter shows the -- is probative of the enforcement of this policy, Judge, and the binding effect of this policy and in the specific field that is sought to be

litigated in this case.

The conflict preemption, your Honor, I would respectfully submit is manifest.  Conflict preemption is not only impossibility of performance or lack thereof, it's an obstacle to a state regulation or law which would stand as an obstacle to the policy and legislation, which in this case is to promote uniform labeling under -- for 50 states, your Honor.  Uniform food labeling.  It wouldn't take -- it's just a mere matter of common sense, we would submit, that in New Jersey a jury decides that HFCS is not natural, it has an impact on the labeling in New Jersey.  In Florida a converse decision is made.  This is the whole -- this is one of the primary reasons why Congress has enacted the Federal Food, Drug, and Cosmetic Act, what we call the FFDCA, to prevent that confusion.

The plaintiff is arguing that they're confused.  Can you imagine the confusion on a nationwide basis if all 50 states had different rules and regulations on whether or not a product is natural or not?

THE COURT:  Hasn't the FDA chosen to live with that ambiguity by not enforcing a global definition of natural and FDA products?

MR. DONOVAN:  Judge, I would say that they understand there's an ambiguity but, from my view, there are restrictions under the policy, that the policy does define -- this does

define the term natural by saying it's not anything, again, artificial or synthetic has been included in the food or been added to a food that would not normally be expected in the food.

THE COURT:  Does it say what is natural?

MR. DONOVAN:  Does it say what is natural?

THE COURT:  It's defining by a partial exclusion.  We know what's not natural if it's in the field of synthetic additives.

MR. DONOVAN:  Your Honor, if I may answer that question.  I think if you look at Section -- by referring you back to what's artificial, if you look at Section 101.22, which defines artificial flavor and natural flavor, they define natural flavor to be flavor or natural flavoring means the essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate or any product of roasting, heating or enzymolysis, which contains the flavoring constituents derived from a spice, fruit or fruit juice, vegetable or vegetable juice, herbs, et cetera.  Well, in that sense they do define by referring you back to natural flavor.  And we're dealing with high fructose corn syrup, which is derived from corn, hence, it's derived from a vegetable.

THE COURT:  Are you arguing that it is a flavoring?

MR. DONOVAN:  That high fructose corn syrup?

THE COURT:  Yes.

MR. DONOVAN: Yes, your Honor, it's a sweetener, it adds to the flavor.

Plaintiff is, in this case, your Honor, is inserting their own definition of the term natural claiming that nothing can be labeled natural if it's an ingredient which is not, as they say in the complaint, derived from nature.

If this Court is not satisfied with the policy, is not dissatisfied that there is an incorporation into regulations, then you're left with who's the expert to really handle these issues? Who has exercised jurisdiction over these issues? There's no dispute that they have, Judge. They've contemplated it. They've debated it, they've received comment from the public. They're the experts. So separate and apart from the issue of conflict preemption is the issue of primary jurisdiction, your Honor, that the plaintiffs or rather the FDA is the expert that would, as we understand it, the dismissal on primary jurisdiction grounds would allow that issue to be fleshed out with the expert. If the plaintiff has an issue with the definition under the policy, as we've stated, and with respect specifically to HFCS, they can certainly raise that with the FDA.

THE COURT: What would that mechanism look like? If I were to defer for the exercise of primary jurisdiction, does the burden fall to the plaintiff to present a petition, and is it more likely than not that the FDA would accept their

petition and act on it because there's a court case waiting for their answer?

MR. DONOVAN:  I would suppose that the answer to that is, yes, your Honor.  Obviously, it's their burden.  They're unhappy with the policy.  And to the extent that there's a, you know, an existing case, I would suppose, and a recent decision on this issue, which they can petition and change, this is the July 3rd letter, that could have their own audience as we speak with the FDA if they want to change the policy or they don't like the July 3rd letter.

Because, your Honor, this goes really also to the heart of this issue.  We're in the midst of discovery in this case, we have provided to the plaintiffs letters from the HFCS suppliers.  We don't make the product.  This is a manufacturer.  We get the HFCS from third party suppliers.  We have provided letters, which are probative, we think dispositive, certainly probative, of the fact that we comply with the HFCS manufacturing specifications that the FDA say comply with the natural policy as evidenced in the July 3rd letter.  That should be dispositive of this case.  I'm getting the feeling, though, that it's not, that the FDA -- that the plaintiff wants to substitute their own definition.  So that even if we comply with the FDA's manufacturing specifications as outlined in the July 3rd letter, which the plaintiff in briefs to this Court opposing the motion to stay discovery,

conceded were a guideline for compliance with the FDA policy. I'm still going to be embroiled in a litigation because the plaintiff is seeking to insert their own definition of what natural is, and that is the expertise of the FDA. And perhaps short of preemption, that is the best avenue to pursue.

THE COURT: What process led to that July 3rd letter? It mentioned that there had been a meeting with the Corn Refiners Association and the Center For Food Safety and Applied Nutrition and that letter, that meeting occurred on April 16, 2008. And then a little less than three months later a fairly low level employee writes this letter. She's a supervisor within the Product Evaluation and Labeling Team of the Food Labeling and Standard Staff of the Office of Nutrition Labeling and Dietary Supplement within the Center For Food Safety and Applied Nutrition. So compared with the Commissioner of FDA, for instance, Geraldine June, although she may be the most knowledgeable person in the world on this subject, who knows, isn't speaking with the force of the Commissioner or even with the force of an agency that finds itself in litigation.

Now, we do know that deference is to be given to the Commissioner's statements. That much less deference is to be given to an agent's statements in litigation that were prepared for litigation. Colacicco even says that. So what deference should be given to this letter? What was the

process that led to it?  Or in short, isn't this more like a Fellner situation than it is a Colacicco situation when we look at the formality in which the agency reached this determination?

MR. DONOVAN:  I would say that there is a great degree of deference that should be accorded this letter, Judge.  Because of the regulatory history here, Fellner, there was really an absence of any regulatory history with the issue and deliberation on this issue.  So if the letter was in a vacuum alone, in and of itself, the deference would definitely be mitigated, maybe not to a point of any degree of significance.

My understanding, your Honor, is that there was a statement made which may have led to this lawsuit and perhaps may have led to this letter.  On foodnavigator.com, and I believe it may have been by Ms. June and I don't know whether it's referred to in the letter, which dealt with whether, this is back in April or March of or maybe earlier 2008, dealt with whether that person at the FDA would consider HFCS natural or not.  And I don't have the statement on foodnavigator.com, but it brought into question whether HFCS was in fact natural.  So we understand that the Corn Refiners Association as per the C.F.R. is entitled to sit down, as is this plaintiff, with the FDA to discuss any issue they have with respect to the FDA policies and regulations.

The letter talks about a three-month period where this person, although not a commissioner, your Honor, we would submit by virtue of being a supervisor of product evaluation, has some level of expertise entitled to deference, and looked at the manufacturing processes of the HFCS and made a determination, in very specific ways, explaining their conclusions as to why certain manufacturing processes would be considered compliant with the natural policy, which the FDA in the letter, or rather Ms. June in the letter, your Honor, refers to as a long-standing policy.

This is not a case like Fellner where you have four unilateral documents which aren't based on any regulatory history and are not the product, at least in Fellner the court found not the product of due deliberation.  This is a letter which is, we would submit, you know, has the indicia of reasoning, rationale and is an authorized act.  This is not an unauthorized act.  But if the plaintiff has a dispute with that after, again, the FDA has donated -- there's no dispute that the FDA in this letter has shown that they have devoted resources to this issue.  If they have a dispute with that finding, they're certainly entitled to petition the FDA and ask them to reconsider that letter just as well as they're entitled to have the FDA reconsider the long-standing FDA policy.

THE COURT:  Would this plaintiff have standing to seek

that sort of formal reconsideration by the FDA?  The plaintiff wasn't at that table, were they?

MR. DONOVAN:  No.  But the plaintiff could have their own -- my understanding of the regulations, they could ask for their own review of the policy.

THE COURT:  I've had several experiences with primary jurisdiction in the past, one was good and one was awful.  The one that was awful was a referral to the Insurance Commissioner of New Jersey for greater development of what their policy is with regard to the duties of certain automobile insurance representatives in New Jersey, and it bounced back and forth literally for years, didn't reach a result.  And so when I grew impatient, I took the case back, there having been no decision.  And then after that, there was a decision so it went back to the agency.  But I've also had a positive experience.  You could see that I don't want to send the attorneys in search of an answer to this question on what might be a fool's errand all the while keeping my docket open waiting for the answer.  Do you have any insight into how the FDA might handle or has in the past handled primary jurisdiction referrals?

MR. DONOVAN:  No, I don't, your Honor.  All I can say is that it would be a fair inference or fair presumption that since they held an audience and acted relatively promptly with respect to the July 3rd letter, this is, you know, I can see

certainly something on their plate and something that they have at their disposal knowledge of and that something that they're aware of.  But to answer your question straight out, I do not have that experience.

Your Honor, if I may, I do not want to repeat myself, we dealt with the conflict preemption issue and how this lawsuit is a real obstacle, not a fake one, your Honor, a real one.  My client has been sued in Florida and in California on virtually identical allegations.  There's now -- there's an MDL motion pending with respect to these three cases.  This has a real disabling effect, your Honor, on my client's ability to do business and it's a punitive class action.  This is a serious case.  And we submit that it flies in the face of the congressional intent of uniform labeling.

I would like to wrap up, your Honor --

THE COURT:  Let me ask a practical question.  Is it clear that the process that's used by your suppliers of the high fructose corn syrup squarely fits within the approved, what you're saying is the approved FDA definition?

MR. DONOVAN:  Yes.

THE COURT:  Okay.  And the second question is:  Are there substitutes available in the marketplace that would satisfy even the plaintiff's definition of natural?  In other words, that it isn't made by a laboratory process?

MR. DONOVAN:  I don't know the answer to that, Judge.

I don't know the answer to that.  This product has been used for quite some time in the whole line of ice tea products.

Judge, if I'll -- we did address, and I just want to make this clear, putting aside preemption, we also say that the plaintiff has no legally cognizable claim to disgorge the defendant's profits, that is not a remedy.  There's no legal basis to assert unjust enrichment.  We did not receive any unjust enrichment.  The plaintiff bought, I believe, two bottles of ice tea and we sold them, sold her the ice tea. There's no legal basis to seek unjust enrichment.  There was no notification for this -- you know, this is the owner's part of this lawsuit, Judge, amongst other things, in addition to the discovery that we've endeavor to provide, we're dealing with a case where we didn't get any notification of any problem with this and then we get sued going back six years for breach of warranty.  Under the UCC, you can't sue for damages unless you notify, and there was no such notification.

And in a real sense, your Honor, under the consumer fraud claim, there's an absence under the <u>Twombly</u> pleading standard of asserting legally cognizable ascertainable loss. We cited the <u>International Union vs. Merck</u> case, your Honor. This case, as we understand it, doesn't have anything to do with -- there's no assertion of personal injury.  This is a claim of alleged economic loss.

What's the loss?  There is none, your Honor.  The

alleged premium price paid, which, by the way, I don't know what that is, I haven't gotten that in discovery, I haven't gotten any damage discovery, there is no premium price, Judge. And that's not -- in any event, that's not a cognizable claim for ascertainable loss under the Consumer Fraud Act statute in New Jersey.

One of the biggest sellers, I'm getting into the practicalities of this lawsuit, Judge, you can see any time you go into the store, it's a 23-ounce bottle or rather a 23-ounce can, I tried to buy it before I came in today, I couldn't find it, it's 99 cents, 23 ounces for 99 cents. There's no premium price.  That's why people in a large part buy this product, because of the price.  So we assert, your Honor, that putting aside preemption, that the claims are not legally cognizable.  And I thank you for your time.

THE COURT:  Well, is it sufficient for the plaintiff to allege, as she has, that she paid more for the product than she would otherwise?

MR. DONOVAN:  We say under International Union, no, Judge, because that's a premium price theory, that's not an ascertainable loss, there has to be some allegation of damage. And that I understand the International Union case that dealt with the issue of fraud on the market is exactly what the plaintiff is asserting here, that there's been a fraud on the market, that you have priced your product too high or that you

priced the product higher than you should have priced it and that's a fraud on me and a fraud on the market. That is not a legally sustainable ascertainable loss under the Consumer Fraud Act as we read International Union, your Honor. There has to be an ascertainable loss, and the premium price theory is not one because it's tantamount to a fraud on the market.

THE COURT: Well, is it not conceivable that the plaintiff would come up with evidence that similar products that don't claim to be 100 percent natural are sold for less money. And that under the plaintiff's point of view, she would have bought the 79 cent product rather than the 99 cent product if she knew that the 99 cent product were artificial?

MR. DONOVAN: That's conceivable, Judge. But my view of the law that is not a cognizable theory of damages under consumer fraud. Because, as I understand it, it's a policy decision with respect to, legal policy decision with respect to what type of loss do you have to prove that you suffered. And although there's no -- although it's ambiguous and perhaps the issue of reliance is up in the air, there still has to be a proof of causation, loss causation. What did the term all natural do to you? And again, we're only dealing with loss of pocket, out-of-pocket. And we read the International Union case as saying that you cannot establish a fraud on the market theory as a basis for damages in a consumer fraud context, so that's why we're raising that argument, your Honor.

THE COURT:  Okay.

MR. DONOVAN:  Thank you for your time.

THE COURT:  Thank you.

Mr. Lapinski?

MR. LAPINSKI:  Your Honor, thank you very much.

Your Honor, what I'd first like to do is just go back and address some of the questions that you had posed in order to shed some insight from the plaintiff's standpoint.

First of all, in regard to the issue of primary jurisdiction, you had expressed the fact in the past you had a negative result from a primary jurisdiction issue and also a positive result, and you asked whether or not there was anything that could shed insight into whether staying this action in deference to the FDA under the doctrine of primary jurisdiction would be, as you termed it, a fool's errand.  And what I would say is that the history that we're dealing with in regard to use of the term natural in food and beverage labeling, shows that it will be a fool's errand to send this -- to stay this action in deference to the FDA.  Since 1988, the FDA has been dancing around the issue of what is natural, what isn't natural.  And they have consistently, when approached through citizens' petitions, when approached by the industry, said that they're not going to implement any type of rulemaking.  They don't have the resources, they don't have the time to be able to address an issue that they recognize as

ambiguous, as confusing, as misleading.  And if they were able to devote the time and resources, that they would be able to get rid of some of that confusion and some of that ambiguity but they don't have time.  And there's nothing to say that now, after 20 years of not implementing any type of regulation, a light switch is all of a sudden going to go on and they're going to turn around and they're going implement a regulation in regard to the use of the term natural.

Another point that was brought up --

THE COURT:  Well, is history able to predict with the same certainty where there's a new administration that has come in, I don't know if administration decisions drift down to this level of FDA decision making, but isn't there an opportunity in the FDA to review past policies that generally that, you know, doesn't present itself but it does now?

MR. LAPINSKI:  Yes, your Honor, with a new administration there is that opportunity.  But there is nothing that says in reviewing this position, the FDA will or will not take action.  The only thing that we have before us, as far as what the FDA will and will not do is a 20-year history spanning what would now be four administrations where they didn't take any action, where they specifically said, hey, we recognize that there's ambiguity, we recognize that there's confusion, but we don't have the time or the resources to implement a regulation.  And they specifically say we are

not undertaking rulemaking at this time.  Yet defendant stands and says rulemaking is in place.  The FDA itself said there's no rulemaking.

THE COURT:  What if the request came not from the plaintiff or the defendant to the FDA but from the Court?  There's a growing interest, I think, in courts and administrative agencies being encouraged to cooperate.  And if I were to package this issue, send it to the FDA, and ask for their response within a certain period of time, the response could be we are looking into it now or we are not interested in looking into it.  And if the response is we're looking into it, then I would ask them, well, how much more time would you need?  So that I would keep some degree of control recognizing that I don't have jurisdiction to tell them what to do or even how fast to do it, but I do have jurisdiction over my own docket.  Would that work?

MR. LAPINSKI:  You know what, your Honor, I can't stand here today and tell you whether it would work or wouldn't work.  Because based upon the duties that the FDA has on its plate right now, whether it be with food and beverage labeling, whether it be with the pharmaceutical industry, whatever the case may be, the things that the FDA has on its plate I can't stand here and give you an honest opinion whether I think it will or it won't.  Me personally?  I don't think it would make a difference.  I think whatever went to

the FDA, the FDA would take the same stance.  And their same stance would be we are not going to implement rulemaking, we don't have the time to do it right now.

Since I brought up the issue of primary jurisdiction, I would like to be able to address the issue in full, if I can.

THE COURT:  Yes.

MR. LAPINSKI:  The defendants have only made reference in their papers to a need for specialized knowledge and expertise in order to support stay of this action in deference to the FDA under the doctrine of primary jurisdiction.  And that doesn't -- that alone does not warrant the application of primary jurisdiction.

There's four factors that have to be considered by the Court when deciding whether or not to defer pursuant to the doctrine of primary jurisdiction.  And the first is whether not the issue is within the conventional expertise of judges or whether it involves technical or policy considerations.  And consumer confusion is not a technical issue, and it's not -- it is something that should be left to the judiciary and not to a government agency.  The Supreme Court held that in the Goya matter.  And let me just get a complete reference to the Goya matter, if I may, your Honor.  I apologize.  The Second Circuit in Goya Foods vs. Tropicana Products, 846 F.2d 848, held that consumer confusion is not a technical issue and should be left to the judiciary.

In addition, in Nader vs. Allegheny Airlines, the Supreme Court in 1976 held the same, that a fraudulent misrepresentation and consumer confusion is something that's best left to the judiciary as compared to a government agency.

And, finally, from an FDA standpoint, in the matter of Luckey vs. Baxter Healthcare, 1996 U.S. District LEXIS, Northern District of Illinois, May 9, 1996, the court held that there's no need for judicial deference to FDA authority in cases involving false claims. And that's what we're looking at right here, your Honor.

So what I would say is that the first of the four factors that have it be considered from a primary jurisdiction standpoint, weigh in favor of the Court maintaining jurisdiction over this action.

The second point is whether or not the issue is within the agency's discretion. And what I would say, your Honor, is that the second of the four factors, to the extent that it's in the agency's discretion, the agency, for the past 20 years going back to 1983 when it first referenced the fact that there was a lot of ambiguity surrounding the use of the term natural, has declined to act and they've declined to put rulemaking in place. As far as --

THE COURT: Is the same statement true after the July 3rd letter?

MR. LAPINSKI: Yes, your Honor, I believe that it is,

because the July 3rd letter is not rulemaking.

You know, another thing that I was going to go into before I started hitting on all the legal arguments, your Honor, was the July 3rd letter and you had asked that what was the process that led up to that letter.  And the process that led up to that letter was an early 2008 statement made by this employee of the FDA that said that high fructose corn syrup was not natural and that sent the Corn Refiners Association, which incidentally has filed an amicus brief in the <u>Holk</u> matter that's pending before the Third Circuit, so there's bias there from the Corn Refiners Association and it's, you know, their motivation, they have to go to the FDA and say, wait a second, you can't say that it's not natural, we believe it is natural.  They had a one-on-one meeting in April.  And the one-on-one meeting they had in the middle of 2008, the FDA again said, hey, look, these processes, the way that they're put together, we don't believe that high fructose corn syrup is natural.  And then following that meeting, the day after, a representative from the Corn Refiners Association sent some additional information to the FDA saying, wait, you can't say that this isn't natural, here's how we break down all of our processes and showed them how they break down the processes. And in response to that, the July 3rd letter said, hey, look, if this is how you do it, we are not going to object to you doing it.

Now, the important thing there, your Honor, is that they didn't say if you do it this way, it complies with regulations that we have in place; if you don't do it this way it doesn't comply with regulations that we have in place. They said we are not going to object to you doing it. And the fact that they're not going to object does not, in and of itself, result in the formation of a law or rule or regulation that says that everyone must follow it. It just says that in that particular situation, the FDA isn't going to object. You're not right. You're not wrong. But you know what, we're not going to pay attention to it because we have better things to do with our time.

So I would pose to you that the July 3rd letter is not rulemaking, and that's supported by Fellner, and this issue is more like Fellner than it is like Colacicco. Because in the Colacicco case, your Honor, or, excuse me, in the Fellner case, like here, we're dealing with a situation where there are already lawsuits pending dealing with the specific issue that we're at. The Holk matter was before Judge Cooper in the District of New Jersey in Trenton at the time that all of this started to unfold. So this all natural letter that was spurred on by the Corn Refiners Association, came about after litigation was already underway. So it's very much like Fellner, as compared to the Colacicco case, where in the Colacicco case there had been FDA considerations of a lot of

different matters.  They had specifically looked at the issue time and time again and made an affirmative decision that, hey, we've looked and based upon what we've seen, and this is again the Colacicco matter, they said we've looked and based upon what we've seen, we see no reason to put any type of warning in regard to suicide on this package.  And then plaintiffs came by and said, hey, we think there should be a warning, and that conflicted with what the FDA had said and had studied for a 20- to 25-year period in regard to antidepressant medications.

THE COURT:  Yes and no.  In Colacicco, the issue of exactly what should be on a drug label in terms of a warning had been studied by the FDA with regard to this class of antidepressant drugs since about 1988, and so to that extent it predated any litigation.  But the FDA took no public position about the preemptive effect of its own determinations of labeling until long after litigation was started.  It might have been before Colacicco but it was after half a dozen lawsuits, I'll say, around the country.  And then an official in the FDA, and eventually I think the Commissioner, took the position that we intend for our drug labeling to be preemptive where it speaks of warnings.  The agency itself had never taken that position before litigation.

MR. LAPINSKI:  Correct, the agency itself had never taken that position.  But the Colacicco, matter the under

current in the Colacicco matter was that for 20 years the FDA had researched the issue and continually come back and said, hey, we don't see a need for a warning based upon the independent research that we've done.  Plaintiffs cannot now come in, and this is what the Court said, plaintiffs cannot now come in and demand that there be a warning where the FDA for the last 20 years have said we don't need a warning, we don't need a warning.

That's distinguished from the present matter because in the present matter the FDA has never come in and said here's what's right, here's what's wrong, this is what the regulations, the FDA has never done that.  I think that's where the distinction is as far as the Fellner case is concerned and the July 3rd letter.

THE COURT:  Indeed, the agency's never taken a position on this beverage label, has it?

MR. LAPINSKI:  No, your Honor, it hasn't.

THE COURT:  And again, in distinction to drug labeling, whether it can be marketed before the FDA has applied every jot and tittle of that label.

MR. LAPINSKI:  Correct, your Honor, there's a lot more hurdles a drug labeling has to overcome, a drug manufacturer has to overcome before a label can be put onto a product as compared to a food and beverage label where there aren't obstacles that have to be overcome.  Anyone can put any

type of food and beverage label that they want on their product and they do it at their own risk.  That if they haven't complied with FDA regulations, the FDA can turn around and take action against them.

Now, that's not what we're dealing with here.  We're not dealing with a situation where plaintiff is saying that there have been violations of federal acts.  This isn't an express preemption issue where we're looking to enforce FDA policies and procedures.  What we're doing is we're looking to enforce violation of the New Jersey Consumer Fraud Act by making false and misleading and inaccurate statements on the product label.

If I can, your Honor, going back to where we started, just to finish up on the issue of primary jurisdiction, we were talking about the four factors that had to be considered.  And I had said that the first factor being consumer confusion and fraudulent misrepresentations being left in the lap of the judiciary as compared to deferring and as far as agency discretion was concerned, I had brought up the point that the second factor, to the extent there is agency discretion, the agency has chosen not to act.

The third factor is the danger of inconsistent rulings.  And the important thing in regard to the danger of inconsistent rulings is that inconsistencies among different courts is not a consideration for primary jurisdiction.  The

inconsistencies relates to inconsistencies that would develop between the courts and the FDA.  And in the nearly 20 years since the FDA first considered use of the term natural, they've refused to act.  And the fact that they have not acted eliminates any confusion that there could be between the FDA regulations and between state laws.

And then, finally, the fourth factor --

THE COURT:  Well, how do you interpret the refusal to act?  The FDA is aware of the constituents of high fructose corn syrup, they've never taken an action against a manufacturer or seller of that product who described it as natural.  And so doesn't that suggest that the FDA is okay with what it knows to be going on?  Doesn't that, to the extent it's ambiguous, weigh more in favor of the defendant's position than yours?

MR. LAPINSKI:  No, your Honor, it doesn't.  And the Third Circuit in Fellner found that in those situations it doesn't weigh in favor of defendants because the refusal to act and inaction does not in itself equate to regulation.  And Fellner says that.  And it's most clearly spelled out in Sprietsma matter.  Let me get the proper citation for you on that, your Honor.  In the Sprietsma vs. Mercury Marine matter, 537 U.S. 51, and that was a 2002 decision, the Supreme Court specifically addressed that.  And the Supreme Court specifically said that the refusal to act or the deliberate

inaction on the part of an agency does not, in and of itself, equate to rulemaking.  So while the FDA is aware of the ambiguity and the confusion, the fact that they have refused to act does not, in and of itself, equate to rulemaking and does not weigh in favor of this case being dismissed based upon a theory that there is some type of regulation in place because they have refused to act.

Essentially, your Honor, what this boils down to is the FDA having too much on their plate.  There are too many other things the FDA is involved with where they themselves have recognized the fact that they're underfunded and undermanned in order to be able to address all of the issues they have to address.  And that being the case, the FDA prioritizes.  And I would say that based upon their action or inaction, the confusion that consumers undergo when they're presented with a product labeled as natural, is not something they consider a top priority when there are other issues that they must be involved with that deal with human safety from a drug standpoint.  So that would be my answer to your question there, your Honor.

Then the fourth factor, as far as primary jurisdiction is concerned, is prior application.  And as far as prior application is concerned, this matter has been put in front of the FDA several times before.  There's been several citizen petitions.  In addition to the citizen petitions, they've

attempted -- they've attempted to analyze it through a period of comment. And after the period of comment, back in 1991, they received their comments in 1993, made a decision that they were not going to undertake rulemaking. So what I would say to the Court is that from a primary jurisdiction standpoint, your Honor, I do not believe that this is the type of case that should be stayed in deference to the FDA under the doctrine of primary jurisdiction.

You had mentioned, your Honor, that another area that you wanted to focus on was the area of conflict preemption, and I'll do that up front before I get into and touch upon the other areas.

From a conflict preemption standpoint, your Honor, the two things that are looked at is impossibility to comply with both federal regulation and state law. And the second thing is whether or not the state regulation would be an obstacle to the policies and legislation of the government.

This is not a conflict preemption issue. And there's a very simple explanation as to why it's not. If tomorrow defendants removed the words all natural or natural from their product, they would still be in compliance with all federal regulations. It's not impossible for them to abide by a state law that makes unlawful the use of false and misleading claims and also stay in compliance with FDA regulations. Removing the term natural from their product would not put them out of

compliance.  In fact, a competitor of the defendants, Snapple Beverage Corporation, has recently undertaken a label change where they removed high fructose corn syrup from their product and they now have sugar and it's all natural product that's manufactured with sugar as compared to high fructose corn syrup.  And you had asked whether or not there are any alternatives to high fructose corn syrup and Mr. Donovan said he wasn't aware of any.  Sugar is one.

Secondly, in regard to that -- and actually while we're on the topic of sugar, Mr. Donovan had referenced the fact that high fructose corn syrup is a sweetener and, therefore, it is a flavor and would be regulated by the artificial flavor statute.  There's a difference between a sweetener and a flavor.  Anything that's put into a product, your Honor, can technically be considered a flavor because in one way or another it's going to impact the flavor of the beverage.  But there is a distinct difference between an artificial flavor and a sweetener.  And high fructose corn syrup is a sweetener and it's not regulated by the statute pertaining to artificial flavor.

THE COURT:  How do we know that?  What's the textural mooring of that argument?

MR. LAPINSKI:  There are, and I don't have them with me, I don't have them with me now, your Honor, because this is the first time that this issue was raised, but there are

United States District Court
Camden, New Jersey

specific federal regulations that deal with sweeteners and there are specific federal regulation that deal with artificial colors, artificial flavors.  So the FDA has broken them apart and looked at them differently and high fructose corn syrup is considered a sweetener.

THE COURT:  I don't know that the regulations about sweeteners have been briefed, have they?  Is the FDA occupying the field of regulating sweeteners in beverages?

MR. LAPINSKI:  To the extent that they occupy the field, and I would say that they don't, your Honor, but to the extent that they do occupy the field of sweeteners, it still is different when you talk about use of the term natural and regulation of a sweetener.  Okay?  Unless there is something inside the regulations that specifically regarding sweeteners that say this sweetener is considered natural, this sweetener is not considered natural, if you use this sweetener you can say that it is natural.  And I can tell you there is nothing in those regulations that deal with that.  The fact that they regulate the use of sweeteners is an issue separate and apart from use of the term natural when you have any type of sweeteners in there.  As an example, Splenda is a sweetener and the FDA regulates Splenda.  The FDA, however, does not regulate whether or not you can market Splenda as a natural sweetener, as a natural product or an unnatural product.

Now, if I can continue, your Honor.  Your Honor, this

case is not about mandatory labeling requirements and whether or not the defendants have satisfied mandatory labeling requirements.  And this is not an attempt by plaintiff to establish new federal labeling regulations or to define for the FDA or for the nation the term natural or all natural. And it's not a suit about nutrient content or health claims or any other areas that the FDA does currently regulate.

What the case is about, your Honor, is the case is about the defendant's marketing, advertising and promotion of its beverages as all natural when in fact the beverages contain highly processed ingredients that are not natural. This case is about the protection of New Jersey consumers from defendant's use of the deception in an area where the FDA itself has recognized confusion but has simultaneously made the decision not to act.  And I would put forward that if the FDA refuses to protect the citizens of the state, then it's up to the judiciary to do so.  States possess a legitimate interest in protecting consumers against fraud and deception in the sale of foods.  Over 110 years ago the Supreme Court held as much in the case of <u>Plumley vs. Massachusetts</u>.  And it reiterated that position in 1963 in <u>Florida Lime and Avocado Growers vs. Paul</u>.  In fact, within the last year, Judge Cooper in the <u>Holk</u> decision, one that from a decisional standpoint I disagree with, she found that states have a legitimate interest in protecting their consumers against deception and

fraud in food and beverage labeling.  And that was reiterated by the Third Circuit as recently as August of 2008 in <u>Fellner</u> when the Third Circuit reversed and remanded the dismissal of a food labeling claim.

Defendant bears the burden of establishing the plaintiff's claims are preempted.  And there's a strong presumption against preemption that can only be overcome by clear and manifest congressional intent to the contrary. Defendants, your Honor, I say have failed to satisfy their burden.  The F.D.C.A. the Food, Drug and Cosmetic Act, contains no express preemption clauses, and that was recognized in the case of <u>Riegel vs. Medtronic Incorporated</u>. And there's no such clause because it wasn't the intent of Congress to have the Food, Drug and Cosmetic Act to preempt state law.  Plaintiff's brief in opposition to the motion to dismiss, summarizes the legislative history of the Food, Drug and Cosmetic Act.  And, specifically, the NLEA amendment that makes clear that national uniformity in food labeling that is set forth in legislation has absolutely no effect on the preemption of state or local requirements.

Express preemption is also inapplicable because the FDA has not promulgated rulemaking governing the use of the term natural.

THE COURT:  Are you arguing that the NLEA is not an express preemption provision because it's referenced or it

cites to 343(k) that pertains to mislabeling of artificial flavoring, isn't implicated with regard to a sweetener?

MR. LAPINSKI:  That's correct, your Honor. Artificial flavors are different than sweeteners.  The FDA regulation of artificial flavors and artificial colors is totally separate from the regulation of the use of the term natural in beverage marketing and advertising.

From an implied preemption standpoint, the text of the NLEA warrants against implied preemption.  The NLEA specifically states that it shall not be construed to preempt any provision of state law unless such provision is expressly preempted under 21, U.S.C., 343-1.  And defendants cannot point anywhere within 21, U.S.C., 343-1 that expressly preempts claims alleging deceptive use of natural.  The text of the NLEA also prohibits the establishment of any requirement for a food that is the subject of an established standard.  This statutory language would serve no purpose and would simply be surplus if the intent of Congress was to preempt.

Finally, the Supreme Court has found as much in similar situations, such as the <u>Wisconsin Public Intervenors</u> case. Nor does the federal regulatory scheme impliedly preempt in this situation.  Although vested with the authority at its discretion to regulate in areas that Congress as reserved to states, the FDA has chosen not to regulate the term natural.

Their policy has been the use is unrestrictive.  They recognize the use of the term is confusing and misleading.  They discourage the use due to the ambiguity.  And they've taken no enforcement actions because they have neither the time nor the resources.

THE COURT:  Don't they set forth something of a definition by exclusion in the 1993 federal register policy?  The one that's on the easel here.

MR. LAPINSKI:  It's a definition by exclusion, your Honor, but it's an informal policy.  It's not a policy that was determined through rulemaking and as has been defined in Altria Group, as was determined in Fellner.  And let me just get my cite to the additional case.  There was one other cite that I wanted to refer to in that regard.  And also in the Sprietsma case.  Deliberate agency inaction does not alone preempt state law and industry guidance, consent orders and inactions don't justify preemption.

And that's what we're looking after here, your Honor.  Specifically, the July 3rd letter is nothing more than industry guidance.  It's industry guidance to a single inquirer who sought comment or sought discussions with the FDA because the FDA had come out in early 2008 and said we don't think high fructose corn syrup is natural.  So there wasn't a give and take.  There wasn't a procedure put in place where both sides could present their information prior to the

July 3, 2008 letter that came out, it was a one-on-one conversation.

THE COURT:  Who was that second entity in the July 3rd letter, the Center For Food Safety and Applied Nutrition?  When I read that, it implied that there was some sort of adversarial meeting of one side arguing that food safety is being sacrificed, the Corn Refiners arguing this is fine.

MR. LAPINSKI:  No, your Honor.  If you look at the July 3rd letter, if you look at the signature line on the July 3rd letter, Geraldine A. June is the supervisor of Product Evaluation and Labeling Team, Food Labeling and Standard Staff, Office of Nutrition, Labeling and Dietary Supplements, Center for Food Safety and Applied Nutrition.

THE COURT:  That's the FDA.

MR. LAPINSKI:  That's one heck of a business card as well.

So it was not an adversarial situation where two sides were able to present their particular argument.  This was a, I'll call it an ex parte communication with the FDA where the Corn Refiners Association said, hey, look, this is what we're doing, this is why we think it's natural.  And the FDA in the letter again, and you brought up this isn't a letter from a supervisor, but the individual who wrote the letter, they didn't say we find you to be within specific guidelines, we

don't find you to be outside of specific guidelines, it just says we are not going to object, we are not going to bother fighting this fight at this particular time, that's what the letter says.  The letter specifically says we will not object to your use of this particular process or your use of the term natural with this particular process.  It's not regulations.  It's not rulemaking.

THE COURT:  Now, you've argued that the federal register policy from 1993 was not the product of rulemaking.  But wasn't it the product of notice and comment that had gone on for about two years by that time and a degree of deliberation by the FDA?

MR. LAPINSKI:  It was, your Honor.  In 1991 the FDA sought comment on proposed rulemaking.  And after the two plus years of comment period, the FDA came back and said, look, after the two years of give and take that we've had, we are not implementing rulemaking here.  They specifically say it in the Federal Register note, we are not undertaking rulemaking at this time.  They recognized the fact that it's confusing.  They recognized the fact that it's misleading.  But they specifically state because they're understaffed, because they're underfunded, they're not undertaking rulemaking.  Instead what they say is we're going to defer to the policy, the informal policy that we've had in place and that we follow that just says, hey, look, you know, if it's minimally

processed, that's fine.

You know, an interesting point, your Honor, defendants have argued that, look, now all of a sudden we're going to have these new requirements cast upon us and it's going to throw our business policy and business model in place after we've been following it for years.  The fact of the matter is, your Honor, just as they allege and say that my client has the right to go to the FDA, before they put their product on the market, they had the ability to go to the FDA and say, hey, look, here's the product that we're going to market and this is how we want to market.  What's your thought?  Do you think that it would be okay for us to do that?  They never did it. And one of the reasons that they don't do it, your Honor, is because they can take advantage of the loophole that's here, they can get out in the market and they can make themselves millions and millions and millions of dollars at the cost of New Jersey consumers knowing that the FDA is not going to turn around and slap them on the wrist for doing something that's improper and deceptive.

From an implied preemption standpoint, your Honor, just to further hit upon why from an implied preemption standpoint this case does not warrant dismissal due to preemption.  If you take a look at other cases where implied preemption has been -- has resulted in the dismissal of a case, it's because there were specific regulations that were in place.  The Geier

vs. American Honda case is a good example.  The government, from an auto manufacturer's standpoint, had provided four or five different options that an auto manufacturer could follow from a seatbelt and safety standpoint.  They said as long as you abide by one of these four or five different options, you meet the requirements of the federal government of the National Highway and Traffic Safety Administration.  Plaintiff filed a suit saying, Honda, you chose the least of the four safety requirements that have been put forth by the federal government, and because of that we feel that you're liable. And the court stepped in and said, look, the auto manufacturer satisfied the federal requirements by choosing one of the four, it doesn't matter which one of the four, and you can't say that because he chose one of the four as compared to another one he's liable to you, your claim is preempted.  We are not dealing with that here because we don't have any regulations in place that plaintiff is looking to have this court change or circumvented in any way.

Your Honor, unless you have questions right now in regard to the issue of preemption or the issue of primary jurisdiction, I'll move on and I'll address the points that were raised as far as the Consumer Fraud Act, unjust enrichment, and warranty claims.

THE COURT:  I had just a couple questions.  The defendant claims a long-standing policy of the FDA to permit

HFCS to be described as natural and that there was a reliance placed upon that over the years, and then this lawsuit comes along and seeks damages going back six years.  My question isn't about damages, but it's about whether you would agree that the FDA has a long-standing permissiveness toward high fructose corn syrup and that that would be an argument in the defendant's favor of conflict preemption?

MR. LAPINSKI:  Your Honor, I understand your point, and I would disagree that it would be an argument in favor of defendants for the following reason.  If there's a police officer who's parked on the highway and I drive down that highway every day and the speed limit is 55 miles an hour and I know that that police officer who is a state police officer never pulls me over when I'm doing 70 miles, that's 15 miles over the speed limit, but then one day a local or county police officer is parked out there and that local or county police officer decides to pull me over at 70 miles an hour, it's no -- it's no defense for me to be able to say, hey, look, I was never pulled over by the state guy before even though I was breaking the law, you can't pull me over, because it can.  And in this situation it even goes further away because there was no regulation.  And the permissiveness by the FDA, that permissiveness does not, in and of itself, create rulemaking.  And the defendant can be subject, your Honor, to both state law requirements and to federal

rulemaking requirements to the extent that they're in place. And even if they did have rulemaking in place and regulations in place, which they don't, there's no conflict between them because there isn't -- there isn't a specific -- there is no specific rulemaking that says here, here's what natural is. So there is no conflict there from a conflict preemption standpoint. And, as I said earlier, your Honor, the perfect example as to why there's no conflict preemption, is because tomorrow the defendant can remove the term natural and all natural from their products and they would still be in compliance with FDA regulations.

THE COURT: I think you mentioned that the Holk case is on appeal.

MR. LAPINSKI: Yes, your Honor.

THE COURT: Does the appeal present the same issues that I'm confronting today with regard to preemption?

MR. LAPINSKI: Yes, your Honor, I believe that it does.

THE COURT: Would it be wise for me to wait until the Third Circuit speaks to that issue? I assume the briefing is underway in Holk and it generally doesn't take too long.

MR. LAPINSKI: Yes, your Honor, the briefing is underway in Holk. Appellant is scheduled to submit a reply brief on, I believe, March 9th, and briefing will be completed in the Holk matter. So to the extent that you yourself wanted

to await a decision in Holk, I leave that to your discretion. Judge Schneider, in managing the discovery amongst the parties, has taken the position that he's aware of Holk, he's aware of what's going on in the Third Circuit, and he's aware of this case as well and he's allowed discovery to proceed, and I think that that was an appropriate decision on his part. So to the extent that you wish to withhold your opinion until the decision in Holk, you know, we're able to continue to move forward with discovery and we're able to move our case forward.  And I think that's the important thing from our standpoint.

A final point that I would bring up in regard to the issue of preemption, your Honor, is that defendant mentioned the fact that there is a case proceeding in Florida and there's also a case proceeding in California.  What defendants did not tell you, however, was that the California case, which is Hitt vs. Arizona Beverage, there was a motion to dismiss pending in that case.  That motion to dismiss was denied.  And significantly, although I'm aware of the fact that the Hitt case is not binding upon this Court, the analysis undertaken by the district court in the Hitt case relies on U.S. Supreme Court cases and also relies upon Third Circuit cases in coming to the determination that federal preemption does not apply in this particular situation.

There was also a second California case that dealt with

the issue of all natural that was recently decided, and that was a case that involved the manufacturer of a pasta sauce. And the manufacturer of the pasta sauce marketed their pasta as an all natural product, although it contained high fructose corn syrup. And similar to the <u>Hitt</u> California case, the district court determined that federal preemption did not apply to that case. And the cite for that case, your Honor, is <u>Lockwood vs. Conagra Foods Incorporated</u>. And I actually, I don't have a LEXIS or WestLaw cite, your Honor, I apologize for that, because the decision just came down at the end of the January, but it is a Northern District of California case, Docket Number 08-cv-4151.

THE COURT:  Thanks for bringing that to my attention.

MR. LAPINSKI:  Unless you have other questions, your Honor, I'll move on to the issue of plaintiff's claims of consumer fraud and why we don't feel dismissal is appropriate here.

THE COURT:  Very well.  What about warranty, do you have any objection to the dismissal of the warranty count?  I don't see it addressed in your papers?

MR. LAPINSKI:  The express or the implied warranty claims, your Honor, or both?

THE COURT:  Is there a difference in your view?

MR. LAPINSKI:  Yeah, what I would say with regard to express warranty is that defendants did breach their express

warranty.  They warranted their product as an all natural product.  They expressly said in their marketing and advertising that this product was all natural and it was not an all natural product, they therefore breached their express warranty.

From an implied warranty standpoint, I think defendant's argument misses the mark.  Defendant's argument states that, look, plaintiff purchased -- wanted to buy ice tea.  She bought ice tea.  Therefore, she got what she wanted. There's no breach of the implied warranty of merchantability. But that's not what we're dealing with here.  What we're dealing with here is that plaintiff wanted to purchase an all natural ice tea product, and she purchased what she thought was an all natural ice tea product and she did not get what she bargained for.  The goods, pursuant to N.J.S.A. 12A:2-314, goods to be merchantable must be at least as such as they conform to the promises or affirmations of fact made on the container or label, if any.  This product did not conform to the promises or affirmations.  It was promised it would be an all natural beverage and in fact it was not an all natural beverage.  In the case of Hoyte vs. Yum! Brands, which we cited in our opposition, that case held that in order to state a claim for breach of implied warranty of merchantability, the plaintiff must demonstrate that the offensive object or substance in the food is not one that a consumer would

reasonably expect to find.  And, your Honor, we argue that in an all natural product, a reasonable consumer would not expect to find an unnatural ingredient in a product that is held out to be all natural.

Also, from a notice standpoint, defendants raise the issue that, you know, this claim needs to be dismissed because notice is required.  However, notice is not required.  And to the extent that it is, that notice requirement is satisfied by the filing of a complaint.  If you, and I'll refer the Court to Elias vs. Youngers Food Product, 252 F.R.D. 233, and in that case, which was a class action, and it was dealing with food labeling where food was labeled as having specific fat and calorie content when in fact the fat and calorie content were much higher, the court in a class certification decision said, in addition, plaintiffs need not give notice of the breach against a manufacturer who was not the immediate seller of the product and, in any event, a civil complaint would satisfy any such notice requirements.  And it also cites a Strzakowlski case, that's 2005 WestLaw 2001912 at Page 3.  So to the extent that notice was required, your Honor, the filing of the complaint provides adequate notice under New Jersey law.

Now, from a Consumer Fraud Act standpoint, your Honor, a couple different points I want to want to hit on.  First of all, defendants brought up --

THE COURT: Well, if that were true, then why have a notice provision at all if you can just sue someone? I thought that the way you described the Elias case, that's saying notice isn't required against a manufacturer, that's what the court was deciding. Well, here it's notice against the -- well, strike that. I guess you're arguing that this defendant is the manufacturer of the product your client brought. This manufacturer isn't the seller, it's not Wawa as alleged in the complaint. Right?

MR. LAPINSKI: That's correct. The seller of the product is your supermarket, your convenience store, your deli. The defendants in this case are the manufacturers of the product.

THE COURT: Okay.

MR. LAPINSKI: Now, from a Consumer Fraud Act standpoint, your Honor, the first point I would like to bring up is the issue of heightened pleading requirements. And defendants argue that plaintiff's case should be dismissed because they failed to satisfy the Rule 9(b) heightened pleading requirements. And I would argue that Rule 9(b) pleading requirements are not necessary in this type of case where plaintiff has not alleged fraud. This is a Consumer Fraud Act claim where plaintiffs have alleged false, deceptive and misleading claims, not that defendant's committed fraud. In the Solo vs. Bed, Bath and Beyond case, is an example of

the type of situation we're dealing with here.  And in that case the Rule 8 pleading standards were applied to a CFA claim where the plaintiff alleged misrepresentations but not specific allegations of frauds.

Having said that, to the extent that the Court were to find that the Rule 9(b) pleading requirements were necessary in this particular case, plaintiffs have satisfied those pleading requirements.  Seville Industrial Machinery Corporation vs. Southmost Machinery Corporation, that case provided, from a Rule 9(b) standpoint, the complaint must be able to set out the who, what, where, when, and how for the purpose of putting the defendants on notice as to the precise misconduct surrounding the allegations.  I would also refer to the South Broward Hospital District case, which is South Broward Hospital District vs. MedQuist Incorporated, 516 F. Supp. 2d 370 for the same premise.

THE COURT:  That's my case.

MR. LAPINSKI:  I'm sorry?

THE COURT:  That's my case.

MR. LAPINSKI:  Okay.  And the elements of the Consumer Fraud Act have been properly pled here.  The unlawful -- I'm sorry.  From a Rule 9(b) standpoint, plaintiff has alleged the who, who was responsible.  Defendants. They've alleged the what, the intentional -- I'm sorry. Strike that, because we didn't allege intentional mislabeling.

But the deception, false and misleading claims of all natural that were contained in defendant's marketing and advertising. The where, we specifically alleged that the product labels contained all natural. We also specifically alleged when and where the product was purchased. And we also allege how the product was false and misleading in that it's marketed as an all natural product and it contains ingredients that are not all natural. So from a 9(b) standpoint, I feel we've satisfied the pleading requirement.

Plaintiff has also properly alleged the elements of the Consumer Fraud Act. Alleged unlawful conduct, and that's the false and misleading marketing, advertising, and promotion of the beverage as all natural when it contains high fructose corn syrup and other unnatural ingredients.

We've also properly alleged ascertainable loss. We properly alleged in the complaint that the plaintiff paid a premium price for the product. That the plaintiff did not get what she paid for and received something less. That she would not have purchased the product had she known the truth. The Solo case states the ascertainable loss -- it's an ascertainable loss when the consumer receives less than what was promises. The case of Franulovic vs. Coca-Cola says that consumer received -- it's an ascertainable loss when a consumer receives less than what was promised and different from what they reasonably expected. And the case of Talalai

vs. Cooper Tire and Rubber Company found ascertainable loss when a product fails to measure up, the consumer has been injured.

Now, defendant's argument regarding fraud on the market is premature, your Honor.  The defendant arguing the case has to be dismissed because we failed to allege ascertainable loss because our theory is based on fraud on the market is premature.  The case that they rely upon the Merck case, the International Union of Operating Engineers, that decision was entered after the appeal of a class certification decision. Discovery had already taken place.  Plaintiffs had put their experts forward and the experts that they put forward posited a fraud on the market theory for the ascertainable loss.  We just started discovery.  We haven't yet produced -- we haven't yet produced any information any information as far as what our theory on damages will be and how we're going to go about proving damages.

THE COURT:  What does your initial disclosure say about the reckoning of damages?

MR. LAPINSKI:  The initial disclosures and the initial discovery indicated that plaintiff paid a premium price for the product.  We're in the process of supplementing discovery.  So to the extent that I don't have the discovery in front of me, to the extent that the discovery does not state upon supplementing the discovery, the discovery will

state paid a premium price for the product, she did not get what she bargained for, she received something less, and that she wouldn't have purchased the product had she known the truth, from an ascertainable law standpoint, that satisfies the burden from a motion to dismiss.

Now, if defendants want to come back after discovery and after we've put forward our damages model and then challenge by way of summary judgment motion whether or not the case can move forward, then I think that's the appropriate time to do so. But defendants trying to determine and read where we're going with the case is inappropriate for a motion to dismiss standpoint.

What I would also say, your Honor, is that this case is distinguishable from the International Union of Operating Engineers case from the following standpoint. The fraud on the market theory in that case was that there was a market for this drug, this individual drug, and this individual drug was marketed improperly thereby creating an additional premium market for that drug. And if not for the fraud committed by the defendants, the price would not have increased. So the focus there is on the individual drug and it's on the action the defendants took in order to fraudulently increase the price of the drug. I think that case is distinguishable from the present case from the following standpoint: Studies show that industry wide, individuals are willing to pay a premium

price for a product that is marketed as natural. And the fact that it is industry wide, not focused on a single product, eliminates that fraud on the market theory because the fraud on the market theory assumes that it's defendants who are creating the groundswell to create the premium price.

In this particular situation, studies show that the premium price has already been created because the inherent thought that products that are natural are more wholesome and better for you, people are willing to pay for it. There's studies that show that's exactly the case, so the premium already exists in the market regardless of defendant's actions. What defendants have done, is they've taken advantage of that existing premium and marketed their product as natural in order to benefit from that premium that comes along with it. So that's how I would distinguish it from the International Operators case.

Finally, from a consumer fraud standpoint, plaintiffs have adequately alleged the causal nexus. Plaintiff alleged that she would not have purchased the product had she known the truth, and nothing more is required from a causal nexus standpoint.

Now, as far as unjust enrichment is concerned, your Honor, at the pleading stage on a motion to dismiss, plaintiffs have the right to be able to plead in the alternative. And from an unjust enrichment standpoint, the

plaintiff only needs to allege that the defendants received the benefit and that retention of the benefit by defendants would be inequitable.  And that's what we allege in the complaint, that we paid for a product and the product was less than what we had bargained for and would be inequitable for the defendant to retain the unjust profits they received due to their false and misleading marketing.

And we already addressed the breach of warranty issues, your Honor.  So unless the Court has any questions, I'm all set.

THE COURT:  On unjust enrichment, why would it be just to take the profits from a well-established product and redistribute them to the consumers under this situation where there had been no notice or complaint until 2008?

MR. LAPINSKI:  Why would it be just, your Honor?

THE COURT:  Yes.

MR. LAPINSKI:  It would be just because for the last six years that this complaint would entail, those profits have been derived through false, misleading and deceptive marketing programs.  To not disgorge the profits would create an unjust situation.  A situation where a manufacturer of a product could mislead the consuming public and not be held accountable for it and be able to retain the unjust profits received.

THE COURT:  Is there some way ultimately to determine what percentage of the profits came from labeling this as

natural versus the percentage of the profits that came from other reasons?

MR. LAPINSKI:  Your Honor, I believe that that gets into a damages model standpoint.  And, yes, we will use expert testimony and material that's publicly available to show that, yes, you can determine how much of a premium the use of the term natural brings to a product in order to be able to determine just how unjustly enriched, how much money defendants were able to obtain through their false and deceptive practices.

THE COURT:  The reason I ask the question is because it is a higher standard of damages under the Consumer Fraud Act, ascertainable loss means more than just loss.  But we are not there yet.  You're saying that in due time you predict that there will be a model that will be in play in this litigation that will enable you to stake your claim to a particular dollar amount of what the ascertainable loss is.

MR. LAPINSKI:  That's correct, your Honor.  And as I had also said, at this particular stage plaintiff has the right to be able to plead in the alternative to the extent there are damages available to the plaintiff by way of Consumer Fraud Act, that still doesn't preclude us to seek damages by way of unjust enrichment at this particular stage.

THE COURT:  Okay.

MR. LAPINSKI:  Thank you very much, your Honor.

THE COURT:  Thank you, Mr. Lapinski.

Mr. Donovan?

MR. DONOVAN:  I'll be as brief as I can, your Honor. Thanks for indulging us.

I wanted to bring to the Court's attention that, frankly, the defendants are kind of dealing with a moving target here with respect to this July 3rd letter.

In opposing the stay, there was a stay of discovery in this case, Judge, that Judge Schneider asked the defendants to file a motion to continue.  I was not successful in part because the plaintiffs raised -- the plaintiffs raised the issue of the July 3rd letter, which they characterized, your Honor, this is their characterization, the importance of that letter, which is not an official action by the FDA and is not a regulations is twofold:  It allows a manufacturer, like Arizona, that would be the defendant, your Honor, to confirm whether or not the HFCS it uses conforms with the guidelines and, two, it implicitly confirms that there are some methods of producing HFCS that would not be considered natural.  So, obviously, it confirms some that are not and some that are. That's what the plaintiffs said, your Honor.

I invite your Honor to obviously read the July 3rd letter.  And without belaboring the entire entirety of it, it does refer to the fact that it is applying a long-standing policy to look at this term natural on a case by case basis.

This is evidence that they're in the field, your Honor.  The plaintiff has conceded that it's evidence that they're from the field.

Now, with respect to the conflict, Judge, you know, analogies are sticky things.  The analogy of the 55 mile an hour, I prosecute locally in New Jersey and I can tell you that the analogy that I see that if someone is driving down a road 55 miles an hour and it's 55 miles an hour posted, they're implying.  What the plaintiff is trying to do is change the speed limit even though it's posted 55 miles an hour.  Our client has complied with this long-standing policy.  The plaintiff is saying there's no conflict.  Oh, there's no conflict because you can remove the name all natural.  Yeah, at a price, Judge.  At a price.  Because the only reason they're saying to do it is because it's violative of the law.  Violative of consumer fraud.  Violative of breach of warranty.  That is why there is a conflict, your Honor.

With respect to primary jurisdiction, again I don't want to belabor the point, but the expertise and the highly technical issues, I invite the Court to look at the complaint, and some of the discovery the defendants are going to have to respond to on the technical aspects of HFCS manufacturing, whether there's enzymes, whether there's acids, whether there's enzymolysis.  These are highly technical issues, your Honor, that the FDA, without doubt, has the expertise on,

there's no disputing that, and has asserted authority over the issue as evidenced in policy, which is a formal policy, Judge, and acted pursuant to notice and comment.

With respect to the issue, as I understand it --

THE COURT:  Well, I actually had some questions about that aspect of the letter, I'm glad you bring it up.  There is some line drawing in the letter, it says we won't object to A but we would object if it was B or C, and we read your Corn Refiners Association as defining a process if it's within A. And the first exception is a product containing HFCS that has a synthetic substance, which is a synthetic fixing agent included or added to it.  And the second exception, which they would object to, is a product containing HFCS if the acids used to obtain the starch hydrolysate do not fit within our policy of natural stated above.

Now, your client is just a beverage manufacturer, is that right?

MR. DONOVAN:  My client does not manufacture the beverage.  They have third party co-packers, your Honor.  They design the product in terms of the flavoring and such but they don't make the product.

THE COURT:  Okay.  Even more so.  Then is your client in a position to say what process it is that yields the corn syrup that's being used in the product?

MR. DONOVAN:  With respect to HFCS suppliers, the

information they received from them and their understanding on the regulations being, this policy rather, and it being derived from corn and not being an artificial flavor and not being a natural flavor, they are, Judge.  So notwithstanding the fact that they're not making the product, certainly with respect to, if I understand, your Honor, correctly, this letter obviously was written to the Corn Refiners Association, which are the HFCS manufacturers, they are the manufacturers, members of that trade group are the manufacturers that supply the HFCS that we, that the defendants use in their products. I don't know if that answers your question or not.

THE COURT:  Well, it seems like out there in the real world there's some HFCS's that would conform with the definition of natural under this policy, if it is a policy, and there's some ways of making HFCS that would not conform to this.  I'm simply asking that, because your client isn't the maker of the HFCS, whether it's in possession of sufficient knowledge to be sure which side of the line the product falls onto or do we perhaps need to have other parties brought in, like your suppliers, to answer that question with reliability.

MR. DONOVAN:  Judge, in the event, as discovery proceeds with respect to the HFCS suppliers, there obviously, as I understand it, plaintiff is going to depose them with respect to that issue.  My understanding, Judge, this is just my understanding, is that all of the HFCS supplied to the

defendants complies with this long-standing policy as evidenced in the FDA policy and as applied in the July 3rd letter.  I'm not aware of any HFCS that does not, but I'm not saying that there isn't.  But certainly with respect to my client, we, as I said, we've supplied letters in discovery which are probative, if not dispositive, of the fact that the July 3rd letter, or the manufacturing policy, or manufacturing process I should say, your Honor, as outlined in the letter, our HFCS complies with that manufacturing process.  And, hence, the FDA would not object to the reference of natural as that policy is applied to our client's product.

Judge, with respect to the issue of natural flavor and sweetener, which early on in my adversary's oral argument, your Honor, addressed, we will happily if your Honor is so inclined, if you want a supplement brief on that regulatory issue as to whether it matters, whether it, you know -- as a matter of fact, I think HFCS is regulated.  There are regulations that deal with HFCS.  There are regulations that deal with that.  And to address the issue of flavoring and sweetener, if your Honor would like, that may help the Court.

THE COURT:  I think that I would like.  And that was one of the things I was going to review with both counsel is whether you would like an opportunity to briefly address this extra point that has emerged at argument today about whether HFCS is a sweetener or a flavoring.

MR. DONOVAN:  We would be happy to do that, Judge.

THE COURT:  Okay.  Would you want to go first?

MR. DONOVAN:  Sure.

THE COURT:  How much time would you need?

MR. DONOVAN:  Ten days would be fine, Judge.

THE COURT:  Okay.  And, Mr. Lapinski, would you like an opportunity to submit something after you receive that?

MR. LAPINSKI:  Yes, I believe I would, your Honor. If I could have ten days following submission, I would appreciate that.

THE COURT:  All right.  That's reasonable.  So I'm just requesting in supplemental briefing, it can be informal in the form of a letter, that addresses this single point of whether HFCS should be categorized as a sweetener or a flavoring and whether it matters.

MR. DONOVAN:  With respect to California case, that was the Hitt case, I was present during oral argument and did the motions.  Opposing counsel's correct, the motion was denied, it's an interlocutory motion.  However, the court raised in oral argument Holk but did not apply Holk.  I would say that's significant in the event that Holk is affirmed on Third Circuit that the Court would be inclined to visit, revisit that issue with respect to the Hitt case.

THE COURT:  Let me ask you the same question I asked Mr. Lapinski.  Should I stay this case until the Third Circuit

speaks to Holk?

MR. DONOVAN:  Yes, Judge, I think we should stay. I've said that at a Rule 16 conference and the case was stayed, and then I was ordered to try to continue that stay, I was unsuccessful.  In the interest of judicial economy and judicial expediency, we obviously disagree, not surprisingly, with opposing counsel's view of Holk, we think it's well-reasoned.  We think it will be affirmed.  Regardless of that, there's no dispute that that's dispositive of this case.

This is a very unique case in one sense, at least in my perspective, Judge, perhaps not yours.  There's no disputing that Holk is on all fours with our case.  It's the same complaint and the same issues on a threshold issue of jurisdiction of this Court.  So in the interest of judicial expediency and judicial economy, we do think that this matter should be administratively stayed, especially since we'd probably only be dealing with three or four months before a decision is rendered.

Thank you, Judge.

MR. LAPINSKI:  Your Honor, if I could just be heard for a second on the last point brought up?

THE COURT:  Yes.

MR. LAPINSKI:  The only point that I would bring up in regard to a stay pending a decision in Holk, is that that matter was already fully briefed and argued before Judge

Schneider and Judge Schneider found that it was in the best interest of the case not to stay the case but to move the case forward through discovery pending your decision on the motion to dismiss, pending a decision by the Third Circuit in Holk. And what I would say, your Honor, is that if it's a decision on your part to hold off on rendering an opinion on the motion to dismiss until the Holk matter is determined, then I think that, you know, we would be in agreement with that.  However, to the extent that there's consideration to stay the entire action pending a decision in Holk, that matter's already been fully briefed, already argued, and a decision has already been entered by Judge Schneider in that regard.

THE COURT:  Well, if it's going to be a matter of three to six months, would the plaintiff lose anything by foregoing discovery during that period of time if there may be a dispositive determination that's going to be binding on all of us?

MR. LAPINSKI:  Your Honor, that's an assumption again that's going to be three to six months.  We don't know what the exact time frame is going to be.  This case has already been on the docket approaching nearly a year now and we're just now at the point where initial discovery requests have been served and responded to and we're in the process of supplementing those requests.  So I think that plaintiff is prejudiced to the extent the action is stayed pending some

type of decision in Holk.  And again, that exact point was raised in briefing before Judge Schneider and argued before Judge Schneider, and Judge Schneider found it was in the best interests of the case to move it forward.  Discovery at this standpoint has been limited to issues of class certification with the recognition there would be some merits overlap with the class certification discovery.  And so I think that the scheduling order that has been put in place by Judge Schneider is well-reasoned and based upon briefing and oral argument.

And again, just in regard to the amount of time that we're looking at from a stay, briefing will be complete in Holk following the first week in March, however, there's no oral argument that's been scheduled in Holk.  Because there's no oral argument, we have no way of being able to determine just how long it's going to be until oral argument and until a decision following oral argument in that matter.

So my position, just to reiterate, your Honor, I would support a decision on your part to hold off on rendering an opinion on the motion to dismiss until Holk, but I don't think that we should be put in a situation where a stay is put in place after Judge Schneider has been exposed to full briefing on the matter, oral argument on the matter, and has entered a decision not to stay the case in the matter.

MR. DONOVAN:  Judge, if I --

THE COURT:  What's to be gained jurisprudentially by

my simply jumping in with a decision now that will either say I agree with Holk or disagree willing Holk when the whole matter is before the Third Circuit?

MR. LAPINSKI:  Your Honor, I don't know that there is anything to be gained, and that's why I said that I wouldn't be at odds with your decision to hold off on entering an opinion on the motion to dismiss until Holk is decided.

THE COURT:  But if I do so, then why should not discovery be stayed as well?  I mean, are there witnesses that may die or claims that we dissipate somehow by the passage of time by deferring discovery?

MR. LAPINSKI:  I don't think that there are those extremes.  However, I also don't feel that defendant has satisfied their burden of showing that a stay would be appropriate in this particular action.  My client should not have to sit on the sidelines and wait while the decision in the Third Circuit is made in a totally different case.  My client has a right to be able to push her case forward and to undergo discovery.

THE COURT:  Well, is this a totally different case? I haven't read the complaint, but counsel said that it's identical to the complaint here.

MR. LAPINSKI:  In Holk, it's nearly, it is nearly identical, your Honor, there are significant similarities. And the Holk decision will have an impact on what the ultimate

decision is in this court. But as far as a stay is concerned, your Honor, one of the reasons that a court would look to put a stay in place would be because it's prejudicial and burdensome to the defendants to move forward with the case. Defendants are not being prejudiced and the defendants are not being burden by us moving forward with the case because the matter is moving forward in California, discovery is going to be taking place in California, this is all moving forward from California. So whatever is being done in California is the same type of stuff that's being done here so there is no burden that the defendants are experiencing. And that's one of the reasons that Judge Schneider entered the Opinion that he did and denied the motion to stay because he recognized the fact that the Covington case in Florida was proceeding with discovery. Now the case in California, the Hitt case, now that the motion to dismiss has been denied, that case is moving forward with discovery. And that's one of the reasons Judge Schneider refused to enter a stay in this action, because it wasn't significant prejudice and it wasn't burdensome to defendants. And the defendants submitted declarations and they submitted briefs trying to establish the fact that discovery limited to class certification would be burdensome and Judge Schneider didn't see a burden. In his oral argument -- in his decision that he read from the bench, he said the defendants would not be burdened. And I think

that the important thing we have to look at here, is that the person that's being burdened is my client by not being able to push her case forward.  Defendants aren't burdened by it.

MR. DONOVAN:  Your Honor, if I may?

THE COURT:  Yes.

MR. DONOVAN:  Although the California court and the Florida court may well apply Fellner and Holk.  If and when its affirmed, this Court, obviously, Third Circuit does apply so Holk is dispositive of this appeal with respect to the issues presented.  There's no disputing that.  And in the interest of judicial economy, again there's prejudice to my client, Judge.  All the discovery's coming virtually -- nearly all the discovery is coming from my client.  I don't want to belabor the Court with all the issues, manufacturing, processing, sales figures, all -- going back six years.  And, obviously, also one of the -- again, one of the issues addressed is they do already have some preliminary discovery. But as we march along, it's going to get even more burdensome for my client, Judge, costly and intrusive.  And just in terms of weighing the scales, it tips, we submit, substantially in favor of some judicial economy and judicial expedience would favor a brief stay while Holk is being decided.  And again, it's on all fours with this case, your Honor.

THE COURT:  Let's complete the supplemental briefing that we talked about.  The matter of a stay of discovery has

previously been presented to Judge Schneider, there's not an appeal from that determination before me.  If I were of a mind that he should take a second look at this, then I could remand that issue to him to take a second look at that.  But it sounds like the parties are in agreement that they would not oppose the Court staying a decision on this dispositive motion pending action by the Third Circuit.  I don't know why it didn't occur to me before this weekend that that might be a wise course, but the more I think about it the wiser I think that it is.

MR. DONOVAN:  Your Honor, if I may, on the issue of the stay, can we address that to your Honor by way of a letter or in a brief?

THE COURT:  No, I think it's more orderly and at least more in tune with my judicial philosophy of respecting a magistrate judge's decision, that I'm not going to second guess absent an appeal or some drastic change.  But I would want to give him a second opportunity to look at it in light of this stay.

I think that's what I'll do, that I am going to reserve decision upon these motions, but I'm going to stay my decision on these motions pending the Third Circuit's decision in Holk and refer the matter to Judge Schneider to convene a telephone conference where you can readdress this issue of whether there should be an overall stay.

MR. DONOVAN:  We can revisit the issue of an appeal, rather a stay with Judge Schneider, your Honor?

THE COURT:  Yes.

MR. DONOVAN:  Thank you.

THE COURT:  So I'll enter an Order to that effect within a couple of days.

I'd still like the supplemental briefing, unless someone feels strongly that that issue should be stayed, but I would like to bring this record to a conclusion.

MR. LAPINSKI:  We're fine with that, your Honor.

MR. DONOVAN:  Your Honor, you just want on that issue only, not on primary jurisdiction or anything else.

THE COURT:  It's always tempting to ask for more. The question that I had, that I wasn't sure either side had an answer to, whether there are any examples that you're aware of that the FDA has accepted primary jurisdiction referral from a federal district court and acted on it or failed to act on it. In other words, what's the FDA's track record in the area of primary jurisdiction?  Maybe there's an article I can find as quick as you, I just don't know the answer.

MR. DONOVAN:  We can address that, your Honor, very briefly.

THE COURT:  Okay.  Any objection?

MR. LAPINSKI:  Your Honor, I would just state that the issue of primary jurisdiction is already been full

briefed.  To the extent the defendants are going to submit some type of supplemental briefing, we would just like the opportunity to file a reply to it.

THE COURT:  Very well, I'll permit that.  And the issue is the FDA's track record in the area of primary jurisdiction.  In other words, I'm not asking for legal argument about what triggers a referral for primary jurisdiction, you've already covered that excellent on either side.

MR. DONOVAN:  Real world examples, your Honor, correct?

THE COURT:  Yes, if there are.

MR. DONOVAN:  Thank you, your Honor.

THE COURT:  I would like to commend both counsel on both sides for excellent briefing and excellent arguments this morning, I find this a very interesting set of issues.  And I hope for all of our sakes there will be some clarity that emerges.  Thanks.

MR. LAPINSKI:  Thank you very much, your Honor.

MR. DONOVAN:  Thank you, your Honor.

MR. TORTORETI:  Thank you, your Honor.

MS. CLOAD:  Thank you.

THE COURT:  Court's adjourned.

(Proceedings Concluded.)

| 0 |
| --- |

**08-2797** [2] - 1:7, 2:9
**08-cv-4151** [1] - 47:12
**08101** [1] - 1:13

| 1 |
| --- |

**100** [2] - 4:23, 20:9
**101.22** [2] - 6:5, 10:12
**110** [1] - 36:19
**12A:2-314** [1] - 48:15
**1492** [1] - 1:25
**15** [1] - 44:14
**15-year** [2] - 7:16, 7:17
**16** [2] - 13:10, 64:3
**1963** [1] - 36:21
**1976** [1] - 25:2
**1983** [1] - 25:19
**1988** [2] - 21:20, 28:14
**1991** [2] - 33:2, 41:13
**1993** [4] - 7:17, 33:3, 39:7, 41:9
**1996** [2] - 25:6, 25:7

| 2 |
| --- |

**2** [1] - 4:22
**20** [6] - 22:5, 25:18, 28:9, 29:1, 29:7, 31:2
**20-year** [1] - 22:20
**2001912** [1] - 49:19
**2002** [1] - 31:23
**2005** [1] - 49:19
**2008** [8] - 13:10, 14:18, 26:6, 26:15, 37:2, 39:22, 40:1, 56:14
**2009** [2] - 1:13, 8:16
**21** [4] - 5:7, 6:5, 38:12, 38:13
**23** [2] - 1:13, 19:11
**23-ounce** [2] - 19:9, 19:10
**2302** [1] - 5:18
**233** [1] - 49:10
**2407** [2] - 5:18, 6:18
**25-year** [1] - 28:9
**252** [1] - 49:10
**2d** [1] - 51:16

| 3 |
| --- |

**3** [3] - 8:16, 40:1, 49:19
**343(k** [2] - 5:11, 38:1
**343(k)** [1] - 5:11
**343-1** [3] - 5:7, 38:12, 38:13
**370** [1] - 51:16
**3rd** [22] - 8:23, 12:8, 12:10, 12:19, 12:24, 13:6, 16:25, 25:24, 26:1, 26:4, 26:23, 27:13, 29:14, 39:19, 40:4, 40:10, 40:11, 58:7, 58:12, 58:22, 62:2,

62:7

| 4 |
| --- |

**4TH** [1] - 1:12

| 5 |
| --- |

**50** [2] - 9:7, 9:17
**51** [1] - 31:23
**516** [1] - 51:15
**537** [1] - 31:23
**55** [5] - 44:12, 59:5, 59:8, 59:10
**58** [1] - 5:17

| 7 |
| --- |

**70** [2] - 44:14, 44:17
**79** [1] - 20:11

| 8 |
| --- |

**8** [1] - 51:2
**846** [1] - 24:23
**848** [1] - 24:24

| 9 |
| --- |

**9** [1] - 25:7
**9(b** [6] - 50:19, 50:20, 51:6, 51:10, 51:22, 52:8
**99** [4] - 19:11, 20:11, 20:12
**9th** [1] - 45:24

| A |
| --- |

**abide** [2] - 33:22, 43:5
**ability** [2] - 17:12, 42:9
**able** [19] - 21:25, 22:1, 22:2, 22:10, 24:5, 32:12, 40:19, 44:18, 46:8, 46:9, 51:11, 55:24, 56:23, 57:7, 57:9, 57:20, 66:14, 67:18, 69:2
**absence** [2] - 14:8, 18:19
**absent** [1] - 70:17
**absolutely** [3] - 6:23, 7:4, 37:19
**accept** [1] - 11:25
**accepted** [1] - 71:16
**accorded** [1] - 14:6
**accountable** [1] - 56:22
**acids** [2] - 59:23, 60:13
**act** [16] - 4:1, 5:23, 5:25, 12:1, 15:16, 15:17, 25:21, 30:21, 31:4, 31:9, 31:19, 31:25, 32:4, 32:7, 36:15, 71:17
**Act** [16] - 3:25, 9:14, 19:5, 20:4, 30:10, 37:10, 37:14, 37:17, 43:22, 49:23, 50:15, 50:23, 51:21, 52:11, 57:13,

57:22
**acted** [4] - 16:24, 31:4, 60:3, 71:17
**ACTION** [1] - 1:6
**action** [18] - 17:12, 21:14, 21:19, 22:19, 22:22, 24:9, 25:14, 30:4, 31:10, 32:14, 49:11, 54:21, 58:14, 65:10, 65:25, 67:15, 68:18, 70:7
**actions** [2] - 39:4, 55:12
**acts** [1] - 30:7
**added** [4] - 6:4, 6:10, 10:3, 60:12
**addition** [4] - 18:12, 25:1, 32:25, 49:15
**additional** [3] - 26:20, 39:13, 54:18
**Additionally** [1] - 6:8
**additives** [1] - 10:9
**address** [11] - 18:3, 21:7, 21:25, 24:5, 32:12, 32:13, 43:21, 62:19, 62:23, 70:12, 71:21
**addressed** [5] - 31:24, 47:20, 56:8, 62:14, 69:17
**addresses** [1] - 63:13
**adds** [1] - 11:2
**adequate** [1] - 49:21
**adequately** [1] - 55:18
**adjourned** [1] - 72:23
**adjudication** [2] - 4:12
**administration** [3] - 22:11, 22:12, 22:17
**Administration** [1] - 43:7
**administrations** [1] - 22:21
**administrative** [1] - 23:7
**administratively** [1] - 64:16
**advantage** [2] - 42:14, 55:13
**adversarial** [2] - 40:6, 40:18
**adversary's** [1] - 62:13
**advertising** [5] - 36:9, 38:7, 48:3, 52:2, 52:12
**affirmations** [2] - 48:17, 48:19
**affirmed** [3] - 63:21, 64:8, 69:8
**agencies** [1] - 23:7
**agency** [16] - 6:2, 6:8, 6:19, 13:19, 14:3, 16:15, 24:20, 25:4, 25:18, 28:22, 28:24, 30:18, 30:20, 30:21, 32:1, 39:15
**agency's** [3] - 25:16, 25:18, 29:15
**agent** [1] - 60:11
**agent's** [1] - 13:23
**ago** [1] - 36:19
**agree** [2] - 44:4, 67:2
**agreement** [2] - 65:8, 70:5
**ahead** [1] - 7:11
**air** [1] - 20:19
**Airlines** [1] - 25:1
**allegation** [2] - 3:23, 19:21
**allegations** [3] - 17:9, 51:4, 51:13
**allege** [7] - 19:17, 42:7, 51:25, 52:5, 53:6, 56:1, 56:3
**alleged** [16] - 7:21, 18:24, 19:1, 50:9, 50:22, 50:23, 51:3, 51:23, 51:24, 52:3, 52:4, 52:10, 52:15, 52:16, 55:18
**Alleged** [1] - 52:11

**Allegheny** [1] - 25:1
**alleging** [1] - 38:14
**allow** [1] - 11:17
**allowed** [1] - 46:5
**allows** [1] - 58:15
**alone** [3] - 14:10, 24:11, 39:15
**altered** [1] - 4:25
**alternative** [2] - 55:25, 57:20
**alternatives** [1] - 34:7
**Altria** [4] - 7:13, 8:2, 8:9, 39:12
**ambiguity** [7] - 9:21, 9:24, 22:3, 22:23, 25:20, 32:3, 39:3
**ambiguous** [3] - 20:18, 22:1, 31:14
**amendment** [1] - 37:17
**American** [1] - 43:1
**amicus** [1] - 26:9
**amount** [2] - 57:17, 66:10
**analogies** [1] - 59:5
**analogy** [2] - 59:5, 59:7
**analysis** [3] - 4:2, 6:25, 46:20
**analyze** [1] - 33:1
**AND** [1] - 1:12
**answer** [12] - 10:10, 12:2, 12:3, 16:17, 16:19, 17:3, 17:25, 18:1, 32:19, 61:20, 71:15, 71:20
**answers** [1] - 61:11
**anticipate** [1] - 5:19
**antidepressant** [2] - 28:10, 28:14
**apart** [3] - 11:13, 35:4, 35:19
**apologize** [2] - 24:22, 47:9
**appeal** [7] - 45:13, 45:15, 53:10, 69:9, 70:2, 70:17, 71:1
**appearances** [1] - 2:10
**Appellant** [1] - 45:23
**application** [3] - 24:12, 32:22, 32:23
**applied** [4] - 29:20, 51:2, 62:2, 62:11
**Applied** [4] - 13:9, 13:15, 40:4, 40:14
**apply** [5] - 46:23, 47:7, 63:20, 69:7, 69:8
**applying** [1] - 58:24
**appreciate** [2] - 3:2, 63:10
**approached** [2] - 21:22
**approaching** [1] - 65:21
**appropriate** [4] - 46:6, 47:16, 54:9, 67:15
**approved** [2] - 17:18, 17:19
**April** [3] - 13:10, 14:18, 26:14
**area** [5] - 33:9, 33:10, 36:13, 71:18, 72:5
**areas** [3] - 33:12, 36:7, 38:24
**argue** [6] - 3:3, 3:6, 5:19, 49:1, 50:18, 50:20
**argued** [5] - 41:8, 42:3, 64:25, 65:11, 66:2
**argues** [1] - 3:22
**arguing** [8] - 8:22, 9:16, 10:23, 37:24, 40:6, 40:7, 50:6, 53:5
**argument** [22] - 2:8, 3:1, 20:25, 34:22, 40:19, 44:6, 44:9, 48:7, 53:4, 62:13, 62:24, 63:17, 63:20, 66:9, 66:13, 66:14, 66:15, 66:16, 66:22, 68:24,

72:7
**arguments** [3] - 3:2, 26:3, 72:15
**ARIZONA** [1] - 1:8
**Arizona** [3] - 2:20, 46:17, 58:16
**artfully** [1] - 4:14
**article** [1] - 71:19
**Artificial** [1] - 38:4
**artificial** [21] - 4:14, 4:16, 4:18, 5:6, 5:12, 6:6, 6:10, 6:13, 10:2, 10:12, 10:13, 20:12, 34:12, 34:17, 34:19, 35:3, 38:1, 38:5, 61:3
**ascertainable** [15] - 18:20, 19:5, 19:21, 20:3, 20:5, 52:15, 52:20, 52:21, 52:23, 53:1, 53:6, 53:13, 54:4, 57:13, 57:17
**aside** [3] - 3:1, 18:4, 19:14
**aspect** [1] - 60:6
**aspects** [1] - 59:22
**assert** [2] - 18:7, 19:13
**asserted** [1] - 60:1
**asserting** [2] - 18:20, 19:24
**assertion** [1] - 18:23
**Association** [9] - 13:8, 14:22, 26:8, 26:11, 26:19, 27:22, 40:21, 60:9, 61:7
**assume** [1] - 45:20
**assumes** [1] - 55:4
**assumption** [1] - 65:18
**attempt** [1] - 36:3
**attempted** [2] - 33:1
**attention** [4] - 3:9, 27:11, 47:13, 58:5
**attorney** [1] - 2:13
**ATTORNEYS** [2] - 1:20, 1:23
**attorneys** [1] - 16:17
**audience** [2] - 12:9, 16:24
**August** [1] - 37:2
**authority** [3] - 25:8, 38:23, 60:1
**authorized** [1] - 15:16
**auto** [3] - 43:2, 43:3, 43:11
**automobile** [1] - 16:11
**available** [3] - 17:22, 57:5, 57:21
**avenue** [1] - 13:5
**Avocado** [1] - 36:21
**await** [1] - 46:1
**aware** [10] - 17:3, 31:9, 32:2, 34:8, 46:3, 46:4, 46:19, 62:3, 71:15
**awful** [2] - 16:7, 16:8

# B

**bargained** [3] - 48:15, 54:2, 56:5
**based** [9] - 15:12, 23:19, 28:3, 28:4, 29:3, 32:5, 32:14, 53:7, 66:9
**basis** [5] - 9:17, 18:7, 18:10, 20:24, 58:25
**Bath** [1] - 50:25
**Baxter** [1] - 25:6
**bears** [1] - 37:5
**Bed** [1] - 50:25
**beginning** [1] - 2:11
**behalf** [3] - 1:3, 2:14, 2:16

**belabor** [2] - 59:19, 69:14
**belaboring** [1] - 58:23
**bench** [1] - 68:24
**benefit** [3] - 55:14, 56:2
**best** [5] - 3:15, 13:5, 25:4, 65:1, 66:3
**better** [2] - 27:11, 55:9
**between** [6] - 31:2, 31:5, 31:6, 34:13, 34:17, 45:3
**Beverage** [3] - 2:21, 34:2, 46:17
**BEVERAGE** [1] - 1:8
**beverage** [15] - 3:19, 3:20, 21:17, 23:20, 29:16, 29:24, 30:1, 34:16, 37:1, 38:7, 48:20, 48:21, 52:13, 60:16, 60:19
**beverages** [3] - 35:8, 36:10
**Beyond** [1] - 50:25
**bias** [1] - 26:11
**biggest** [1] - 19:7
**binding** [6] - 5:23, 5:24, 7:18, 8:24, 46:20, 65:16
**Bob** [1] - 2:18
**boils** [1] - 32:8
**bother** [1] - 41:2
**bottle** [1] - 19:9
**bottles** [1] - 18:9
**bought** [3] - 18:8, 20:11, 48:9
**bounced** [1] - 16:12
**Brands** [1] - 48:21
**breach** [7] - 18:16, 47:25, 48:10, 48:23, 49:16, 56:8, 59:16
**breached** [1] - 48:4
**break** [2] - 26:21, 26:22
**breaking** [1] - 44:20
**Brewing** [2] - 2:9, 2:20
**BREWING** [1] - 1:8
**brief** [8] - 7:9, 26:9, 37:15, 45:24, 58:3, 62:15, 69:22, 70:13
**briefed** [4] - 35:7, 64:25, 65:11, 72:1
**briefing** [12] - 45:20, 45:22, 45:24, 63:12, 66:2, 66:9, 66:11, 66:21, 69:24, 71:7, 72:2, 72:15
**briefly** [2] - 62:23, 71:22
**briefs** [2] - 12:25, 68:21
**bring** [6] - 46:12, 50:16, 58:5, 60:6, 64:23, 71:9
**bringing** [1] - 47:13
**brings** [1] - 57:7
**broken** [1] - 35:3
**brought** [9] - 14:21, 22:9, 24:4, 30:19, 40:23, 49:25, 50:8, 61:19, 64:21
**Broward** [2] - 51:14, 51:15
**burden** [9] - 11:24, 12:4, 37:5, 37:10, 54:5, 67:14, 68:6, 68:11, 68:23
**burdened** [3] - 68:25, 69:2, 69:3
**burdensome** [4] - 68:4, 68:20, 68:23, 69:18
**business** [4] - 17:12, 40:16, 42:5
**businesses** [1] - 7:18
**buy** [3] - 19:10, 19:13, 48:8

**C**

C.F.R [2] - 6:5, 14:23
C.S.R [1] - 1:24
California [13] - 17:8, 46:15, 46:16, 46:25, 47:5, 47:11, 63:16, 68:7, 68:8, 68:9, 68:15, 69:6
calorie [2] - 49:13
CAMDEN [1] - 1:13
cannot [4] - 20:23, 29:4, 29:5, 38:12
card [1] - 40:16
Carpenter [2] - 2:19, 2:23
CARPENTER [1] - 1:21
case [112] - 3:18, 3:19, 7:13, 9:1, 9:6, 11:3, 12:1, 12:6, 12:12, 12:20, 15:11, 16:13, 17:13, 18:14, 18:21, 18:22, 19:22, 20:23, 23:22, 27:16, 27:17, 27:24, 27:25, 29:13, 32:5, 32:13, 33:7, 36:1, 36:8, 36:12, 36:20, 37:12, 38:21, 39:13, 39:15, 42:22, 42:24, 43:1, 45:12, 46:5, 46:9, 46:14, 46:15, 46:16, 46:18, 46:20, 46:21, 46:25, 47:2, 47:5, 47:7, 47:11, 48:21, 48:22, 49:11, 49:19, 50:3, 50:12, 50:18, 50:21, 50:25, 51:2, 51:7, 51:9, 51:14, 51:17, 51:19, 52:20, 52:22, 52:25, 53:5, 53:8, 54:9, 54:11, 54:13, 54:15, 54:16, 54:23, 54:24, 55:10, 55:16, 58:9, 58:25, 63:16, 63:17, 63:23, 63:25, 64:3, 64:9, 64:10, 64:12, 65:2, 65:20, 66:4, 66:23, 67:17, 67:18, 67:20, 68:4, 68:6, 68:14, 68:15, 68:16, 69:3, 69:23
cases [6] - 8:2, 17:10, 25:9, 42:23, 46:22
cast [1] - 42:4
categorized [1] - 63:14
causal [2] - 55:18, 55:20
causation [2] - 20:20
cent [3] - 20:11, 20:12
Center [4] - 13:8, 13:14, 40:4, 40:14
cents [2] - 19:11
certain [3] - 15:7, 16:10, 23:9
certainly [6] - 11:21, 12:17, 15:21, 17:1, 61:5, 62:4
certainty [1] - 22:11
CERTIFICATE [1] - 1:25
certification [5] - 49:14, 53:10, 66:5, 66:7, 68:22
cetera [1] - 10:19
CFA [1] - 51:2
challenge [1] - 54:8
change [6] - 12:7, 12:9, 34:2, 43:18, 59:10, 70:17
characterization [1] - 58:13
characterized [1] - 58:12
chemically [1] - 4:25
choosing [1] - 43:12
chose [2] - 43:8, 43:14
chosen [3] - 9:20, 30:21, 38:25

Circuit [15] - 24:23, 26:10, 31:17, 37:2, 37:3, 45:20, 46:4, 46:22, 63:22, 63:25, 65:4, 67:3, 67:17, 69:8, 70:7
Circuit's [1] - 70:22
circumvented [1] - 43:18
citation [1] - 31:21
cite [4] - 39:13, 47:7, 47:9
cited [2] - 18:21, 48:22
cites [2] - 38:1, 49:18
citizen [2] - 32:24, 32:25
citizens [1] - 36:16
citizens' [1] - 21:22
CIVIL [1] - 1:6
Civil [1] - 2:9
civil [1] - 49:17
claim [14] - 3:19, 4:11, 18:5, 18:19, 18:24, 19:4, 20:9, 37:4, 43:15, 48:23, 49:6, 50:23, 51:2, 57:16
claiming [1] - 11:4
claims [13] - 19:14, 25:9, 33:23, 36:6, 37:6, 38:14, 43:23, 43:25, 47:15, 47:22, 50:24, 52:1, 67:10
clarity [1] - 72:17
class [8] - 17:12, 28:13, 49:11, 49:14, 53:10, 66:5, 66:7, 68:22
clause [1] - 37:13
clauses [1] - 37:11
clear [4] - 17:17, 18:4, 37:8, 37:18
clearly [1] - 31:20
CLERK [1] - 2:1
client [16] - 7:19, 17:8, 42:7, 50:7, 59:11, 60:16, 60:18, 60:22, 61:16, 62:5, 67:15, 67:18, 69:2, 69:12, 69:13, 69:19
client's [2] - 17:11, 62:11
CLOAD [4] - 1:22, 2:7, 2:22, 72:22
Cload [1] - 2:22
close [1] - 3:5
co [1] - 60:19
Co [1] - 2:20
CO [1] - 1:8
co-packers [1] - 60:19
Coca [1] - 52:22
Coca-Cola [1] - 52:22
cognizable [5] - 18:5, 18:20, 19:4, 19:15, 20:14
Cola [1] - 52:22
Colacicco [15] - 7:24, 7:25, 8:1, 8:10, 13:24, 14:2, 27:15, 27:16, 27:24, 27:25, 28:4, 28:11, 28:18, 28:25, 29:1
color [1] - 6:4
colors [2] - 35:3, 38:5
coming [3] - 46:22, 69:12, 69:13
commend [1] - 72:14
comment [9] - 5:22, 11:12, 33:2, 39:21, 41:10, 41:14, 41:15, 60:3
comments [2] - 7:8, 33:3
commissioner [1] - 15:2
Commissioner [4] - 13:16, 13:19, 16:9,

28:20
Commissioner's [1] - 13:22
committed [3] - 7:23, 50:24, 54:19
common [2] - 4:16, 9:9
communication [1] - 40:20
COMPANY [1] - 1:8
Company [2] - 2:21, 53:1
compared [7] - 13:15, 25:4, 27:24, 29:24, 30:18, 34:5, 43:14
competitor [1] - 34:1
complaint [17] - 4:15, 4:20, 4:22, 11:6, 49:9, 49:17, 49:21, 50:9, 51:10, 52:16, 56:4, 56:14, 56:18, 59:20, 64:13, 67:21, 67:22
complete [3] - 24:21, 66:11, 69:24
completed [1] - 45:24
compliance [5] - 13:1, 33:21, 33:24, 34:1, 45:11
compliant [1] - 15:8
complied [3] - 7:22, 30:3, 59:11
complies [3] - 27:2, 62:1, 62:9
comply [5] - 12:17, 12:19, 12:23, 27:4, 33:14
Conagra [1] - 47:8
conceded [2] - 13:1, 59:2
conceivable [2] - 20:7, 20:13
concerned [6] - 29:14, 30:19, 32:22, 32:23, 55:22, 68:1
Concluded [1] - 72:24
conclusion [1] - 71:9
conclusions [1] - 15:7
conduct [1] - 52:11
conference [2] - 64:3, 70:24
confirm [1] - 58:16
confirms [2] - 58:18, 58:20
conflict [19] - 3:3, 3:8, 3:15, 4:4, 9:2, 11:14, 17:6, 33:10, 33:13, 33:18, 44:7, 45:3, 45:6, 45:8, 59:4, 59:12, 59:13, 59:17
Conflict [1] - 9:3
conflicted [1] - 28:8
conform [4] - 48:17, 48:18, 61:13, 61:15
conforms [1] - 58:17
confronting [1] - 45:16
confused [1] - 9:16
confusing [3] - 22:1, 39:2, 41:19
confusion [12] - 9:15, 9:17, 22:3, 22:24, 24:18, 24:24, 25:3, 30:16, 31:5, 32:3, 32:15, 36:14
Congress [4] - 9:13, 37:14, 38:18, 38:24
congressional [3] - 4:1, 17:14, 37:8
consent [1] - 39:16
consider [2] - 14:19, 32:16
consideration [3] - 5:14, 30:25, 65:9
considerations [2] - 24:17, 27:25
considered [10] - 15:8, 24:13, 25:12, 30:15, 31:3, 34:15, 35:5, 35:15, 35:16, 58:19
considering [1] - 3:12

consistently [1] - 21:21
constituents [2] - 10:17, 31:9
construed [1] - 38:10
consumer [16] - 18:18, 20:15, 20:24, 24:18, 24:24, 25:3, 30:16, 47:16, 48:25, 49:2, 52:21, 52:23, 52:24, 53:2, 55:17, 59:16
Consumer [11] - 19:5, 20:3, 30:10, 43:22, 49:23, 50:15, 50:22, 51:21, 52:11, 57:12, 57:22
consumers [6] - 32:15, 36:12, 36:18, 36:25, 42:17, 56:13
consuming [1] - 56:22
contain [1] - 36:11
contained [3] - 47:4, 52:2, 52:4
container [1] - 48:18
containing [2] - 60:10, 60:13
contains [5] - 3:21, 10:17, 37:11, 52:7, 52:13
contemplated [1] - 11:12
content [3] - 36:6, 49:13
context [1] - 20:24
continually [1] - 29:2
continue [4] - 35:25, 46:8, 58:10, 64:4
contrary [1] - 37:8
control [1] - 23:13
convene [1] - 70:23
convenience [1] - 50:11
conventional [1] - 24:16
conversation [1] - 40:2
converse [1] - 9:11
COOPER [1] - 1:12
Cooper [3] - 27:19, 36:22, 53:1
cooperate [1] - 23:7
Corn [10] - 13:7, 14:22, 26:8, 26:11, 26:19, 27:22, 40:7, 40:21, 60:8, 61:7
corn [22] - 3:22, 4:9, 4:13, 10:21, 10:24, 17:18, 26:7, 26:17, 31:10, 34:3, 34:5, 34:7, 34:11, 34:18, 35:5, 39:23, 44:6, 47:5, 52:14, 60:23, 61:3
Corporation [3] - 34:2, 51:9
correct [6] - 6:25, 38:3, 50:10, 57:18, 63:18, 72:11
Correct [2] - 28:24, 29:21
correctly [1] - 61:6
Cosmetic [5] - 3:25, 9:14, 37:10, 37:14, 37:17
cost [1] - 42:16
costly [1] - 69:19
counsel [4] - 2:10, 62:22, 67:21, 72:14
counsel's [2] - 63:18, 64:7
count [1] - 47:19
country [1] - 28:19
county [2] - 44:15, 44:16
couple [3] - 43:24, 49:24, 71:6
course [1] - 70:9
Court [28] - 4:20, 6:15, 7:13, 11:7, 12:25, 23:5, 24:14, 24:20, 25:2, 25:13, 29:5, 31:23, 31:24, 33:5, 36:19, 38:20,

46:20, 46:22, 49:9, 51:5, 56:9, 59:20, 62:20, 63:22, 64:14, 69:8, 69:14, 70:6
COURT [80] - 1:1, 2:2, 2:8, 2:25, 6:17, 7:2, 7:25, 9:20, 10:5, 10:7, 10:23, 10:25, 11:22, 13:6, 15:25, 16:6, 17:16, 17:21, 19:16, 20:7, 21:1, 21:3, 22:10, 23:4, 24:6, 25:23, 28:11, 29:15, 29:18, 31:8, 34:21, 35:6, 37:24, 39:6, 40:3, 40:15, 41:8, 43:24, 45:12, 45:15, 45:19, 47:13, 47:18, 47:23, 50:1, 50:14, 51:17, 51:19, 53:18, 56:11, 56:16, 56:24, 57:11, 57:24, 58:1, 60:5, 60:22, 61:12, 62:21, 63:2, 63:4, 63:6, 63:11, 63:24, 64:22, 65:13, 66:25, 67:8, 67:20, 69:5, 69:24, 70:14, 71:3, 71:5, 71:13, 71:23, 72:4, 72:12, 72:14, 72:23
court [16] - 7:20, 12:1, 15:13, 25:7, 43:11, 43:18, 46:21, 47:6, 49:14, 50:5, 63:19, 68:1, 68:2, 69:6, 69:7, 71:17
Court's [2] - 58:5, 72:23
COURTHOUSE [1] - 1:11
courts [3] - 23:6, 30:25, 31:2
covered [1] - 72:8
Covington [1] - 68:14
COYLE [1] - 1:3
Coyle [3] - 2:9, 2:14, 2:17
create [3] - 44:24, 55:5, 56:20
created [1] - 55:7
creating [2] - 54:18, 55:5
current [2] - 6:3, 29:1

## D

damage [2] - 19:3, 19:21
damages [14] - 7:21, 18:17, 20:14, 20:24, 44:3, 44:4, 53:16, 53:17, 53:19, 54:7, 57:4, 57:12, 57:21, 57:23
dancing [1] - 21:20
danger [2] - 30:22, 30:23
Daniel [1] - 2:13
DANIEL [1] - 1:19
date [1] - 2:8
days [3] - 63:5, 63:9, 71:6
deal [7] - 7:11, 32:18, 35:1, 35:2, 35:18, 62:18, 62:19
dealing [16] - 7:16, 10:20, 18:13, 20:21, 21:16, 27:17, 27:18, 30:5, 30:6, 43:16, 48:11, 48:12, 49:11, 51:1, 58:6, 64:17
deals [4] - 4:9, 5:12, 5:16, 6:5
dealt [6] - 8:2, 14:17, 14:18, 17:6, 19:22, 46:25
debated [1] - 11:12
deception [4] - 36:13, 36:18, 36:25, 52:1
deceptive [5] - 38:14, 42:19, 50:23, 56:19, 57:10
decide [1] - 4:5
decided [3] - 47:1, 67:7, 69:22

decides [2] - 9:10, 44:17
deciding [3] - 4:17, 24:14, 50:5
decision [42] - 8:15, 9:12, 12:7, 16:14, 16:15, 20:16, 22:13, 28:2, 31:23, 33:3, 36:15, 36:23, 46:1, 46:6, 46:8, 47:10, 49:14, 53:9, 53:10, 64:18, 64:24, 65:3, 65:4, 65:5, 65:10, 65:11, 66:1, 66:16, 66:18, 66:23, 67:1, 67:6, 67:16, 67:25, 68:1, 68:24, 70:6, 70:16, 70:21, 70:22
decisional [1] - 36:23
decisions [1] - 22:12
declarations [1] - 68:21
declined [2] - 25:21
Defendant [1] - 37:5
defendant [11] - 23:1, 23:5, 43:25, 44:24, 45:9, 46:13, 50:7, 53:5, 56:6, 58:16, 67:13
defendant's [12] - 3:20, 6:16, 18:6, 31:14, 36:9, 36:13, 44:7, 48:7, 50:24, 52:2, 53:4, 55:11
Defendant's [1] - 48:7
Defendants [5] - 1:10, 37:9, 51:23, 68:5, 69:3
DEFENDANTS [1] - 1:23
defendants [38] - 2:20, 2:24, 24:7, 31:18, 33:20, 34:1, 36:2, 38:12, 42:2, 44:10, 46:15, 47:25, 49:5, 49:25, 50:12, 50:18, 51:12, 54:6, 54:10, 54:20, 54:22, 55:4, 55:12, 56:1, 56:2, 57:9, 58:6, 58:9, 59:21, 61:10, 62:1, 68:4, 68:5, 68:11, 68:20, 68:25, 72:1
defense [1] - 44:18
defer [3] - 11:23, 24:14, 41:23
deference [11] - 13:21, 13:22, 13:25, 14:6, 14:10, 15:4, 21:14, 21:19, 24:10, 25:8, 33:7
deferring [2] - 30:18, 67:11
define [5] - 9:25, 10:1, 10:14, 10:19, 36:4
defined [1] - 39:11
defines [1] - 10:13
defining [2] - 10:7, 60:9
definitely [1] - 14:10
definition [14] - 5:2, 6:12, 6:20, 9:21, 11:4, 11:19, 12:22, 13:3, 17:19, 17:23, 39:7, 39:9, 61:14
degree [4] - 14:6, 14:11, 23:13, 41:11
deli [1] - 50:12
deliberate [1] - 31:25
Deliberate [1] - 39:15
deliberation [9] - 5:23, 7:7, 8:3, 8:6, 8:7, 14:9, 15:14, 41:12
demand [1] - 29:6
demonstrate [1] - 48:24
denied [4] - 46:18, 63:19, 68:13, 68:16
depose [1] - 61:23
DEPUTY [1] - 2:1
derived [6] - 10:17, 10:21, 10:22, 11:6, 56:19, 61:3
describe [1] - 4:24

**described** [3] - 31:11, 44:1, 50:3
**design** [1] - 60:20
**determination** [5] - 14:4, 15:6, 46:23, 65:16, 70:2
**determinations** [1] - 28:16
**determine** [5] - 54:10, 56:24, 57:6, 57:8, 66:14
**determined** [4] - 39:11, 39:12, 47:6, 65:7
**determining** [1] - 8:18
**Deutsch** [2] - 2:19, 2:23
**DEUTSCH** [1] - 1:21
**develop** [1] - 31:1
**development** [1] - 16:9
**devote** [1] - 22:2
**devoted** [1] - 15:19
**die** [1] - 67:10
**Dietary** [2] - 13:14, 40:13
**difference** [4] - 23:25, 34:13, 34:17, 47:23
**different** [11] - 9:18, 28:1, 30:24, 35:12, 38:4, 43:3, 43:5, 49:24, 52:24, 67:17, 67:20
**differently** [1] - 35:4
**directly** [1] - 5:9
**disabling** [1] - 17:11
**disagree** [4] - 36:24, 44:9, 64:6, 67:2
**disclosure** [1] - 53:18
**disclosures** [1] - 53:20
**discourage** [1] - 39:3
**discovery** [34] - 12:12, 12:25, 18:13, 19:2, 19:3, 46:2, 46:5, 46:9, 53:14, 53:21, 53:23, 53:24, 53:25, 54:6, 58:8, 59:21, 61:21, 62:5, 65:3, 65:15, 65:22, 66:7, 67:9, 67:11, 67:19, 68:7, 68:15, 68:17, 68:22, 69:13, 69:17, 69:25
**Discovery** [2] - 53:11, 66:4
**discovery's** [1] - 69:12
**discretion** [6] - 25:16, 25:18, 30:19, 30:20, 38:24, 46:1
**discuss** [1] - 14:24
**discussions** [1] - 39:21
**disgorge** [2] - 18:5, 56:20
**dismiss** [11] - 37:16, 46:17, 46:18, 54:5, 54:12, 55:23, 65:4, 65:7, 66:19, 67:7, 68:16
**dismissal** [6] - 11:17, 37:3, 42:22, 42:24, 47:16, 47:19
**dismissed** [4] - 32:5, 49:6, 50:18, 53:6
**disposal** [1] - 17:2
**dispositive** [7] - 12:17, 12:20, 62:6, 64:9, 65:16, 69:9, 70:6
**dispute** [8] - 3:24, 5:5, 8:13, 11:11, 15:17, 15:18, 15:20, 64:9
**disputing** [3] - 60:1, 64:11, 69:10
**dissatisfied** [1] - 11:8
**dissipate** [1] - 67:10
**distillate** [1] - 10:16
**distinct** [1] - 34:17

**distinction** [2] - 29:13, 29:18
**distinguish** [1] - 55:15
**distinguishable** [2] - 54:14, 54:23
**distinguished** [1] - 29:9
**District** [6] - 25:6, 25:7, 27:20, 47:11, 51:14, 51:15
**DISTRICT** [3] - 1:1, 1:1, 1:15
**district** [3] - 46:21, 47:6, 71:17
**divorce** [1] - 6:24
**Docket** [1] - 47:12
**docket** [3] - 16:18, 23:16, 65:21
**doctrine** [4] - 21:14, 24:10, 24:15, 33:8
**documents** [2] - 8:5, 15:12
**dollar** [1] - 57:17
**dollars** [1] - 42:16
**donated** [1] - 15:18
**done** [5] - 29:4, 29:12, 55:12, 68:9, 68:10
**DONOVAN** [40] - 1:22, 2:5, 2:18, 3:14, 7:3, 8:1, 9:23, 10:6, 10:10, 10:24, 11:1, 12:3, 14:5, 16:3, 16:22, 17:20, 17:25, 19:19, 20:13, 21:2, 58:3, 60:18, 60:25, 61:21, 63:1, 63:3, 63:5, 63:16, 64:2, 66:24, 69:4, 69:6, 70:11, 71:1, 71:4, 71:11, 71:21, 72:10, 72:13, 72:20
**Donovan** [5] - 2:18, 3:13, 34:7, 34:10, 58:2
**doubt** [2] - 7:14, 59:25
**down** [9] - 7:13, 14:23, 22:12, 26:21, 26:22, 32:8, 44:11, 47:10, 59:7
**dozen** [1] - 28:18
**drastic** [1] - 70:17
**drawing** [1] - 60:7
**drift** [1] - 22:12
**drive** [1] - 44:11
**driving** [1] - 59:7
**Drug** [5] - 3:25, 9:14, 37:10, 37:14, 37:16
**drug** [12] - 28:12, 28:21, 29:18, 29:22, 32:18, 54:17, 54:19, 54:21, 54:23
**drugs** [1] - 28:14
**due** [10] - 7:7, 8:2, 8:3, 8:6, 8:7, 15:14, 39:3, 42:22, 56:6, 57:14
**during** [2] - 63:17, 65:15
**duties** [2] - 16:10, 23:19

## E

**early** [3] - 26:6, 39:22, 62:13
**easel** [1] - 39:8
**economic** [1] - 18:24
**economy** [4] - 64:5, 64:15, 69:11, 69:21
**effect** [6] - 4:16, 8:24, 17:11, 28:16, 37:19, 71:5
**either** [3] - 67:1, 71:14, 72:8
**elements** [2] - 51:20, 52:10
**Elias** [2] - 49:10, 50:3
**eliminates** [2] - 31:5, 55:3

**embrace** [1] - 5:3
**embroiled** [1] - 13:2
**emerged** [1] - 62:24
**emerges** [1] - 72:18
**employee** [2] - 13:11, 26:7
**enable** [1] - 57:16
**enacted** [2] - 5:16, 9:13
**encouraged** [1] - 23:7
**end** [4] - 3:7, 4:3, 8:4, 47:10
**endeavor** [1] - 18:13
**enforce** [2] - 30:8, 30:10
**enforcement** [2] - 8:24, 39:4
**enforcing** [1] - 9:21
**Engineers** [2] - 53:9, 54:15
**enriched** [1] - 57:8
**enrichment** [8] - 18:7, 18:8, 18:10, 43:23, 55:22, 55:25, 56:11, 57:23
**entail** [1] - 56:18
**enter** [3] - 2:10, 68:18, 71:5
**entered** [4] - 53:10, 65:12, 66:22, 68:12
**entering** [1] - 67:6
**entertain** [1] - 8:20
**entire** [2] - 58:23, 65:9
**entirety** [1] - 58:23
**entitled** [4] - 14:23, 15:4, 15:21, 15:23
**entity** [1] - 40:3
**enzymes** [1] - 59:23
**enzymolysis** [2] - 10:17, 59:24
**equate** [3] - 31:19, 32:2, 32:4
**errand** [3] - 16:18, 21:15, 21:18
**especially** [1] - 64:16
**ESQUIRE** [4] - 1:19, 1:20, 1:22, 1:22
**essence** [1] - 10:15
**essential** [1] - 10:15
**Essentially** [1] - 32:8
**establish** [5] - 5:9, 6:20, 20:23, 36:4, 68:21
**established** [2] - 38:16, 56:12
**establishing** [1] - 37:5
**establishment** [1] - 38:15
**et** [1] - 10:19
**evaluation** [1] - 15:3
**Evaluation** [2] - 13:12, 40:12
**event** [4] - 19:4, 49:17, 61:21, 63:21
**eventually** [1] - 28:20
**evidence** [5] - 8:16, 8:22, 20:8, 59:1, 59:2
**evidenced** [3] - 12:19, 60:2, 62:2
**ex** [1] - 40:20
**exact** [2] - 65:20, 66:1
**exactly** [4] - 4:9, 19:23, 28:12, 55:10
**example** [4] - 35:21, 43:1, 45:8, 50:25
**examples** [2] - 71:15, 72:10
**excellent** [3] - 72:8, 72:15
**except** [1] - 6:4
**exception** [2] - 60:10, 60:12
**exclusion** [3] - 10:7, 39:7, 39:9
**excuse** [1] - 27:16
**exercise** [1] - 11:23

**exercised** [1] - 11:10
**exist** [1] - 5:1
**existence** [1] - 7:14
**existing** [2] - 12:6, 55:13
**exists** [1] - 55:11
**expect** [2] - 49:1, 49:2
**expected** [3] - 6:11, 10:3, 52:25
**expedience** [1] - 69:21
**expediency** [2] - 64:6, 64:15
**experience** [2] - 16:16, 17:4
**experiences** [1] - 16:6
**experiencing** [1] - 68:11
**expert** [6] - 4:6, 7:9, 11:9, 11:16, 11:18, 57:4
**expertise** [8] - 6:12, 8:3, 13:4, 15:4, 24:9, 24:16, 59:19, 59:25
**experts** [3] - 11:13, 53:12
**explaining** [1] - 15:6
**explanation** [1] - 33:19
**exposed** [1] - 66:21
**express** [10] - 3:6, 4:3, 5:12, 30:8, 37:11, 37:25, 47:21, 47:25, 48:4
**Express** [1] - 37:21
**expressed** [1] - 21:10
**expressly** [3] - 38:11, 38:13, 48:2
**extent** [19] - 12:5, 25:17, 28:14, 30:20, 31:14, 35:9, 35:11, 45:1, 45:25, 46:7, 49:8, 49:20, 51:5, 53:23, 53:24, 57:20, 65:9, 65:25, 72:1
**extra** [1] - 62:24
**extractive** [1] - 10:15
**extremes** [1] - 67:13

---

**F**

---

**F.2d** [1] - 24:23
**F.D.C.A** [1] - 37:10
**F.R.D** [1] - 49:10
**face** [1] - 17:13
**fact** [29] - 4:18, 12:17, 14:21, 21:10, 25:19, 27:6, 31:4, 32:3, 32:11, 34:1, 34:10, 35:18, 36:10, 36:22, 41:19, 41:20, 42:6, 46:14, 46:19, 48:17, 48:20, 49:13, 55:1, 58:24, 61:5, 62:6, 62:17, 68:14, 68:22
**factor** [5] - 30:16, 30:20, 30:22, 31:7, 32:21
**factors** [4] - 24:13, 25:12, 25:17, 30:15
**failed** [4] - 37:9, 50:19, 53:6, 71:17
**fails** [1] - 53:2
**fair** [2] - 16:23
**fairly** [1] - 13:11
**fairness** [1] - 8:4
**fake** [1] - 17:7
**fall** [1] - 11:24
**falls** [1] - 61:18
**false** [10] - 25:9, 30:11, 33:23, 50:23, 52:1, 52:6, 52:12, 56:7, 56:19, 57:9
**falsely** [1] - 3:21

**far** [10] - 22:20, 25:22, 29:13, 30:18, 32:21, 32:22, 43:22, 53:15, 55:22, 68:1
**fast** [1] - 23:15
**fat** [2] - 49:12, 49:13
**favor** [9] - 7:5, 25:13, 31:14, 31:18, 32:5, 44:7, 44:9, 69:21, 69:22
**FDA** [115] - 3:11, 4:6, 4:7, 5:5, 5:16, 5:25, 6:12, 6:15, 6:19, 7:18, 8:16, 8:17, 8:19, 8:21, 9:20, 9:22, 11:16, 11:21, 11:25, 12:9, 12:18, 12:21, 13:1, 13:4, 13:16, 14:19, 14:24, 15:8, 15:18, 15:19, 15:21, 15:23, 16:1, 16:20, 17:19, 21:14, 21:19, 21:20, 22:13, 22:14, 22:18, 22:20, 23:2, 23:5, 23:8, 23:19, 23:22, 24:1, 24:10, 25:5, 25:8, 26:7, 26:12, 26:15, 26:20, 27:9, 27:25, 28:8, 28:13, 28:15, 28:20, 29:1, 29:6, 29:10, 29:12, 29:19, 30:3, 30:8, 31:2, 31:3, 31:5, 31:9, 31:12, 32:2, 32:9, 32:10, 32:13, 32:24, 33:7, 33:24, 35:3, 35:7, 35:22, 36:5, 36:7, 36:13, 36:16, 37:21, 38:4, 38:25, 39:21, 39:22, 40:15, 40:20, 40:22, 41:12, 41:13, 41:15, 42:8, 42:9, 42:17, 43:25, 44:5, 44:23, 45:11, 58:14, 59:25, 62:2, 62:10, 71:16
**FDA's** [3] - 12:23, 71:18, 72:5
**FEBRUARY** [1] - 1:13
**federal** [17] - 5:23, 30:7, 33:15, 33:21, 35:1, 35:2, 36:4, 38:22, 39:7, 41:8, 43:6, 43:9, 43:12, 44:25, 46:23, 47:6, 71:17
**Federal** [4] - 3:24, 5:17, 9:13, 41:18
**Fellner** [20] - 5:21, 6:1, 7:12, 7:24, 8:4, 8:9, 14:2, 14:7, 15:11, 15:13, 27:14, 27:15, 27:16, 27:24, 29:13, 31:17, 31:20, 37:2, 39:12, 69:7
**FFDCA** [2] - 5:11, 9:14
**field** [12] - 3:6, 4:4, 4:8, 8:17, 8:22, 8:25, 10:8, 35:8, 35:10, 35:11, 59:1, 59:3
**fight** [1] - 41:3
**fighting** [1] - 41:3
**figures** [1] - 69:15
**file** [2] - 58:10, 72:3
**filed** [3] - 8:7, 26:9, 43:8
**filing** [2] - 49:9, 49:20
**final** [1] - 46:12
**Finally** [2] - 38:20, 55:17
**finally** [3] - 3:9, 25:5, 31:7
**fine** [4] - 40:8, 42:1, 63:5, 71:10
**finish** [1] - 30:14
**firm** [3] - 2:13, 2:19, 2:23
**first** [12] - 4:19, 21:6, 24:15, 25:11, 25:19, 30:16, 31:3, 34:25, 50:16, 60:10, 63:2, 66:12
**First** [2] - 21:9, 49:24
**fit** [1] - 60:14
**fits** [1] - 17:18
**five** [2] - 43:3, 43:5

**fixing** [1] - 60:11
**flavor** [20] - 5:6, 6:4, 6:6, 10:13, 10:14, 10:20, 11:2, 34:12, 34:14, 34:15, 34:16, 34:17, 34:20, 61:3, 61:4, 62:12
**flavoring** [9] - 5:12, 10:14, 10:17, 10:23, 38:2, 60:20, 62:19, 62:25, 63:15
**flavors** [3] - 35:3, 38:4, 38:5
**fleshed** [1] - 11:18
**flies** [1] - 17:13
**Florida** [6] - 9:11, 17:8, 36:21, 46:14, 68:14, 69:7
**focus** [3] - 3:15, 33:10, 54:21
**focused** [1] - 55:2
**follow** [3] - 27:8, 41:24, 43:3
**following** [8] - 26:18, 42:6, 44:10, 54:15, 54:24, 63:9, 66:12, 66:16
**Food** [12] - 3:25, 9:13, 13:8, 13:13, 13:15, 37:10, 37:14, 37:16, 40:4, 40:12, 40:14, 49:10
**food** [20] - 3:25, 5:10, 6:11, 9:8, 10:2, 10:3, 10:4, 21:17, 23:20, 29:24, 30:1, 37:1, 37:4, 37:18, 38:16, 40:6, 48:25, 49:12
**foodnavigator.com** [2] - 14:15, 14:20
**Foods** [2] - 24:23, 47:8
**foods** [1] - 36:19
**fool's** [3] - 16:18, 21:15, 21:18
**FOR** [3] - 1:1, 1:20, 1:23
**force** [2] - 13:18, 13:19
**foregoing** [1] - 65:15
**form** [1] - 63:13
**formal** [3] - 3:11, 16:1, 60:2
**formality** [1] - 14:3
**formation** [1] - 27:7
**forth** [4] - 16:12, 37:19, 39:6, 43:9
**forward** [16] - 36:15, 46:9, 46:10, 53:12, 54:7, 54:9, 65:3, 66:4, 67:18, 68:4, 68:6, 68:7, 68:8, 68:17, 69:3
**four** [14] - 8:4, 15:11, 22:21, 24:13, 25:11, 25:17, 30:15, 43:2, 43:5, 43:8, 43:13, 43:14, 64:17
**fours** [2] - 64:12, 69:23
**fourth** [2] - 31:7, 32:21
**frame** [1] - 65:20
**frankly** [2] - 7:9, 58:6
**Franulovic** [1] - 52:22
**Fraud** [11] - 19:5, 20:4, 30:10, 43:22, 49:23, 50:15, 50:23, 51:21, 52:11, 57:12, 57:22
**fraud** [24] - 7:23, 18:19, 19:23, 19:24, 20:2, 20:6, 20:15, 20:23, 20:24, 36:18, 37:1, 47:16, 50:22, 50:24, 53:4, 53:7, 53:13, 54:15, 54:19, 55:3, 55:17, 59:16
**frauds** [1] - 51:4
**fraudulent** [2] - 25:2, 30:17
**fraudulently** [1] - 54:22
**free** [2] - 3:3, 3:5
**front** [3] - 32:23, 33:11, 53:24
**fructose** [19] - 3:22, 4:9, 4:13, 10:21,

10:24, 17:18, 26:7, 26:17, 31:9, 34:3, 34:5, 34:7, 34:11, 34:18, 35:4, 39:23, 44:6, 47:4, 52:13
**fruit** [2] - 10:18
**full** [4] - 7:3, 24:5, 66:21, 71:25
**fully** [2] - 64:25, 65:11

## G

**gained** [2] - 66:25, 67:5
**Geier** [1] - 42:25
**generally** [2] - 22:14, 45:21
**Geraldine** [2] - 13:16, 40:11
**GERRY** [1] - 1:12
**given** [3] - 13:21, 13:23, 13:25
**glad** [1] - 60:6
**global** [1] - 9:21
**Goldman** [2] - 2:14, 2:16
**GOLDMAN** [1] - 1:19
**goods** [2] - 48:15, 48:16
**governing** [1] - 37:22
**government** [6] - 24:20, 25:4, 33:17, 43:1, 43:6, 43:10
**governs** [1] - 3:25
**Goya** [3] - 24:21, 24:22, 24:23
**great** [1] - 14:5
**greater** [1] - 16:9
**grew** [1] - 16:13
**grounds** [1] - 11:17
**groundswell** [1] - 55:5
**group** [1] - 61:9
**Group** [1] - 39:12
**Growers** [1] - 36:22
**growing** [1] - 23:6
**guess** [2] - 50:6, 70:17
**guidance** [3] - 39:16, 39:20
**guideline** [1] - 13:1
**guidelines** [3] - 40:25, 41:1, 58:17
**guy** [1] - 44:19

## H

**hailed** [1] - 7:20
**half** [1] - 28:18
**handle** [2] - 11:9, 16:20
**handled** [1] - 16:20
**happily** [1] - 62:14
**happy** [1] - 63:1
**health** [1] - 36:6
**Healthcare** [1] - 25:6
**heard** [1] - 64:20
**hearing** [1] - 3:2
**heart** [1] - 12:11
**heating** [1] - 10:16
**heck** [1] - 40:16
**heightened** [2] - 50:17, 50:19
**held** [9] - 16:24, 24:20, 24:24, 25:2, 25:7, 36:20, 48:22, 49:3, 56:22

**help** [1] - 62:20
**hence** [2] - 10:22, 62:10
**herbs** [1] - 10:19
**Herself** [1] - 1:4
**HFCS** [32] - 4:12, 4:15, 4:18, 4:25, 8:18, 9:10, 11:20, 12:13, 12:15, 12:18, 14:19, 14:21, 15:5, 44:1, 58:17, 58:19, 59:22, 60:10, 60:13, 60:25, 61:8, 61:10, 61:15, 61:17, 61:22, 61:25, 62:3, 62:9, 62:17, 62:18, 62:25, 63:14
**HFCS's** [1] - 61:13
**high** [20] - 3:22, 4:9, 4:13, 10:21, 10:24, 17:18, 19:25, 26:7, 26:17, 31:9, 34:3, 34:5, 34:7, 34:11, 34:18, 35:4, 39:23, 44:5, 47:4, 52:13
**higher** [3] - 20:1, 49:14, 57:12
**highlighted** [1] - 4:23
**highly** [4] - 5:1, 36:11, 59:19, 59:24
**highway** [2] - 44:11, 44:12
**Highway** [1] - 43:7
**history** [7] - 14:7, 14:8, 15:13, 21:16, 22:10, 22:21, 37:16
**hit** [2] - 42:21, 49:24
**Hitt** [7] - 46:17, 46:19, 46:21, 47:5, 63:17, 63:23, 68:15
**hitting** [1] - 26:3
**hold** [3] - 65:6, 66:18, 67:6
**Holk** [35] - 8:14, 8:15, 26:9, 27:19, 36:23, 45:12, 45:21, 45:23, 45:25, 46:1, 46:3, 46:8, 63:20, 63:21, 64:1, 64:7, 64:12, 64:24, 65:4, 65:7, 65:10, 66:1, 66:12, 66:13, 66:19, 67:2, 67:7, 67:23, 67:25, 69:7, 69:9, 69:22, 70:22
**Honda** [2] - 43:1, 43:8
**honest** [1] - 23:23
**Honor** [149] - 2:12, 2:15, 2:18, 2:22, 3:14, 3:15, 3:23, 4:4, 4:13, 4:15, 4:21, 4:22, 5:8, 5:13, 5:17, 6:2, 6:22, 6:24, 7:1, 7:8, 7:15, 7:17, 7:18, 7:23, 8:1, 8:8, 8:11, 8:13, 8:15, 8:17, 9:2, 9:8, 10:10, 11:1, 11:3, 11:15, 12:4, 12:11, 14:13, 15:2, 15:9, 16:22, 17:5, 17:7, 17:11, 17:15, 18:18, 18:21, 18:25, 19:14, 20:4, 20:25, 21:5, 21:6, 22:16, 23:17, 24:22, 25:10, 25:16, 25:25, 26:4, 27:1, 27:16, 29:17, 29:21, 30:13, 31:16, 31:22, 32:8, 32:20, 33:6, 33:9, 33:13, 34:14, 34:24, 35:10, 35:25, 36:8, 37:9, 38:3, 39:10, 39:18, 40:9, 41:13, 42:2, 42:7, 42:13, 42:20, 43:19, 44:8, 44:25, 45:7, 45:14, 45:17, 45:22, 46:13, 47:7, 47:9, 47:15, 47:22, 49:1, 49:20, 49:23, 50:16, 53:5, 54:13, 55:23, 56:9, 56:15, 57:3, 57:18, 57:25, 58:3, 58:13, 58:16, 58:21, 58:22, 59:1, 59:17, 59:25, 60:19, 61:6, 62:8, 62:14, 62:20, 63:8, 64:20, 65:5, 65:18, 66:17, 67:4, 67:24, 68:2, 69:4, 69:23, 70:11, 70:12, 71:2, 71:10, 71:11, 71:21, 71:24, 72:10, 72:13, 72:19, 72:20,

72:21
**Honor's** [1] - 7:4
**HONORABLE** [1] - 1:15
**hope** [1] - 72:17
**Hornell** [2] - 2:9, 2:20
**HORNELL** [1] - 1:8
**Hospital** [2] - 51:14, 51:15
**hour** [6] - 44:12, 44:17, 59:6, 59:8, 59:11
**Hoyte** [1] - 48:21
**human** [1] - 32:18
**hundreds** [1] - 7:8
**hurdles** [1] - 29:22
**hydrolysate** [2] - 10:16, 60:14

## I

**ice** [7] - 18:2, 18:9, 48:8, 48:9, 48:13, 48:14
**identical** [3] - 17:9, 67:22, 67:24
**Illinois** [1] - 25:7
**imagine** [3] - 8:19, 8:21, 9:17
**immediate** [1] - 49:16
**impact** [3] - 9:11, 34:16, 67:25
**impatient** [1] - 16:13
**implement** [4] - 21:23, 22:7, 22:25, 24:2
**implementing** [2] - 22:5, 41:17
**implicated** [1] - 38:2
**implicitly** [1] - 58:18
**implied** [10] - 38:8, 38:9, 40:5, 42:20, 42:21, 42:23, 47:21, 48:6, 48:10, 48:23
**impliedly** [1] - 38:22
**implying** [1] - 59:9
**import** [1] - 7:14
**importance** [1] - 58:13
**important** [8] - 4:19, 5:4, 6:6, 27:1, 30:23, 46:10, 69:1
**impossibility** [2] - 9:4, 33:14
**impossible** [1] - 33:22
**improper** [1] - 42:19
**improperly** [1] - 54:18
**inaccurate** [1] - 30:11
**inaction** [4] - 31:19, 32:1, 32:14, 39:15
**inactions** [1] - 39:17
**inapplicable** [1] - 37:21
**inappropriate** [1] - 54:11
**incidentally** [1] - 26:9
**inclined** [2] - 62:15, 63:22
**included** [3] - 6:10, 10:2, 60:12
**inconsistencies** [3] - 30:24, 31:1
**inconsistent** [2] - 30:22, 30:24
**Incorporated** [3] - 37:12, 47:8, 51:15
**incorporated** [1] - 6:13
**incorporating** [1] - 6:7
**incorporation** [1] - 11:8
**increase** [1] - 54:22
**increased** [1] - 54:20
**Indeed** [1] - 29:15

**independent** [1] - 29:4
**indicated** [1] - 53:21
**indicia** [1] - 15:15
**indirectly** [1] - 5:9
**individual** [4] - 40:24, 54:17, 54:21
**individuals** [1] - 54:25
**indulging** [1] - 58:4
**Industrial** [1] - 51:8
**industry** [7] - 21:23, 23:21, 39:16, 39:20, 54:25, 55:2
**inequitable** [2] - 56:3, 56:5
**inference** [1] - 16:23
**informal** [4] - 5:20, 39:10, 41:24, 63:12
**information** [5] - 26:20, 39:25, 53:15, 61:1
**ingredient** [3] - 3:22, 11:5, 49:3
**ingredients** [4] - 4:25, 36:11, 52:7, 52:14
**inherent** [1] - 55:7
**initial** [4] - 53:18, 53:20, 53:21, 65:22
**injured** [1] - 53:3
**injury** [1] - 18:23
**inquirer** [1] - 39:21
**insert** [1] - 13:3
**inserting** [1] - 11:3
**inside** [1] - 35:14
**insight** [3] - 16:19, 21:8, 21:13
**instance** [1] - 13:16
**Instead** [1] - 41:23
**Insurance** [1] - 16:8
**insurance** [1] - 16:11
**intend** [1] - 28:21
**intent** [4] - 17:14, 37:8, 37:13, 38:18
**intentional** [2] - 51:24, 51:25
**interest** [7] - 23:6, 36:18, 36:25, 64:5, 64:14, 65:2, 69:11
**interested** [1] - 23:10
**interesting** [2] - 42:2, 72:16
**interests** [1] - 66:4
**interlocutory** [1] - 63:19
**International** [8] - 18:21, 19:19, 19:22, 20:4, 20:22, 53:9, 54:14, 55:16
**interpret** [1] - 31:8
**Intervenors** [1] - 38:21
**intrusive** [1] - 69:19
**invite** [2] - 58:22, 59:20
**involved** [4] - 4:8, 32:10, 32:18, 47:2
**involves** [1] - 24:17
**involving** [1] - 25:9
**issue** [71] - 3:5, 4:8, 4:9, 5:13, 5:15, 5:17, 6:14, 7:8, 7:9, 7:10, 7:12, 8:20, 11:14, 11:18, 11:19, 12:7, 12:12, 14:8, 14:9, 14:24, 15:20, 17:6, 19:23, 20:19, 21:9, 21:11, 21:20, 21:25, 23:8, 24:4, 24:5, 24:16, 24:18, 24:24, 25:15, 27:14, 27:18, 28:1, 28:11, 29:2, 30:8, 30:14, 33:18, 34:25, 35:19, 43:20, 45:20, 46:13, 47:1, 47:15, 49:6, 50:17, 58:12, 60:2, 60:4, 61:24, 62:12, 62:16,

62:19, 63:23, 64:13, 70:4, 70:11, 70:24, 71:1, 71:8, 71:11, 71:25, 72:5
**issues** [15] - 3:7, 11:10, 32:12, 32:17, 45:15, 56:8, 59:20, 59:24, 64:13, 66:5, 69:10, 69:14, 69:16, 72:16
**itself** [12] - 13:20, 14:10, 22:15, 23:2, 27:7, 28:22, 28:24, 31:19, 32:1, 32:4, 36:14, 44:23

### J

**January** [1] - 47:11
**JBS** [1] - 1:7
**JEROME** [1] - 1:15
**Jersey** [13] - 3:20, 4:17, 9:10, 9:11, 16:9, 16:11, 19:6, 27:20, 30:10, 36:12, 42:17, 49:21, 59:6
**JERSEY** [2] - 1:1, 1:13
**JOHN** [1] - 1:12
**jot** [1] - 29:20
**Judge** [49] - 5:4, 5:16, 5:20, 7:11, 8:24, 9:23, 11:11, 14:7, 17:25, 18:3, 18:12, 19:3, 19:8, 19:20, 20:13, 27:19, 36:22, 46:2, 58:9, 59:4, 59:14, 60:2, 61:4, 61:21, 61:24, 62:12, 63:1, 63:5, 64:2, 64:11, 64:19, 64:25, 65:1, 65:12, 66:2, 66:3, 66:8, 66:21, 66:24, 68:12, 68:18, 68:23, 69:12, 69:19, 70:1, 70:23, 71:2
**JUDGE** [1] - 1:15
**judge's** [1] - 70:16
**judges** [1] - 24:16
**judgment** [1] - 54:8
**judicial** [9] - 25:8, 64:5, 64:6, 64:14, 64:15, 69:11, 69:21, 70:15
**judiciary** [5] - 24:19, 24:25, 25:4, 30:18, 36:17
**juice** [2] - 10:18, 10:19
**July** [25] - 8:15, 8:16, 8:23, 12:8, 12:10, 12:19, 12:24, 13:6, 16:25, 25:24, 26:1, 26:4, 26:23, 27:13, 29:14, 39:19, 40:1, 40:4, 40:10, 40:11, 58:7, 58:12, 58:22, 62:2, 62:7
**jump** [1] - 7:10
**jumping** [1] - 67:1
**June** [4] - 13:16, 14:16, 15:9, 40:11
**jurisdiction** [34] - 3:10, 3:16, 7:10, 11:10, 11:15, 11:17, 11:23, 16:7, 16:21, 21:10, 21:11, 21:15, 23:14, 23:15, 24:4, 24:11, 24:12, 24:15, 25:12, 25:14, 30:14, 30:25, 32:21, 33:5, 33:8, 43:21, 59:18, 64:14, 71:12, 71:16, 71:19, 71:25, 72:6, 72:8
**jurisprudentially** [1] - 66:25
**jury** [4] - 4:5, 4:17, 5:3, 9:10
**justify** [1] - 39:17

### K

**keep** [1] - 23:13

**keeping** [1] - 16:18
**kind** [2] - 3:17, 58:6
**knowing** [1] - 42:17
**knowledge** [3] - 17:2, 24:8, 61:18
**knowledgeable** [1] - 13:17
**known** [3] - 52:19, 54:3, 55:19
**knows** [2] - 13:18, 31:13

### L

**label** [9] - 28:12, 29:16, 29:20, 29:23, 29:24, 30:1, 30:12, 34:2, 48:18
**labeled** [4] - 3:21, 11:5, 32:16, 49:12
**Labeling** [6] - 13:12, 13:13, 13:14, 40:12, 40:13
**labeling** [22] - 3:19, 3:25, 4:2, 5:10, 9:7, 9:8, 9:11, 17:14, 21:18, 23:21, 28:17, 28:21, 29:19, 29:22, 36:1, 36:2, 36:4, 37:1, 37:4, 37:18, 49:12, 56:25
**labels** [1] - 52:3
**laboratory** [1] - 17:24
**lack** [1] - 9:4
**language** [1] - 38:17
**lap** [1] - 30:17
**LAPINSKI** [47] - 1:19, 2:4, 2:12, 6:22, 21:5, 22:16, 23:17, 24:7, 25:25, 28:24, 29:17, 29:21, 31:16, 34:23, 35:9, 38:3, 39:9, 40:9, 40:16, 41:13, 44:8, 45:14, 45:17, 45:22, 47:14, 47:21, 47:24, 50:10, 50:15, 51:18, 51:20, 53:20, 56:15, 56:17, 57:3, 57:18, 57:25, 63:8, 64:20, 64:23, 65:18, 67:4, 67:12, 67:23, 71:10, 71:24, 72:19
**Lapinski** [5] - 2:13, 21:4, 58:1, 63:6, 63:25
**large** [2] - 5:5, 19:12
**last** [4] - 29:7, 36:22, 56:17, 64:21
**LAUREN** [1] - 1:3
**Lauren** [2] - 2:14, 2:16
**law** [13] - 9:5, 20:14, 27:7, 33:15, 33:23, 37:15, 38:11, 39:16, 44:20, 44:25, 49:22, 54:4, 59:15
**laws** [1] - 31:6
**lawsuit** [6] - 8:6, 14:14, 17:7, 18:12, 19:8, 44:2
**lawsuits** [2] - 27:18, 28:19
**least** [6] - 6:16, 15:13, 43:8, 48:16, 64:10, 70:15
**leave** [1] - 46:1
**led** [6] - 13:6, 14:1, 14:14, 14:15, 26:5, 26:6
**left** [5] - 11:9, 24:19, 24:25, 25:4, 30:17
**legal** [5] - 18:6, 18:10, 20:16, 26:3, 72:6
**legally** [4] - 18:5, 18:20, 19:15, 20:3
**legislation** [3] - 9:6, 33:17, 37:19
**legislative** [1] - 37:16
**legitimate** [2] - 36:17, 36:24
**less** [8] - 13:10, 13:22, 20:9, 52:18, 52:21, 52:24, 54:2, 56:4

**letter** [53] - 8:16, 8:19, 8:23, 12:8, 12:10, 12:20, 12:24, 13:6, 13:9, 13:11, 13:25, 14:6, 14:9, 14:15, 14:17, 15:1, 15:9, 15:14, 15:19, 15:22, 16:25, 25:24, 26:1, 26:4, 26:5, 26:6, 26:23, 27:13, 27:21, 29:14, 39:19, 40:1, 40:4, 40:10, 40:11, 40:23, 40:24, 41:4, 58:7, 58:12, 58:14, 58:23, 60:6, 60:7, 61:7, 62:3, 62:7, 62:8, 63:13, 70:12
**letters** [3] - 12:13, 12:16, 62:5
**level** [3] - 13:11, 15:4, 22:13
**LEXIS** [2] - 25:6, 47:9
**liable** [2] - 43:10, 43:15
**light** [2] - 22:6, 70:18
**likely** [1] - 11:25
**Lime** [1] - 36:21
**limit** [3] - 44:12, 44:15, 59:10
**limitations** [2] - 6:19, 7:6
**limited** [2] - 66:5, 68:22
**line** [4] - 18:2, 40:10, 60:7, 61:18
**LISA** [1] - 1:24
**LISBETH** [1] - 1:22
**Lisbeth** [1] - 2:22
**listen** [1] - 8:19
**literally** [1] - 16:12
**litigated** [1] - 9:1
**litigation** [9] - 13:2, 13:20, 13:23, 13:24, 27:23, 28:15, 28:17, 28:23, 57:16
**live** [1] - 9:20
**LLC** [1] - 1:8
**local** [3] - 37:20, 44:15, 44:16
**locally** [1] - 59:6
**Lockwood** [1] - 47:8
**long-standing** [10] - 7:15, 8:8, 8:12, 15:10, 15:23, 43:25, 44:5, 58:24, 59:11, 62:1
**look** [27] - 7:6, 7:12, 10:11, 10:12, 11:22, 14:3, 26:16, 26:23, 40:9, 40:10, 40:21, 41:15, 41:25, 42:3, 42:10, 42:23, 43:11, 44:19, 48:8, 58:25, 59:20, 68:2, 69:1, 70:3, 70:4, 70:18
**looked** [6] - 15:4, 28:1, 28:3, 28:4, 33:14, 35:4
**looking** [9] - 23:10, 23:11, 25:10, 30:8, 30:9, 39:18, 43:17, 66:11
**loophole** [1] - 42:14
**lose** [1] - 65:14
**loss** [20] - 18:20, 18:24, 18:25, 19:5, 19:21, 20:3, 20:5, 20:17, 20:20, 20:21, 52:15, 52:20, 52:21, 52:23, 53:1, 53:6, 53:13, 57:13, 57:17
**low** [1] - 13:11
**Luckey** [1] - 25:6

## M

**Machinery** [2] - 51:8, 51:9
**magistrate** [1] - 70:16
**maintain** [2] - 6:2, 6:8

**maintaining** [2] - 7:7, 25:13
**maker** [1] - 61:17
**man** [1] - 4:25
**man-made** [1] - 4:25
**managing** [1] - 46:2
**mandatory** [2] - 36:1, 36:2
**manifest** [2] - 9:3, 37:8
**manufacture** [1] - 60:18
**manufactured** [1] - 34:5
**manufacturer** [14] - 12:15, 29:23, 31:11, 43:3, 43:11, 47:2, 47:3, 49:16, 50:4, 50:7, 50:8, 56:21, 58:15, 60:16
**manufacturer's** [1] - 43:2
**manufacturers** [5] - 4:24, 50:12, 61:8, 61:9
**manufacturing** [9] - 12:18, 12:23, 15:5, 15:7, 59:22, 62:7, 62:9, 69:14
**march** [1] - 69:18
**March** [3] - 14:18, 45:24, 66:12
**MARCUS** [1] - 1:24
**Marine** [1] - 31:22
**mark** [1] - 48:7
**market** [19] - 19:23, 19:25, 20:2, 20:6, 20:23, 35:23, 42:9, 42:10, 42:11, 42:15, 53:4, 53:7, 53:13, 54:16, 54:19, 55:3, 55:4, 55:11
**marketed** [6] - 29:19, 47:3, 52:6, 54:18, 55:1, 55:13
**marketing** [7] - 36:9, 38:7, 48:2, 52:2, 52:12, 56:7, 56:19
**marketplace** [1] - 17:22
**Massachusetts** [1] - 36:20
**material** [1] - 57:5
**matter** [31] - 3:10, 9:9, 24:21, 24:22, 25:5, 26:10, 27:19, 28:4, 28:25, 29:1, 29:9, 29:10, 31:21, 31:22, 32:23, 42:6, 43:13, 45:25, 62:17, 64:15, 64:25, 65:7, 65:13, 66:16, 66:22, 66:23, 67:3, 68:7, 69:25, 70:23
**matter's** [1] - 65:10
**matters** [3] - 28:1, 62:16, 63:15
**McElroy** [3] - 1:21, 2:19, 2:23
**MDL** [1] - 17:10
**mean** [1] - 67:9
**meaning** [1] - 6:9
**means** [2] - 10:14, 57:13
**measure** [1] - 53:2
**mechanism** [1] - 11:22
**medications** [1] - 28:10
**MedQuist** [1] - 51:15
**Medtronic** [1] - 37:12
**meet** [1] - 43:6
**meeting** [6] - 13:7, 13:9, 26:14, 26:15, 26:18, 40:6
**members** [1] - 61:9
**mentioned** [4] - 13:7, 33:9, 45:12, 46:13
**merchantability** [2] - 48:10, 48:23
**merchantable** [1] - 48:16
**Merck** [2] - 18:21, 53:8

**Mercury** [1] - 31:22
**mere** [1] - 9:9
**merits** [1] - 66:6
**methods** [1] - 58:18
**middle** [1] - 26:15
**midst** [1] - 12:12
**might** [4] - 16:18, 16:20, 28:17, 70:8
**mile** [1] - 59:5
**miles** [7] - 44:12, 44:14, 44:17, 59:8, 59:10
**millions** [3] - 42:16
**mind** [1] - 70:2
**minimally** [1] - 41:25
**misconduct** [1] - 51:13
**mislabeling** [3] - 5:12, 38:1, 51:25
**mislead** [1] - 56:22
**misleading** [11] - 22:1, 30:11, 33:23, 39:2, 41:20, 50:24, 52:1, 52:6, 52:12, 56:7, 56:19
**mispronouncing** [1] - 7:24
**misrepresentation** [1] - 25:3
**misrepresentations** [2] - 30:17, 51:3
**misses** [1] - 48:7
**mitigated** [1] - 14:11
**model** [4] - 42:5, 54:7, 57:4, 57:15
**MONDAY** [1] - 1:13
**money** [2] - 20:10, 57:8
**month** [1] - 15:1
**months** [4] - 13:10, 64:17, 65:14, 65:19
**mooring** [1] - 34:22
**morning** [11] - 2:3, 2:4, 2:5, 2:6, 2:7, 2:12, 2:15, 2:18, 2:22, 2:25, 72:16
**most** [3] - 3:2, 13:17, 31:20
**motion** [19] - 12:25, 17:10, 37:15, 46:17, 46:18, 54:5, 54:8, 54:11, 55:23, 58:10, 63:18, 63:19, 65:3, 65:6, 66:19, 67:7, 68:13, 68:16, 70:6
**motions** [3] - 63:18, 70:21, 70:22
**motivation** [1] - 26:12
**move** [8] - 43:21, 46:8, 46:9, 47:15, 54:9, 65:2, 66:4, 68:4
**moving** [5] - 58:6, 68:6, 68:7, 68:8, 68:17
**MR** [88] - 2:4, 2:5, 2:6, 2:12, 2:15, 2:18, 3:14, 6:22, 7:3, 8:1, 9:23, 10:6, 10:10, 10:24, 11:1, 12:3, 14:5, 16:3, 16:22, 17:20, 17:25, 19:19, 20:13, 21:2, 21:5, 22:16, 23:17, 24:7, 25:25, 28:24, 29:17, 29:21, 31:16, 34:23, 35:9, 38:3, 39:9, 40:9, 40:16, 41:13, 44:8, 45:14, 45:17, 45:22, 47:14, 47:21, 47:24, 50:10, 50:15, 51:18, 51:20, 53:20, 56:15, 56:17, 57:3, 57:18, 57:25, 58:3, 60:18, 60:25, 61:21, 63:1, 63:3, 63:5, 63:8, 63:16, 64:2, 64:20, 64:23, 65:18, 66:24, 67:4, 67:12, 67:23, 69:4, 69:6, 70:11, 71:1, 71:4, 71:10, 71:11, 71:21, 71:24, 72:10, 72:13, 72:19, 72:20, 72:21
**MS** [3] - 2:7, 2:22, 72:22

MULVANEY [1] - 1:21
Mulvaney [2] - 2:19, 2:23
must [5] - 27:8, 32:17, 48:16, 48:24, 51:10

## N

N.J.S.A [1] - 48:15
Nader [1] - 25:1
name [3] - 2:12, 7:24, 59:13
namely [1] - 7:19
nation [1] - 36:5
national [1] - 37:18
National [1] - 43:7
nationwide [1] - 9:17
natural [102] - 3:21, 4:6, 4:23, 5:6, 5:15, 6:3, 6:6, 6:9, 6:12, 6:20, 7:23, 8:18, 9:10, 9:19, 9:21, 10:1, 10:5, 10:6, 10:8, 10:13, 10:14, 10:20, 11:4, 11:5, 12:19, 13:4, 14:19, 14:21, 15:8, 17:23, 20:9, 20:21, 21:17, 21:21, 22:8, 25:21, 26:8, 26:13, 26:14, 26:18, 26:21, 27:21, 31:3, 31:12, 32:16, 33:20, 33:25, 34:4, 35:12, 35:15, 35:16, 35:17, 35:20, 35:23, 35:24, 36:5, 36:10, 36:11, 37:23, 38:7, 38:14, 38:25, 39:23, 40:22, 41:6, 44:1, 45:5, 45:9, 45:10, 47:1, 47:4, 48:1, 48:3, 48:4, 48:13, 48:14, 48:20, 49:2, 49:4, 52:1, 52:4, 52:7, 52:8, 52:13, 55:1, 55:8, 55:14, 57:1, 57:7, 58:19, 58:25, 59:13, 60:15, 61:4, 61:14, 62:10, 62:12
nature [4] - 3:23, 4:17, 5:2, 11:6
nearly [5] - 31:2, 65:21, 67:23, 69:12
necessary [2] - 50:21, 51:6
need [9] - 23:13, 24:8, 25:8, 29:3, 29:7, 29:8, 49:15, 61:19, 63:4
needs [2] - 49:6, 56:1
negative [1] - 21:11
net [1] - 4:16
never [9] - 28:22, 28:24, 29:10, 29:12, 29:15, 31:10, 42:12, 44:14, 44:19
new [4] - 22:11, 22:16, 36:4, 42:4
New [13] - 3:20, 4:17, 9:9, 9:11, 16:9, 16:11, 19:6, 27:20, 30:10, 36:12, 42:17, 49:21, 59:6
NEW [2] - 1:1, 1:13
nexus [2] - 55:18, 55:20
NLEA [6] - 5:7, 37:17, 37:24, 38:9, 38:15
NO [1] - 1:7
None [1] - 8:7
none [1] - 18:25
normally [2] - 6:11, 10:3
Northern [2] - 25:7, 47:11
note [1] - 41:18
nothing [7] - 6:9, 11:4, 22:4, 22:18, 35:17, 39:19, 55:20
notice [16] - 5:22, 41:10, 49:5, 49:7,

49:8, 49:15, 49:18, 49:20, 49:21, 50:2, 50:4, 50:5, 51:12, 56:14, 60:3
notification [3] - 18:11, 18:14, 18:17
notify [1] - 18:17
notwithstanding [1] - 61:4
Number [1] - 47:12
nutrient [1] - 36:6
Nutrition [6] - 13:9, 13:14, 13:15, 40:5, 40:13, 40:14

## O

object [11] - 26:24, 27:5, 27:6, 27:9, 41:2, 41:4, 48:24, 60:7, 60:8, 60:13, 62:10
objection [2] - 47:19, 71:23
obstacle [4] - 9:5, 9:6, 17:7, 33:16
obstacles [1] - 29:25
obtain [2] - 57:9, 60:14
Obviously [1] - 12:4
obviously [8] - 3:5, 58:20, 58:22, 61:7, 61:22, 64:6, 69:8, 69:16
occupy [2] - 35:9, 35:11
occupying [1] - 35:7
occur [1] - 70:8
occurred [1] - 13:9
odds [1] - 67:6
OF [1] - 1:1
offensive [1] - 48:24
Office [2] - 13:13, 40:13
officer [5] - 44:11, 44:13, 44:16, 44:17
OFFICIAL [1] - 1:25
official [2] - 28:19, 58:14
oil [1] - 10:15
oleoresin [1] - 10:15
one [37] - 4:11, 4:20, 9:12, 16:7, 16:8, 17:7, 17:8, 20:6, 26:14, 26:15, 34:8, 34:15, 36:23, 39:8, 39:13, 40:1, 40:6, 40:16, 42:13, 43:5, 43:12, 43:13, 43:14, 43:15, 44:15, 48:25, 62:22, 64:10, 68:2, 68:11, 68:17, 69:16
One [1] - 19:7
ONE [1] - 1:12
one-on-one [3] - 26:14, 26:15, 40:1
open [1] - 16:18
Operating [2] - 53:9, 54:14
operative [1] - 4:20
Operators [1] - 55:16
opinion [6] - 3:11, 23:23, 46:7, 65:6, 66:19, 67:7
Opinion [1] - 68:12
opportunity [6] - 22:14, 22:17, 62:23, 63:7, 70:18, 72:3
oppose [1] - 70:6
opposing [3] - 12:25, 58:8, 64:7
Opposing [1] - 63:18
opposition [3] - 2:17, 37:15, 48:22
options [2] - 43:3, 43:5
oral [12] - 2:8, 3:1, 62:13, 63:17, 63:20,

66:9, 66:13, 66:14, 66:15, 66:16, 66:22, 68:24
Order [1] - 71:5
order [8] - 21:7, 24:9, 32:12, 48:22, 54:22, 55:14, 57:7, 66:8
ordered [1] - 64:4
orderly [1] - 70:14
orders [1] - 39:16
otherwise [1] - 19:18
ounces [1] - 19:11
out-of-pocket [1] - 20:22
outlined [2] - 12:24, 62:8
outside [1] - 41:1
overall [1] - 70:25
overcome [4] - 29:22, 29:23, 29:25, 37:7
overhead [1] - 3:17
overlap [1] - 66:6
own [9] - 11:4, 12:8, 12:22, 13:3, 16:4, 16:5, 23:15, 28:16, 30:2
owner's [1] - 18:11

## P

package [2] - 23:8, 28:6
packers [1] - 60:19
page [1] - 6:18
Page [2] - 5:18, 49:19
paid [8] - 3:9, 19:1, 19:17, 52:16, 52:18, 53:21, 54:1, 56:4
papers [2] - 24:8, 47:20
Paragraph [2] - 4:21, 4:22
parked [2] - 44:11, 44:16
part [8] - 5:5, 18:11, 19:12, 32:1, 46:6, 58:10, 65:6, 66:18
parte [1] - 40:20
partial [2] - 6:17, 10:7
particular [12] - 27:9, 40:19, 41:3, 41:5, 41:6, 46:24, 51:7, 55:6, 57:17, 57:19, 57:23, 67:15
parties [3] - 46:3, 61:19, 70:5
parts [1] - 4:20
party [2] - 12:15, 60:19
passage [1] - 67:10
past [5] - 16:7, 16:20, 21:10, 22:14, 25:18
pasta [3] - 47:2, 47:3
Paul [1] - 36:22
pay [3] - 27:11, 54:25, 55:9
pending [11] - 17:10, 26:10, 27:18, 46:18, 64:24, 65:3, 65:4, 65:10, 65:25, 70:7, 70:22
people [2] - 19:12, 55:9
per [1] - 14:22
percent [2] - 4:23, 20:9
percentage [2] - 56:25, 57:1
perfect [1] - 45:7
performance [1] - 9:4
perhaps [5] - 13:4, 14:14, 20:18, 61:19,

64:11

**period** [7] - 15:1, 23:9, 28:9, 33:1, 33:2, 41:15, 65:15

**permissiveness** [3] - 44:5, 44:22, 44:23

**permit** [2] - 43:25, 72:4

**person** [4] - 13:17, 14:19, 15:2, 69:2

**personal** [1] - 18:23

**personally** [1] - 23:24

**perspective** [1] - 64:11

**pertaining** [1] - 34:19

**pertains** [1] - 38:1

**petition** [4] - 11:24, 12:1, 12:7, 15:21

**petitions** [3] - 21:22, 32:25

**pharmaceutical** [1] - 23:21

**Philip** [1] - 2:15

**PHILIP** [1] - 1:20

**philosophy** [1] - 70:15

**place** [18] - 23:2, 25:22, 27:3, 27:4, 32:6, 39:24, 41:24, 42:5, 42:25, 43:17, 45:1, 45:2, 45:3, 53:11, 66:8, 66:21, 68:3, 68:8

**placed** [1] - 44:2

**plague** [1] - 7:14

**Plaintiff** [4] - 11:3, 43:7, 52:10, 55:18

**plaintiff** [45] - 2:11, 2:14, 3:22, 4:11, 5:19, 5:20, 8:21, 9:16, 11:18, 11:24, 12:22, 12:24, 13:3, 14:23, 15:17, 15:25, 16:1, 16:3, 18:5, 18:8, 19:16, 19:24, 20:8, 23:5, 30:6, 36:3, 43:17, 48:8, 48:12, 48:24, 50:22, 51:3, 51:22, 52:16, 52:17, 53:21, 56:1, 57:19, 57:21, 59:2, 59:9, 59:12, 61:23, 65:14, 65:24

**Plaintiff's** [2] - 4:11, 37:15

**plaintiff's** [8] - 4:22, 5:2, 17:23, 20:10, 21:8, 37:6, 47:15, 50:18

**plaintiffs** [14] - 3:19, 4:5, 11:15, 12:13, 28:7, 29:5, 49:15, 50:23, 51:7, 55:17, 55:24, 58:11, 58:21

**Plaintiffs** [3] - 1:5, 29:4, 53:11

**PLAINTIFFS** [1] - 1:20

**plate** [4] - 17:1, 23:20, 23:23, 32:9

**play** [1] - 57:15

**PLAZA** [1] - 1:12

**plead** [2] - 55:24, 57:20

**pleading** [9] - 18:19, 50:17, 50:20, 50:21, 51:2, 51:6, 51:8, 52:9, 55:23

**pled** [2] - 4:14, 51:21

**Plumley** [1] - 36:20

**plus** [1] - 41:14

**pocket** [2] - 20:22

**point** [17] - 14:11, 20:10, 22:9, 25:15, 30:19, 38:13, 42:2, 44:8, 46:12, 50:16, 59:19, 62:24, 63:13, 64:21, 64:23, 65:22, 66:1

**points** [3] - 3:4, 43:21, 49:24

**police** [5] - 44:10, 44:13, 44:16, 44:17

**policies** [4] - 14:25, 22:14, 30:9, 33:17

**policy** [59] - 4:7, 5:16, 5:18, 5:19, 5:21, 6:2, 6:3, 6:7, 6:8, 6:15, 6:24, 7:7, 7:15,

7:17, 7:19, 7:22, 8:4, 8:8, 8:12, 8:24, 8:25, 9:6, 9:25, 11:7, 11:19, 12:5, 12:10, 12:19, 13:1, 15:8, 15:10, 15:24, 16:5, 16:10, 20:15, 20:16, 24:17, 39:1, 39:7, 39:10, 41:9, 41:23, 41:24, 42:5, 43:25, 58:25, 59:11, 60:2, 60:15, 61:2, 61:14, 62:1, 62:2, 62:7, 62:11

**political** [1] - 5:8

**pose** [1] - 27:13

**posed** [1] - 21:7

**posited** [1] - 53:12

**position** [11] - 22:18, 28:16, 28:21, 28:23, 28:25, 29:16, 31:15, 36:21, 46:3, 60:23, 66:17

**positive** [2] - 16:16, 21:12

**possess** [1] - 36:17

**possession** [1] - 61:17

**post** [2] - 8:14, 8:15

**posted** [2] - 59:8, 59:10

**practical** [1] - 17:16

**practicalities** [1] - 19:8

**practices** [1] - 57:10

**precise** [3] - 4:7, 8:17, 51:12

**preclude** [1] - 57:22

**predated** [1] - 28:15

**predict** [2] - 22:10, 57:14

**preempt** [5] - 37:14, 38:10, 38:19, 38:22, 39:16

**preempted** [3] - 37:6, 38:12, 43:15

**preemption** [45] - 3:3, 3:4, 3:6, 3:8, 4:2, 4:4, 4:5, 5:13, 6:1, 6:14, 6:25, 7:5, 9:2, 9:3, 11:14, 13:5, 17:6, 18:4, 19:14, 30:8, 33:10, 33:13, 33:18, 37:7, 37:11, 37:20, 37:21, 37:25, 38:8, 38:9, 39:17, 42:20, 42:21, 42:22, 42:23, 43:20, 44:7, 45:6, 45:8, 45:16, 46:13, 46:23, 47:6

**preemptive** [2] - 28:16, 28:21

**preempts** [1] - 38:14

**prejudice** [2] - 68:19, 69:11

**prejudiced** [2] - 65:25, 68:5

**prejudicial** [1] - 68:3

**preliminary** [1] - 69:17

**premature** [2] - 53:5, 53:8

**premise** [1] - 51:16

**premium** [16] - 19:1, 19:3, 19:12, 19:20, 20:5, 52:17, 53:21, 54:1, 54:18, 54:25, 55:5, 55:7, 55:10, 55:13, 55:14, 57:6

**prepared** [1] - 13:24

**present** [9] - 11:24, 22:15, 29:9, 29:10, 39:25, 40:19, 45:15, 54:24, 63:17

**presented** [3] - 32:15, 69:10, 70:1

**presents** [1] - 3:4

**presumption** [2] - 16:23, 37:7

**prevent** [1] - 9:14

**previously** [1] - 70:1

**price** [16] - 19:1, 19:3, 19:12, 19:13, 19:20, 20:5, 52:17, 53:22, 54:1, 54:20, 54:23, 55:1, 55:5, 55:7, 59:14

**priced** [3] - 19:25, 20:1

**primary** [30] - 3:10, 3:16, 7:10, 9:13, 11:14, 11:17, 11:23, 16:6, 16:20, 21:9, 21:11, 21:14, 24:4, 24:10, 24:12, 24:15, 25:12, 30:14, 30:25, 32:21, 33:5, 33:8, 43:20, 59:18, 71:12, 71:16, 71:19, 71:25, 72:5, 72:7

**priorities** [1] - 6:19

**prioritizes** [1] - 32:13

**priority** [1] - 32:17

**probative** [4] - 8:23, 12:16, 12:17, 62:6

**problem** [1] - 18:15

**procedure** [1] - 39:24

**procedures** [1] - 30:9

**proceed** [1] - 46:5

**proceeding** [3] - 46:14, 46:15, 68:14

**Proceedings** [1] - 72:24

**proceeds** [1] - 61:22

**process** [14] - 13:6, 14:1, 17:17, 17:24, 26:5, 41:5, 41:6, 53:22, 60:9, 60:23, 62:8, 62:9, 65:23

**processed** [3] - 5:1, 36:11, 42:1

**processes** [5] - 15:5, 15:7, 26:16, 26:22

**processing** [1] - 69:15

**produced** [2] - 53:14, 53:15

**producing** [1] - 58:19

**product** [77] - 3:21, 4:24, 5:22, 7:22, 8:5, 8:7, 9:19, 10:16, 12:14, 15:3, 15:13, 15:14, 18:1, 19:13, 19:17, 19:25, 20:1, 20:11, 20:12, 29:24, 30:2, 30:12, 31:11, 32:16, 33:21, 33:25, 34:3, 34:4, 34:14, 35:24, 41:9, 41:10, 42:8, 42:10, 47:4, 48:1, 48:2, 48:3, 48:4, 48:13, 48:14, 48:18, 49:2, 49:3, 49:17, 50:7, 50:11, 50:13, 52:3, 52:5, 52:6, 52:7, 52:17, 52:19, 53:2, 53:22, 54:1, 54:3, 55:1, 55:2, 55:13, 55:19, 56:4, 56:12, 56:21, 57:7, 60:10, 60:13, 60:20, 60:21, 60:24, 61:5, 61:18, 62:11

**Product** [3] - 13:12, 40:12, 49:10

**Products** [1] - 24:23

**products** [7] - 3:20, 9:22, 18:2, 20:8, 45:10, 55:8, 61:10

**profits** [8] - 18:6, 56:6, 56:12, 56:18, 56:20, 56:23, 56:25, 57:1

**programs** [1] - 56:20

**prohibits** [1] - 38:15

**promised** [2] - 48:19, 52:24

**promises** [3] - 48:17, 48:19, 52:22

**promote** [1] - 9:7

**promotion** [2] - 36:9, 52:12

**promptly** [1] - 16:24

**promulgated** [1] - 37:22

**proof** [1] - 20:20

**proper** [1] - 31:21

**properly** [4] - 51:21, 52:10, 52:15, 52:16

**proposed** [1] - 41:14

**prosecute** [1] - 59:6

**protect** [1] - 36:16

**protecting** [2] - 36:18, 36:25

**protection** [1] - 36:12
**protein** [1] - 10:15
**prove** [1] - 20:17
**provide** [1] - 18:13
**provided** [5] - 6:5, 12:13, 12:16, 43:2, 51:10
**provides** [1] - 49:21
**proving** [1] - 53:17
**provision** [4] - 37:25, 38:11, 50:2
**public** [3] - 11:13, 28:15, 56:22
**Public** [1] - 38:21
**publicly** [1] - 57:5
**pull** [3] - 7:3, 44:17, 44:20
**pulled** [1] - 44:19
**pulls** [1] - 44:14
**punitive** [1] - 17:12
**purchase** [1] - 48:12
**purchased** [6] - 48:8, 48:13, 52:5, 52:19, 54:3, 55:19
**purpose** [3] - 4:1, 38:17, 51:12
**pursuant** [3] - 24:14, 48:15, 60:3
**pursue** [1] - 13:5
**push** [2] - 67:18, 69:3
**put** [19] - 25:21, 26:17, 28:5, 29:23, 29:25, 32:23, 33:25, 34:14, 36:15, 39:24, 42:8, 43:9, 53:11, 53:12, 54:7, 66:8, 66:20, 68:2
**putting** [3] - 18:4, 19:14, 51:12

## Q

**questions** [6] - 21:7, 43:19, 43:24, 47:14, 56:9, 60:5
**quick** [1] - 71:20
**quite** [1] - 18:2
**quiver** [1] - 7:5
**quote** [2] - 5:20, 6:17
**quoting** [1] - 5:7

## R

**raise** [2] - 11:21, 49:5
**raised** [6] - 34:25, 43:22, 58:11, 63:20, 66:2
**raising** [1] - 20:25
**rather** [7] - 4:6, 11:15, 15:9, 19:9, 20:11, 61:2, 71:2
**rationale** [1] - 15:16
**reach** [1] - 16:12
**reached** [1] - 14:3
**read** [8] - 20:4, 20:22, 40:5, 54:10, 58:22, 60:8, 67:21, 68:24
**readdress** [1] - 70:24
**real** [6] - 7:15, 17:7, 17:11, 18:18, 61:12
**Real** [1] - 72:10
**really** [5] - 4:1, 4:11, 11:9, 12:11, 14:8
**reason** [4] - 28:5, 44:10, 57:11, 59:14
**reasonable** [2] - 49:2, 63:11

**reasonably** [2] - 49:1, 52:25
**reasoned** [2] - 64:8, 66:9
**reasoning** [1] - 15:16
**reasons** [6] - 9:13, 42:13, 57:2, 68:2, 68:12, 68:17
**receive** [2] - 18:7, 63:7
**received** [9] - 11:12, 33:3, 52:18, 52:23, 54:2, 56:1, 56:6, 56:23, 61:1
**receives** [2] - 52:21, 52:24
**receiving** [1] - 7:7
**recent** [1] - 12:6
**recently** [3] - 34:2, 37:2, 47:1
**reckoning** [1] - 53:19
**recognition** [1] - 66:6
**recognize** [4] - 21:25, 22:23, 39:2
**recognized** [6] - 32:11, 36:14, 37:12, 41:19, 41:20, 68:13
**recognizing** [1] - 23:13
**reconsider** [2] - 15:22, 15:23
**reconsideration** [1] - 16:1
**record** [6] - 2:10, 7:4, 8:14, 71:9, 71:18, 72:5
**redistribute** [1] - 56:13
**refer** [5] - 39:14, 49:9, 51:13, 58:24, 70:23
**reference** [3] - 24:8, 24:21, 62:10
**referenced** [3] - 25:19, 34:10, 37:25
**referral** [3] - 16:8, 71:16, 72:7
**referrals** [1] - 16:21
**referred** [2] - 3:11, 14:17
**referring** [2] - 10:11, 10:20
**refers** [1] - 15:10
**Refiners** [10] - 13:8, 14:22, 26:8, 26:11, 26:19, 27:22, 40:7, 40:21, 60:9, 61:7
**refusal** [3] - 31:8, 31:18, 31:25
**refused** [4] - 31:4, 32:3, 32:7, 68:18
**refuses** [1] - 36:16
**reg** [1] - 6:5
**regard** [18] - 16:10, 21:9, 21:17, 22:8, 28:6, 28:9, 28:13, 30:23, 34:9, 38:2, 39:14, 43:20, 45:16, 46:12, 47:24, 64:24, 65:12, 66:10
**regarding** [3] - 6:9, 35:14, 53:4
**Regardless** [1] - 64:8
**regardless** [2] - 7:21, 55:11
**register** [2] - 39:7, 41:9
**Register** [2] - 5:18, 41:18
**regularly** [1] - 4:23
**regulate** [6] - 5:6, 35:19, 35:23, 36:7, 38:24, 38:25
**regulated** [3] - 34:12, 34:19, 62:17
**regulates** [2] - 5:5, 35:22
**regulating** [1] - 35:8
**regulation** [15] - 5:24, 9:5, 22:6, 22:8, 22:25, 27:7, 31:19, 32:6, 33:15, 33:16, 35:2, 35:13, 38:5, 38:6, 44:22
**regulations** [27] - 6:7, 6:13, 9:18, 11:8, 14:25, 16:4, 27:3, 27:4, 29:12, 30:3, 31:6, 33:22, 33:24, 35:1, 35:6, 35:14,

35:18, 36:4, 41:6, 42:25, 43:17, 45:2, 45:11, 58:15, 61:2, 62:18
**regulatory** [6] - 5:25, 14:7, 14:8, 15:12, 38:22, 62:15
**reiterate** [1] - 66:17
**reiterated** [2] - 36:21, 37:1
**relates** [1] - 31:1
**relatively** [1] - 16:24
**reliability** [1] - 61:20
**reliance** [2] - 20:19, 44:1
**relies** [2] - 46:21, 46:22
**rely** [1] - 53:8
**relying** [1] - 7:19
**remained** [1] - 8:12
**remand** [1] - 70:3
**remanded** [1] - 37:3
**remedy** [1] - 18:6
**Remember** [1] - 7:15
**remove** [2] - 45:9, 59:13
**removed** [2] - 33:20, 34:3
**Removing** [1] - 33:24
**rendered** [1] - 64:18
**rendering** [2] - 65:6, 66:18
**repeat** [1] - 17:5
**reply** [2] - 45:23, 72:3
**REPORTER** [1] - 1:25
**representative** [1] - 26:19
**representatives** [1] - 16:11
**representing** [2] - 2:20, 2:24
**request** [1] - 23:4
**requesting** [1] - 63:12
**requests** [2] - 65:22, 65:24
**required** [6] - 5:10, 49:7, 49:20, 50:4, 55:20
**requirement** [4] - 5:9, 38:16, 49:8, 52:9
**requirements** [15] - 36:1, 36:3, 37:20, 42:4, 43:6, 43:9, 43:12, 44:25, 45:1, 49:18, 50:17, 50:20, 50:21, 51:6, 51:8
**research** [1] - 29:4
**researched** [1] - 29:2
**reserve** [1] - 70:20
**reserved** [1] - 38:24
**resource** [2] - 6:19, 7:6
**resources** [5] - 15:20, 21:24, 22:2, 22:24, 39:5
**respect** [24] - 3:3, 5:15, 6:14, 6:15, 7:11, 11:20, 14:24, 16:25, 17:10, 20:16, 58:7, 59:4, 59:18, 60:4, 60:25, 61:6, 61:22, 61:24, 62:4, 62:12, 63:16, 63:23, 69:9
**respectfully** [4] - 5:14, 5:21, 5:25, 9:3
**respecting** [1] - 70:15
**respond** [1] - 59:22
**responded** [1] - 65:23
**response** [4] - 23:9, 23:11, 26:23
**responsible** [1] - 51:23
**restrict** [1] - 6:3
**restrictions** [1] - 9:24
**result** [4] - 16:13, 21:11, 21:12, 27:7

**resulted** [1] - 42:24
**retain** [2] - 56:6, 56:23
**retention** [1] - 56:2
**reversed** [1] - 37:3
**review** [3] - 16:5, 22:14, 62:22
**reviewing** [1] - 22:18
**revisit** [2] - 63:23, 71:1
**rid** [1] - 22:3
**Riegel** [1] - 37:12
**rise** [1] - 2:1
**risk** [1] - 30:2
**road** [1] - 59:8
**roasting** [1] - 10:16
**ROBERT** [1] - 1:22
**Rubber** [1] - 53:1
**rule** [2] - 5:24, 27:7
**Rule** [7] - 50:19, 50:20, 51:2, 51:6,
   51:10, 51:22, 64:3
**rulemaking** [26] - 5:22, 6:20, 6:24,
   21:24, 23:1, 23:2, 23:3, 24:2, 25:22,
   26:1, 27:14, 32:2, 32:4, 33:4, 37:22,
   39:11, 41:7, 41:9, 41:14, 41:17, 41:18,
   41:22, 44:24, 45:1, 45:2, 45:5
**rules** [1] - 9:18
**ruling** [1] - 4:16
**rulings** [2] - 30:22, 30:24

## S

**sacrificed** [1] - 40:7
**Safety** [5] - 13:8, 13:15, 40:4, 40:14,
   43:7
**safety** [4] - 32:18, 40:7, 43:4, 43:9
**sakes** [1] - 72:17
**sale** [1] - 36:19
**sales** [1] - 69:15
**satisfied** [7] - 11:7, 36:2, 43:12, 49:8,
   51:7, 52:9, 67:14
**satisfies** [1] - 54:4
**satisfy** [4] - 17:23, 37:9, 49:18, 50:19
**sauce** [2] - 47:2, 47:3
**scales** [1] - 69:20
**scheduled** [2] - 45:23, 66:13
**scheduling** [1] - 66:8
**scheme** [1] - 38:22
**Schneider** [16] - 46:2, 58:9, 65:1, 65:12,
   66:2, 66:3, 66:8, 66:21, 68:12, 68:18,
   68:23, 70:1, 70:23, 71:2
**search** [1] - 16:17
**seatbelt** [1] - 43:4
**seated** [1] - 2:2
**second** [14] - 17:21, 25:15, 25:17,
   26:13, 30:20, 33:15, 40:3, 46:25,
   60:12, 64:21, 70:3, 70:4, 70:16, 70:18
**Second** [1] - 24:23
**Secondly** [1] - 34:9
**Section** [6] - 5:7, 5:8, 5:11, 10:11, 10:12
**see** [10] - 6:1, 7:2, 16:16, 16:25, 19:8,
   28:5, 29:3, 47:20, 59:7, 68:23

**seek** [3] - 15:25, 18:10, 57:22
**seeking** [3] - 4:5, 4:12, 13:3
**seeks** [1] - 44:3
**seller** [4] - 31:11, 49:16, 50:8, 50:10
**sellers** [1] - 19:7
**send** [3] - 16:16, 21:18, 23:8
**sense** [5] - 4:16, 9:9, 10:19, 18:18,
   64:10
**sent** [2] - 26:8, 26:19
**sentence** [1] - 7:6
**separate** [3] - 11:13, 35:19, 38:6
**serious** [1] - 17:13
**serve** [1] - 38:17
**served** [1] - 65:23
**set** [6] - 3:1, 37:19, 39:6, 51:11, 56:10,
   72:16
**several** [3] - 16:6, 32:24
**Seville** [1] - 51:8
**shall** [1] - 38:10
**shed** [2] - 21:8, 21:13
**short** [3] - 4:13, 13:5, 14:1
**show** [5] - 4:19, 54:24, 55:6, 55:10, 57:5
**showed** [1] - 26:22
**showing** [2] - 5:17, 67:14
**shown** [2] - 4:8, 15:19
**shows** [2] - 8:23, 21:18
**side** [4] - 40:6, 61:18, 71:14, 72:9
**sidelines** [1] - 67:16
**sides** [3] - 39:25, 40:18, 72:15
**signature** [1] - 40:10
**significance** [1] - 14:12
**significant** [5] - 8:11, 8:14, 63:21,
   67:24, 68:19
**significantly** [1] - 46:19
**SIMANDLE** [1] - 1:15
**similar** [3] - 20:8, 38:20, 47:5
**similarities** [1] - 67:24
**similarly** [1] - 1:4
**simple** [1] - 33:19
**simply** [3] - 38:18, 61:16, 67:1
**simultaneously** [1] - 36:14
**single** [3] - 39:20, 55:2, 63:13
**sit** [2] - 14:23, 67:16
**Situated** [1] - 1:4
**situation** [15] - 14:2, 27:9, 27:17, 30:6,
   38:23, 40:18, 44:21, 46:24, 51:1, 55:6,
   56:13, 56:21, 66:20
**situations** [2] - 31:17, 38:21
**six** [8] - 7:19, 7:21, 18:15, 44:3, 56:18,
   65:14, 65:19, 69:15
**six-year** [1] - 7:21
**slap** [1] - 42:18
**Snapple** [2] - 8:15, 34:1
**sold** [3] - 18:9, 20:9
**Solo** [2] - 50:25, 52:20
**someone** [3] - 50:2, 59:7, 71:8
**sorry** [5] - 4:21, 8:1, 51:18, 51:22, 51:24
**sort** [2] - 16:1, 40:6
**sought** [4] - 8:25, 39:21, 41:14

**sounds** [1] - 70:5
**South** [2] - 51:14
**Southmost** [1] - 51:9
**spanning** [1] - 22:21
**speaking** [1] - 13:18
**speaks** [3] - 28:22, 45:20, 64:1
**specialized** [1] - 24:8
**specific** [12] - 8:25, 15:6, 27:18, 35:1,
   35:2, 40:25, 41:1, 42:25, 45:4, 45:5,
   49:12, 51:4
**specifically** [16] - 4:14, 5:16, 11:20,
   22:22, 22:25, 28:1, 31:24, 31:25,
   35:14, 37:17, 38:10, 41:4, 41:17,
   41:21, 52:3, 52:4
**Specifically** [1] - 39:19
**specifications** [2] - 12:18, 12:23
**speed** [3] - 44:12, 44:15, 59:10
**spelled** [1] - 31:20
**spice** [1] - 10:18
**Spitzer** [2] - 2:14, 2:16
**SPITZER** [1] - 1:19
**Splenda** [3] - 35:21, 35:22, 35:23
**Sprietsma** [3] - 31:21, 31:22, 39:15
**spurred** [1] - 27:22
**squarely** [1] - 17:18
**Staff** [2] - 13:13, 40:13
**stage** [3] - 55:23, 57:19, 57:23
**stake** [1] - 57:16
**stance** [2] - 24:1, 24:2
**stand** [3] - 9:5, 23:18, 23:23
**standard** [3] - 18:20, 38:17, 57:12
**Standard** [2] - 13:13, 40:13
**standards** [1] - 51:2
**standing** [11] - 7:15, 8:8, 8:12, 15:10,
   15:23, 15:25, 43:25, 44:5, 58:24,
   59:11, 62:1
**standpoint** [30] - 21:8, 25:5, 25:13,
   32:19, 33:6, 33:13, 36:23, 38:8, 42:20,
   42:21, 43:2, 43:4, 45:7, 46:11, 48:6,
   49:5, 49:23, 50:16, 51:10, 51:22, 52:8,
   54:4, 54:12, 54:15, 54:24, 55:17,
   55:21, 55:25, 57:4, 66:5
**stands** [1] - 23:1
**starch** [1] - 60:14
**started** [5] - 26:3, 27:21, 28:17, 30:13,
   53:14
**state** [20] - 5:8, 5:9, 9:5, 31:6, 33:15,
   33:16, 33:22, 36:16, 37:15, 37:20,
   38:11, 39:16, 41:21, 44:13, 44:19,
   44:25, 48:22, 53:25, 54:1, 71:24
**statement** [4] - 14:14, 14:20, 25:23,
   26:6
**statements** [3] - 13:22, 13:23, 30:11
**States** [1] - 36:17
**states** [7] - 9:7, 9:18, 36:24, 38:10,
   38:25, 48:8, 52:20
**STATES** [3] - 1:1, 1:11, 1:15
**statute** [3] - 19:5, 34:13, 34:19
**statutory** [1] - 38:17

**stay** [27] - 12:25, 21:19, 24:9, 33:24, 58:8, 63:25, 64:2, 64:4, 64:24, 65:2, 65:9, 66:11, 66:20, 66:23, 67:14, 68:1, 68:3, 68:13, 68:18, 69:22, 69:25, 70:12, 70:19, 70:21, 70:25, 71:2
**stayed** [6] - 33:7, 64:4, 64:16, 65:25, 67:9, 71:8
**staying** [2] - 21:13, 70:6
**step** [1] - 3:17
**stepped** [1] - 43:11
**sticky** [1] - 59:5
**still** [7] - 13:2, 20:19, 33:21, 35:11, 45:10, 57:22, 71:7
**store** [2] - 19:9, 50:11
**straight** [1] - 17:3
**STREETS** [1] - 1:12
**Strike** [1] - 51:25
**strike** [1] - 50:6
**strong** [1] - 37:6
**strongly** [1] - 71:8
**Strzakowlski** [1] - 49:19
**studied** [2] - 28:9, 28:13
**Studies** [1] - 54:24
**studies** [2] - 55:6, 55:10
**stuff** [1] - 68:10
**subdivision** [1] - 5:8
**subject** [3] - 13:18, 38:16, 44:24
**submission** [1] - 63:9
**submit** [14] - 5:14, 5:22, 5:25, 7:23, 8:11, 9:3, 9:9, 15:3, 15:15, 17:13, 45:23, 63:7, 69:20, 72:1
**submitted** [3] - 8:13, 68:20, 68:21
**Subsection** [1] - 5:10
**subsections** [1] - 5:11
**substance** [2] - 48:25, 60:11
**substances** [1] - 6:4
**substantially** [1] - 69:20
**substitute** [2] - 5:1, 12:22
**substitutes** [1] - 17:22
**successful** [1] - 58:10
**sudden** [2] - 22:6, 42:3
**sue** [2] - 18:16, 50:2
**sued** [2] - 17:8, 18:15
**suffered** [1] - 20:17
**sufficient** [2] - 19:16, 61:17
**Sugar** [1] - 34:8
**sugar** [4] - 5:1, 34:4, 34:5, 34:10
**suggest** [1] - 31:12
**suicide** [1] - 28:6
**suit** [2] - 36:6, 43:8
**summarizes** [1] - 37:16
**summary** [1] - 54:8
**supermarket** [1] - 50:11
**supervisor** [4] - 13:12, 15:3, 40:11, 40:24
**Supp** [1] - 51:16
**supplement** [1] - 62:15
**Supplement** [1] - 13:14
**supplemental** [4] - 63:12, 69:24, 71:7,

72:2
**supplementing** [3] - 53:22, 53:25, 65:24
**Supplements** [1] - 40:14
**supplied** [2] - 61:25, 62:5
**suppliers** [6] - 12:14, 12:15, 17:17, 60:25, 61:20, 61:22
**supply** [1] - 61:9
**support** [2] - 24:9, 66:18
**supported** [1] - 27:14
**suppose** [2] - 12:3, 12:6
**Supreme** [8] - 7:13, 24:20, 25:2, 31:23, 31:24, 36:19, 38:20, 46:21
**surplus** [1] - 38:18
**surprisingly** [1] - 64:6
**surrounding** [2] - 25:20, 51:13
**sustainable** [1] - 20:3
**sweetener** [17] - 11:1, 34:11, 34:13, 34:18, 35:5, 35:13, 35:15, 35:16, 35:21, 35:24, 38:2, 62:13, 62:20, 62:25, 63:14
**sweeteners** [8] - 35:1, 35:7, 35:8, 35:11, 35:14, 35:19, 35:21, 38:4
**switch** [1] - 22:6
**synthetic** [6] - 6:4, 6:10, 10:2, 10:8, 60:11
**syrup** [20] - 3:22, 4:10, 4:13, 10:21, 10:24, 17:18, 26:7, 26:17, 31:10, 34:3, 34:6, 34:7, 34:11, 34:18, 35:5, 39:23, 44:6, 47:5, 52:14, 60:24

## T

**table** [1] - 16:2
**Talalai** [1] - 52:25
**talks** [1] - 15:1
**tantamount** [1] - 20:6
**target** [1] - 58:7
**tea** [7] - 18:2, 18:9, 48:9, 48:13, 48:14
**Team** [2] - 13:12, 40:12
**technical** [6] - 24:17, 24:18, 24:24, 59:20, 59:22, 59:24
**technically** [1] - 34:15
**telephone** [1] - 70:23
**tempting** [1] - 71:13
**Ten** [1] - 63:5
**ten** [1] - 63:9
**term** [26] - 4:13, 4:23, 5:15, 6:3, 6:9, 8:8, 8:9, 10:1, 11:4, 20:20, 21:17, 22:8, 25:20, 31:3, 33:25, 35:12, 35:20, 36:5, 37:22, 38:6, 38:25, 39:2, 41:5, 45:9, 57:7, 58:25
**termed** [1] - 21:15
**terms** [3] - 28:12, 60:20, 69:19
**testimony** [1] - 57:5
**text** [2] - 38:8, 38:14
**textural** [1] - 34:21
**THE** [81] - 1:1, 1:15, 2:2, 2:8, 2:25, 6:17, 7:2, 7:25, 9:20, 10:5, 10:7, 10:23, 10:25, 11:22, 13:6, 15:25, 16:6, 17:16,

17:21, 19:16, 20:7, 21:1, 21:3, 22:10, 23:4, 24:6, 25:23, 28:11, 29:15, 29:18, 31:8, 34:21, 35:6, 37:24, 39:6, 40:3, 40:15, 41:8, 43:24, 45:12, 45:15, 45:19, 47:13, 47:18, 47:23, 50:1, 50:14, 51:17, 51:19, 53:18, 56:11, 56:16, 56:24, 57:11, 57:24, 58:1, 60:5, 60:22, 61:12, 62:21, 63:2, 63:4, 63:6, 63:11, 63:24, 64:22, 65:13, 66:25, 67:8, 67:20, 69:5, 69:24, 70:14, 71:3, 71:5, 71:13, 71:23, 72:4, 72:12, 72:14, 72:23
**themselves** [2] - 32:10, 42:15
**theory** [11] - 19:20, 20:5, 20:14, 20:24, 32:6, 53:7, 53:13, 53:16, 54:16, 55:3, 55:4
**thereby** [1] - 54:18
**Therefore** [1] - 48:9
**therefore** [2] - 34:11, 48:4
**therein** [1] - 6:13
**thereof** [1] - 9:4
**they've** [8] - 11:12, 25:21, 31:4, 31:10, 32:25, 33:1, 39:3, 55:12
**They've** [4] - 4:14, 11:11, 11:12, 51:24
**Third** [15] - 26:10, 31:17, 37:2, 37:3, 45:20, 46:4, 46:22, 63:22, 63:25, 65:4, 67:3, 67:17, 69:8, 70:7, 70:22
**third** [3] - 12:15, 30:22, 60:19
**three** [6] - 13:10, 15:1, 17:10, 64:17, 65:14, 65:19
**three-month** [1] - 15:1
**threshold** [1] - 64:13
**throw** [1] - 42:5
**tied** [1] - 6:12
**tips** [1] - 69:20
**Tire** [1] - 53:1
**tittle** [1] - 29:20
**today** [4] - 19:10, 23:18, 45:16, 62:24
**together** [1] - 26:17
**tomorrow** [2] - 33:19, 45:9
**took** [4] - 16:13, 28:15, 28:20, 54:22
**top** [1] - 32:17
**topic** [2] - 3:4, 34:10
**TORTORETI** [4] - 1:20, 2:6, 2:15, 72:21
**Tortoreti** [1] - 2:16
**totally** [3] - 38:6, 67:17, 67:20
**touch** [2] - 4:7, 33:11
**touchstone** [2] - 4:2, 8:2
**toward** [1] - 44:5
**track** [2] - 71:18, 72:5
**traction** [1] - 3:7
**trade** [1] - 61:9
**Traffic** [1] - 43:7
**Trenton** [1] - 27:20
**tried** [1] - 19:10
**triggers** [1] - 72:7
**Tropicana** [1] - 24:23
**true** [3] - 6:23, 25:23, 50:1
**truth** [3] - 52:19, 54:4, 55:20

**try** [1] - 64:4
**trying** [3] - 54:10, 59:9, 68:21
**tune** [1] - 70:15
**turn** [3] - 22:7, 30:3, 42:17
**two** [7] - 18:8, 33:14, 40:18, 41:11, 41:14, 41:16, 58:18
**twofold** [1] - 58:15
**Twombly** [1] - 18:19
**type** [13] - 20:17, 21:23, 22:5, 28:5, 30:1, 32:6, 33:6, 35:20, 50:21, 51:1, 66:1, 68:10, 72:2

## U

**U.S** [3] - 25:6, 31:23, 46:21
**U.S.C** [3] - 5:7, 38:12, 38:13
**UCC** [1] - 18:16
**ultimate** [1] - 67:25
**ultimately** [1] - 56:24
**unauthorized** [1] - 15:17
**unchanged** [2] - 7:17, 8:12
**Under** [2] - 5:7, 18:16
**under** [23] - 5:21, 5:25, 7:24, 8:2, 9:7, 9:25, 11:19, 18:18, 18:19, 19:5, 19:19, 20:3, 20:10, 20:14, 21:14, 24:10, 28:25, 33:7, 38:12, 49:21, 56:13, 57:12, 61:14
**underfunded** [2] - 32:11, 41:22
**undergo** [2] - 32:15, 67:19
**undermanned** [1] - 32:11
**understaffed** [1] - 41:21
**undertake** [1] - 33:4
**undertaken** [2] - 34:2, 46:20
**undertaking** [5] - 6:20, 6:23, 23:1, 41:18, 41:22
**underway** [3] - 27:23, 45:21, 45:23
**undoubtedly** [1] - 7:5
**unfold** [1] - 27:21
**unhappy** [1] - 12:5
**Uniform** [1] - 9:8
**uniform** [3] - 4:2, 9:7, 17:14
**uniformity** [1] - 37:18
**unilateral** [2] - 8:5, 15:12
**Union** [7] - 18:21, 19:19, 19:22, 20:4, 20:22, 53:9, 54:14
**unique** [1] - 64:10
**UNITED** [3] - 1:1, 1:11, 1:15
**unjust** [11] - 18:7, 18:8, 18:10, 43:22, 55:22, 55:25, 56:6, 56:11, 56:20, 56:23, 57:23
**unjustly** [1] - 57:8
**unlawful** [3] - 33:23, 51:22, 52:11
**Unless** [2] - 35:13, 47:14
**unless** [5] - 18:17, 38:11, 43:19, 56:9, 71:7
**unnatural** [3] - 35:24, 49:3, 52:14
**unrestrictive** [1] - 39:1
**unsuccessful** [1] - 64:5
**up** [21] - 8:6, 8:21, 17:15, 20:8, 20:19,
22:9, 24:4, 26:5, 26:6, 30:14, 30:19, 33:11, 36:16, 40:23, 46:12, 49:25, 50:17, 53:2, 60:6, 64:21, 64:23
**uses** [1] - 58:17

## V

**vacuum** [1] - 14:10
**vegetable** [3] - 10:18, 10:22
**versus** [1] - 57:1
**vested** [1] - 38:23
**viable** [1] - 5:13
**view** [7] - 3:17, 6:16, 9:24, 20:10, 20:13, 47:23, 64:7
**violation** [1] - 30:10
**violations** [1] - 30:7
**violative** [1] - 59:15
**Violative** [2] - 59:16
**virtually** [2] - 17:9, 69:12
**virtue** [1] - 15:3
**visit** [1] - 63:22
**vs** [21] - 1:6, 2:9, 8:15, 18:21, 24:23, 25:1, 25:6, 31:22, 36:20, 36:22, 37:12, 43:1, 46:17, 47:8, 48:21, 49:10, 50:25, 51:9, 51:15, 52:22, 53:1

## W

**wait** [4] - 26:13, 26:20, 45:19, 67:16
**waiting** [2] - 12:1, 16:19
**wants** [1] - 12:22
**warning** [7] - 28:6, 28:8, 28:12, 29:3, 29:6, 29:7, 29:8
**warnings** [1] - 28:22
**warrant** [2] - 24:11, 42:22
**warranted** [1] - 48:1
**warrants** [1] - 38:9
**warranty** [13] - 18:16, 43:23, 47:18, 47:19, 47:21, 47:25, 48:1, 48:5, 48:6, 48:10, 48:23, 56:8, 59:16
**Wawa** [1] - 50:8
**ways** [2] - 15:6, 61:15
**week** [1] - 66:12
**weekend** [1] - 70:8
**weigh** [4] - 25:13, 31:14, 31:18, 32:5
**weighing** [1] - 69:20
**well-established** [1] - 56:12
**well-reasoned** [2] - 64:8, 66:9
**WestLaw** [2] - 47:9, 49:19
**whole** [3] - 9:12, 18:2, 67:2
**wholesome** [1] - 55:8
**wide** [2] - 54:25, 55:2
**Wilentz** [2] - 2:13, 2:16
**WILENTZ** [1] - 1:19
**willing** [3] - 54:25, 55:9, 67:2
**window** [1] - 7:21
**Wisconsin** [1] - 38:21
**wise** [2] - 45:19, 70:9

**wiser** [1] - 70:9
**wish** [1] - 46:7
**withhold** [1] - 46:7
**witnesses** [1] - 67:9
**words** [4] - 17:24, 33:20, 71:18, 72:6
**world** [4] - 7:15, 13:17, 61:13, 72:10
**worthy** [2] - 5:13, 6:1
**wrap** [1] - 17:15
**wrist** [1] - 42:18
**writes** [1] - 13:11
**written** [1] - 61:7
**wrote** [1] - 40:24

## Y

**year** [3] - 7:21, 36:22, 65:21
**years** [17] - 7:20, 16:12, 18:15, 22:5, 25:18, 29:1, 29:7, 31:2, 36:19, 41:11, 41:15, 41:16, 42:6, 44:2, 44:3, 56:18, 69:15
**yields** [1] - 60:23
**Youngers** [1] - 49:10
**yourself** [1] - 45:25
**Yum** [1] - 48:21