*1*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____

LAUREN COYLE,

         **Plaintiff,**          **CIVIL ACTION NUMBER:**

         **-vs-**           **08-cv-2797-JSB-JS**

HORNELL BREWING CO., et al.,

         **Defendants.**
_____

    Mitchell H. Cohen United States Courthouse
    One John F. Gerry Plaza
    Camden, New Jersey 08101
    December 17, 2009

**B E F O R E:**        **THE HONORABLE JOEL SCHNEIDER**
           **UNITED STATES MAGISTRATE-JUDGE**


**A P P E A R A N C E S:**

Wilentz Goldman & Spitzer P. A.
BY: Daniel R. Lapinski, Esquire
    Philip A. Tortoreti, Esquire
ATTORNEYS FOR PLAINTIFF

McElroy, Deutsch, Mulvaney & Carpenter, LLP
BY: Robert P. Donovan Esquire
    Lewis H. Goldfarb, Esquire
ATTORNEYS FOR DEFENDANTS


  Certified as true and correct as required by Title 28,
U.S.C, Section 753.
        /S/ Theodore M. Formaroli, CSR, CRR


        Theodore M. Formaroli, CSR, CRR
        Official U. S. Reporter
        New Jersey Cert. No. 433

THE COURT:  On the record.  This is the matter of Coyle vs. Hornell Brewing, Docket 08-9797.  Can we please have the entries starting with the plaintiff.

MR. LAPINSKI:  Good afternoon.  Daniel Lapinski of the Wilentz law firm on behalf of plaintiff Lauren Coyle.

MR. TORTORETI:  Good afternoon, your Honor. Philip Tortoreti also of the Wilentz law firm also on behalf of the plaintiff.

MR. DONOVAN:  Good afternoon, your Honor. Bob Donovan on behalf of the defendants Hornell Brewing, Arizona Beverage and Beverage Marketing.

MR. GOLDFARB:  Good afternoon, your Honor. I'm Lewis Goldfarb from Mc Elroy Deutsch on behalf of the defendants.

THE COURT:  Counsel, I read the motion papers and absent unforeseen circumstances, the Court's going to rule on all the discovery issues today.  We'll set a schedule for supplementation, if any supplementation is required, and then we'll set a schedule to complete fact discovery and get this motion for class certification decided.

As I always do, what I'd like to do is start with the plaintiff.  We'll exhaust plaintiff's issues and we'll go to the defendant's issues.

So, plaintiff, the floor is yours.

MR. LAPINSKI:  Your Honor, would you prefer that I approach the podium?

THE COURT:  I would prefer that you do whatever you are most comfortable with.

MR. LAPINSKI:  In that case, I'll just going to stay here and be able to refer to papers.

If your Honor by your statement that you wanted to have us exhaust all of our issues were referring specifically to the motions?

THE COURT:  Yes.

MR. LAPINSKI:  We raised issue with responses to two different motions, your Honor.  I'm sorry, two different interrogatories.

THE COURT:  That's what I want.  Let's go one issue at a time.

MR. LAPINSKI:  Yup.  I meant to say two different interrogatories.

THE COURT:  Okay.

MR. LAPINSKI: The first interrogatory is interrogatory number 20 which was propounded upon defendants after they had served upon us approximately 190 different product labels.

THE COURT:  Let me just say, so we can cut to the chase --

MR. LAPINSKI:  Um-hum.

THE COURT:  -- any objection on the ground that too many interrogatories were served is overruled.  This is a big

case, it's been going on quite some time, and whether or not there is 25 interrogatories or 25 interrogatories with ten or 15 extra subparts is not material to the Court.  If there is good cause to request extra questions, the Court will grant it.  The Court finds good cause here, so let's just get to the merits of the issues.

MR. LAPINSKI:  Very good, your Honor.

In response to an initial interrogatory or an initial document request, defendants have produced approximately 190 different product labels.  The interrogatory that was subsequently served upon them asked the defendants to identify when each product label was placed on a product that was put into the market; and to the extent that the product label was ever removed from the market and/or again reentered into the market, just to specify when and why.

THE COURT:  Okay, let's just make the record clear. These are the product labels for the time period in New Jersey of what, April '02 to the present?

MR. LAPINSKI:  That is correct, your Honor.

THE COURT:  And are they all the labels that had the word "natural" or something to that effect on them?

MR. LAPINSKI:  There are -- all of the labels have the word "natural," where "natural" is used in different ways on some of the labels making them irrelevant to the class, such as "natural" in front of "natural flavor" has no bearing

on our claims.  Our claims are focused on "100 percent natural" or "all natural" or "100 percent all natural."

THE COURT:  So, are those the only labels you received?

MR. LAPINSKI:  We received a combination of labels. Some of the labels say "natural flavor" but say nothing else; other labels do say "100 percent natural;" other labels do say "all natural." So if "natural" appears on a label, then it was produced.

THE COURT:  Of the 190 labels that you received, are all of them within your class definition?

MR. LAPINSKI:  No, your Honor.

THE COURT:  How many are within your class definition?

MR. LAPINSKI:  I'll say probably less than half, your Honor.  Half to less than half.

THE COURT:  Are we interested in the approximately 95 labels that are not within this class definition?

MR. LAPINSKI:  I'm not interested in them, your Honor, except from the standpoint that I'd like to know -- and by way of example -- and I put an example in the papers that I had sent to defendant requesting clarification and stating my objections, and I also made reference to it in the motion to compel.  By way of example, there will be a label for Arizona raspberry ice tea and it will have a skew number that's one,

two, three, four, five and it be for a 20-ounce bottle of the product.  That label will say "100 percent natural" on it. There will be the same exact same label with the same exactly skew number for the same exact bottle with the same exact beverage quantity, except instead of saying "100 percent natural," it won't say "100 percent natural."

I think that for purposes of making the motion for class certification and defining which specific products during which time periods are relevant to this, I have a right to be able to know when the change in the label was made and the reason why that change was made.  If, for example, the initial label that was on the market was the label that said "100 percent all natural" and there is a driving force behind a decision to remove the term "100 percent all natural," that's relevant and I have a right to discovery on that and I have a right to know when that new label was introduced into the market and why.

THE COURT:  Of the 190 labels, do you know how many products they represent?

MR. LAPINSKI:  The defendant can probably answer that better, your Honor, but I'll take a rough guess based upon my review and I'll say that we're probably above -- above 25 would be my estimate.

THE COURT:  Okay.  Let's just use 25 as a hypothetical number.

MR. LAPINSKI:  Sure.

THE COURT:  Take one of those 25.  And at one time or another that particular product had a label that said "100 percent natural" on it.  You want to know for that product every label that was on it from April '02 until the present?

MR. LAPINSKI:  I want to be able to know the product -- the products bearing that label that say "100 percent natural," I want to know when during the relevant time period that particular product was on the market.

THE COURT:  This is a hypothetical.  Take cranberry, because I'm making this up.

MR. LAPINSKI:  Yes, your Honor.

THE COURT:  Let's say cranberry was sold from April '02 to the present.  Do you want to know -- and let's assume for the sake of argument that at some time during that period it had a hundred percent natural label and let's say it was from 2005 to 2007.  Do you want to know the labels from April '02 to 2005 and from 2007 to the present for the same product?

MR. LAPINSKI:  What I'd be interested in in that hypothetical, your Honor, is the period of time which I believe you said, you know, 2005 to 2007 when the label was all natural, I want to have that time line delineated --

THE COURT:  Clearly.

MR. LAPINSKI:  -- so I know that time line.

THE COURT:  That's a no brainer.

MR. LAPINSKI:  Because subsequently I'm going to want to know the volume of product that was sold with that label.

THE COURT:  That's easy.  I don't think there can be any dispute that that's relevant.

MR. LAPINSKI:  Yes, that's what I want.  As far as I'm concerned, the other labels, I have no interest in the other labels.  Except, except to the extent I have a right to be able to know why on the cranberry, using your example, why a change was made either from "all natural" to no longer saying "all natural" or vice-versa.

THE COURT:  So hypothetically why then, and I know it's an estimate, why then do you have a 190 labels for 25 products, which is an average of 7 or 8 labels' products?

MR. LAPINSKI:  That is a question best posed to my adversary, your Honor.

THE COURT:  What did you ask for?

MR. LAPINSKI:  I asked for product labels that looked for "100 percent nature" or "all nature." If you hang on one second I can actually...

MR. DONOVAN:  Your Honor, if I may?  The request is all product labels and any variations thereof used on Arizona beverages during the relevant time period within the State of New Jersey.

THE COURT:  So you produced what they asked for.

MR. DONOVAN: Correct, your Honor.

I'm sorry, your Honor, I'm interrupting.

MR. LAPINSKI: And if I could just clarify, your Honor. What opposing counsel failed to point out was in the document request the definition of "Arizona beverage" that was used -- and if you just give me a second -- "Arizona beverage" was defined for purposes of the document request and it was narrowed.

THE COURT: Okay. So defendant gave you more than you asked for.

MR. LAPINSKI: Yes, defendant didn't give me less than I asked for, I think defendant gave me much more than I asked for, your Honor.

THE COURT: Do you know, based on the information you received so far, for the relevant time period of April '02 to the present every product that the defendant sold in New Jersey with the "100 percent natural," or whatever other terms you are looking for, what those products are and the time periods, the inclusive time periods that those products were sold with the allegedly offending label?

MR. LAPINSKI: No, your Honor, I don't.

THE COURT: Based on the information you have, you are saying you can't know that information?

MR. LAPINSKI: That is correct, your Honor.

THE COURT: Do you believe you asked for it in

interrogatories?

MR. LAPINSKI:  I believe that I asked for it in interrogatories, yes, your Honor.

THE COURT:  Okay.

Mr. Donovan, I don't know whether they asked for it or not at this point, but isn't that if not the most basic information in the case, certainly in the top --

MR. DONOVAN:  Yes.

THE COURT:  -- top two or three things that they want to know?  They have to know.

MR. DONOVAN:  Yes, I would agree, Judge.  But with respect to that issue I believe there was an interrogatory question asked:  Name every beverage that you don't have the reference of "natural" on it in any shape, manner or form. And we've answered that, we've given that.  We've also given them sales summaries, Judge, which summarize each and every beverage sold in the State of New Jersey during the damage period.  We also have given them on a CD, Judge, taking the time to put it on a CD, every single invoice for every single product.

So, I'm sorry to interrupt but...

THE COURT:  No.  I understand what you are saying and what your position is, and I read your papers.  Your position is that the information that counsel said he didn't get, I think your position is yes, you did provide it, and that

information is contained in the sales records you produced.

MR. DONOVAN:  Well, in a summarized sense, Judge.  We produced a lot of documents in this case.  So, just to step back for just the issues before us, your Honor raised the labels, we produced all the labels that my client has in the subject time period requested for all the product relevant to this case.  We produced all the sales summaries, which identify -- that's a summary, your Honor, of all the sales in New Jersey.  So there is your time period.  And I don't want to repeat myself, and of course all the invoices, which not only we furnished them in the normal business course, we also took the time and we put them on a CD and gave it to them.  We segregated them.

But I want to add just one, thing, your Honor.  I'm sorry to interrupt.  But on the issue that you've addressed with respect to the timing, I did not consider that to be the issue that we were addressing today, but since we're addressing it, and I think it's in my papers, the labels.  The only issue on the motion to compel is interrogatory number 20 and interrogatory number 22, that's what their motion to compel was.  On interrogatory number 20, and my recall is that they're asking for, well, with respect to the label, when was that label on that product in commerce?  And the answer to that question in an interrogatory and also in a meet and confer, I said the client's not going to know the specific

date. The client can tell you when the label was authorized to be changed. And I think I addressed that in the briefing. That's because even when they authorized it to be changed, your Honor, they roll out the rest of the printing from the old label.

So that question, although we're not saying it's not relevant, of course it's relevant, but it's not going to be to a certainty. I don't think the answer is going to be able to be gotten to a certainty. You can certainly give, and we have given them, the documents that show, all right, here's a new label. So that's how I thought we resolved that issue. I don't know if I addressed your Honor's question, but...

THE COURT: Yes and no. Let's take my hypothetical with this cranberry product. It was sold from 2002 to the present. From 2002 to 2005 it had one label; from 2005 to 2007 it had the offending label; and from 2007 to the present it had another label. Plaintiff has to know for purposes of numerosity, certification, damages, when the label started to be distributed in 2005 and when it stopped being distributed in 2007, and then plaintiff can go to the sales summaries and make an estimate of how much of the product was sold with the offending label.

MR. DONOVAN: Judge, if I may.

THE COURT: Is plaintiff able to do that? Have you provided that information?

MR. DONOVAN:  I don't think the plaintiff has asked that.  But, Judge, my understanding, my understanding of what the plaintiff has said, and I may be wrong, is every one of our labels that say "all natural," and I may be wrong here, every one that says "all natural" no matter in what shape, manner or form, "all natural tea," "all natural flavor," anything that uses the term "all natural" is offensive.  I did not understand until today, I guess, that they're delineating, they're saying okay -- you know, I didn't hear that.  But if they're saying now -- because there did come a point in time, Judge, where the labels were authorized to be changed.  In 2005 and 2006 there is a whole different product line, but the four or five product lines that are named in the complaint, I'm just giving this as an example, your Honor, were authorized to be changed from "all natural" to "all natural tea." Is the plaintiff now saying that's not the subject of their claim?

And it's not an easy answer also, Judge, from the reality that certain products, and we've disclosed this in discovery, certain of the same product may have a different label.  Certain of the same product may have a different ingredient, because it depends on the package size.  If there is a gallon size, that may have a different ingredient depending on the product.

So, my view is we've shown them all the labels, we've

shown them all the products that we have sold. I did not understand that they were saying, well, we need to know which products were -- they asked with respect to the label that you provided when were they distributed in New Jersey? When was that label first put on shelf? The answer to that is we don't know the specific date. We can tell you the date that we authorized to change the label. Because I imagine, Judge, that what you are going to have is there are certain times when a product was authorized to be changed, put new labels on it and it's on the shelf and there it is; but in another store it has the old label on it. So, there is no like bright line as to saying all right, at this point in time the labels were changed and this label no longer was in distribution. I mean, that's just the reality of the business.

THE COURT: Let's turn to the plaintiff. Mr. Lapinski, what I'd like you to do is let's go to the specifics, let's not speculate on what you did or didn't ask for. Let's go to exactly what you asked for and see if what you asked for was provided.

MR. LAPINSKI: Yes, your Honor. And if I can just address a point that was brought up by defense counsel and their claim that they were ignorant to the distinction of "all natural" and "all natural tea."

THE COURT: I don't --

MR. LAPINSKI: Okay.

THE COURT:  I just want to cut to the chase.

MR. LAPINSKI:  Okay.  What was represented to me by opposing counsel is they had provided me with everything that I would need to be able to make the distinction that we're looking for, that it was provided in sales summaries and it was provided in invoices.  I specifically went back to opposing counsel and I said look, you cannot find it with these documents.  I take this label, I take the sales summaries, I take the sales invoice; two different labels, one relevant to the class period, one not relevant to the class period; they intertwine.  I can't determine it.

THE COURT:  If you are not going to do it, I'm going to do it.  Let's get right to the question you asked.

Interrogatory 20 A.  "For each label produced by defendant, provide the following information for the relevant time period:  A.  The first date," etcetera, etcetera, etcetera.

Did you get an answer to that question?

MR. LAPINSKI:  No, your Honor, I did not.

THE COURT:  Okay.  Mr. Donovan, do you believe you've answered interrogatory 20A?

MR. DONOVAN:  As framed, Judge, no.  But there is an explanation, Judge.  And because the answer is that we, and I explained this during the meet and confer, your Honor, that we're not going to be able to answer that question.  That's my

*16*

point.

THE COURT:  Did you provide the date when -- what time did you use?  The date that the label was authorized to be used?

MR. DONOVAN: Yes,  we provided documents to show when labels were authorized to be changed, Judge.

THE COURT:  Okay.

Mr. Lapinski, is that good enough for you?

MR. LAPINSKI:  Your Honor, I don't think the documents they provided bear that information.

THE COURT:  I'm not worried about the --

MR. LAPINSKI:  So, that's not good enough for me, Judge, because I don't think it provides the information.

THE COURT:  Because I'm going to order the defendant to specifically provide this information, not to refer you to documents.

MR. LAPINSKI:  Thank you, your Honor.

THE COURT:  But I'm saying, let's take label one, if defendant says I can't tell you when label one began to be distributed on the shelves but I can tell you that as of April 1, 2002 the distributors were authorized to use this label for sale in New Jersey and this was the only label authorized for sale at that time for this product, is that good enough for you?

MR. LAPINSKI:  That's going to suffice for me, your

Honor, yes.

THE COURT:  Okay.  Interrogatory 20A, instead of referring the plaintiff to documents, that each of those 192 labels that -- is it the defendant or defendants who have to provide this information?

MR. DONOVAN:  It would be Hornell, your Honor.

THE COURT:  Just Hornell, okay.  Hornell has to specifically identify the date that each of the labels was authorized to be distributed in New Jersey.  You can take depositions, Mr. Lapinski, on what the average time is after a label is authorized it takes to clear the shelves, etcetera.  But Mr. Donovan is making what sounds like a valid point, that even if they validate a particular to label on April 1st, it may take some time to clear out the old labels.  Okay?  But you are going to get some sort of chart, and it's going to be for the whole interrogatory instead of referring you to the documents.

This is basic fact, objective information that's clearly relevant, that's critical to the certification and damage issues.  So instead of compelling the plaintiff to go through these documents, we're going to make the defendant provide it.  So that takes care of A.

You will also be able to provide, Mr. Donovan, when that label stopped being authorized for distribution in New Jersey?

MR. DONOVAN: I don't know the answer to that, Judge.

THE COURT:  If it is.

MR. DONOVAN:  Yes.

THE COURT:  Maybe it's still being used.

MR. DONOVAN:  I don't know the answer, Judge.

THE COURT:  Okay.  Well, that's what B is, right?

MR. DONOVAN: Yes, I think.

THE COURT:  Let's go to B.

MR. DONOVAN: Well, B we answered I think as framed, we said there was no stopping of distribution of a label of a product.  I mean, I thought, again, your Honor, in our papers I thought 20A was the hot button issue, I thought 20B was resolved, but I might be mistaken.

THE COURT: Okay. Well, let's go through it.

A, the Court's direction is that the some sort of chart, summary, has to be provided with that specific information.

Plaintiff, did you get the answers to 20B?

MR. LAPINSKI:  I believe I got the answer to 20B for one of the 192 labels, your Honor, and that's the label that I used as an example.  And defendant responded to me by clarifying that the label I used in my example had never been taken off of the market.

THE COURT:  Okay.

MR. LAPINSKI:  So I may have it for one, but I don't

have it for 191 others.

THE COURT:  Defendant is also ordered to provide the information responsive to 20B rather than referring plaintiff to documents.  For each of the 192 labels, that information has to be provided.

MR. DONOVAN:  I understand, your Honor.  Just for the record, we did answer that; there was an answer.  The answer to 22 was there was no stopping or restarting of distributing of products in New Jersey based upon label changes.  That's what we understood.

THE COURT:  But, correct me if I'm wrong, Mr. Lapinski, this is what you are trying to get at, again using my hypothetical.  If this offending label started to be used in 2005 and sometime between 2005 and the present Hornell stopped using this label or stopped authorizing or printing new labels, you want to know that date, right?

MR. LAPINSKI:  Yes, your Honor.

THE COURT:  Mr. Donovan, is that information available?

MR. DONOVAN: The information as to when they stopped printing a certain label, is that your Honor's question?

THE COURT:  Yes.

MR. DONOVAN:  I would presume, Judge, that it is under the presumption that once they authorize a product to have a new label, which is the information we provided in

documents and I understand we have to supplement it when we do that with respect to a specific bottle or skew product, that that would discontinue the other old labels.  So under that presumption, again I don't know the answer to that, but I presume that that would be the same date, that when they say all right, this label supersedes --

THE COURT:  It would seem logical.

MR. DONOVAN:  But again, I don't know.  But I presume, Judge.

THE COURT:  Okay.  So that information has to be provided for 20B.

20C.  Did you get that, plaintiff?

MR. LAPINSKI:  No, your Honor.

THE COURT:  Okay.  I don't know if this ever occurred, but if 20C occurred.  Do you have any knowledge, Mr. Lapinski, that 20C ever occurred, that they used the label, stopped using a label and then restarted using a label?

MR. LAPINSKI:  I have no knowledge that it actually did ever occur, your Honor, but if it did I think I have a right to know.

THE COURT:  All right.  So the information for 20C has to be provided for each of the 192 labels.  If the answer is no, just say no.

And same for 20D.  If there is responsive information, it has to be provided; if it never occurred, then

it's a not applicable.

So now for interrogatory 20 what plaintiff is going to get for each of these 192 labels is when they started to be authorized for distribution in New Jersey between 2002 and the present, and if they were ever superceded by another label for the same product.

That's what you want to know, right?

MR. LAPINSKI:  That's correct, your Honor.

THE COURT:  And in the event that it ever stopped and restarted, you'll get that too.  I don't know how likely that is, but that's what you asked for.  It's relevant, you are entitled to it.

MR. LAPINSKI:  That is correct, your Honor.

MR. DONOVAN:  Your Honor, if I may inquire.  As I understand it, only approximately 50 percent of the labels they're saying are relevant to this case.  Query why we have to go through the process for the other 50 percent?

MR. LAPINSKI:  Your Honor, I propounded a document request, defendant felt it was relevant to produce 192 different documents responsive to it.  I have a right to the information on the 192.  Maybe my ignorance kept me from seeing something that was relevant.  Now that it's out there, I have a right to understand what's going on with all 192 of the labels in order to see whether I missed something.

THE COURT:  Defendant Hornell produced the labels, so

the responsive information has to be provided for each of the labels.  Will you be able to determine, Mr. Lapinski, when you get this information for these 192 labels which are the allegedly offending products?

MR. LAPINSKI:  At that point in time, your Honor, yes, I think that I should have a well defined class of offending products and the time period for which those offending products were on the market.

THE COURT:  That's what you need to know, isn't it?

MR. LAPINSKI:  That's all I've been looking for from the start, your Honor.

THE COURT:  You want to know.  Hopefully, after you get in information, you'll identify all of the allegedly offending products and all of the inclusive time periods when they contained allegedly offending labels, right?

MR. LAPINSKI:  That's correct, your Honor.  If I could just --

THE COURT:  Well, that's so basic to the litigation.

MR. LAPINSKI:  And if I could just put something out there for the Court to address.  There have been responses to certain of the requests for discovery wherein defendant has fully responded but has limited the response to addressing only the select products that were named in the complaint.  It is our position that this litigation is not limited to only those select four or five products that were specifically

identified by plaintiff in the complaint.

I think *Elias v. Underfoods* makes clear that when you're dealing with this type of litigation where it is a common misrepresentation that appears on all of the different products that are being produced by the defendant, the litigation is not limited to only those products that were consumed by the plaintiff or purchased by the plaintiff or named plaintiffs, it covers the entire gamut of the product family.  And I don't want to be put in a situation where defense counsel comes back and limits or attempts to limit the scope of the products that are actually involved here.

THE COURT:  Well, how can the defendant take that position if they produced a 192 labels for approximately 25 products and only four are identified in the complaint?

MR. LAPINSKI:  As I said, from request to request it differs, your Honor.  I should say from response to response it differs.

THE COURT:  You want to address that, Mr. Donovan?

MR. DONOVAN:  Judge, at this point I do have to -- obviously, we're here trying to work things out and I'm willing to address -- I'm not prepared to address that, Judge. In fact, I wasn't really prepared to address these discovery arguments because it was my understanding that this argument or the disposition of this motion was going to be on the papers and I thought this was going to be a status conference.

Well, I received an electronic notice to that effect, Judge, I believe. So, I was not prepared to deal with this, but I'm happy to deal with interrogatory number 20, obviously, and anything else, your Honor. But I am not prepared to address prior discovery requests that we made that weren't objected to and to deal with that. I'm simply not.

THE COURT: You want to make sure that when interrogatory 20 is supplemented it's not limited to only the products identified in the complaint, correct?

MR. LAPINSKI: That is correct, your Honor.

THE COURT: The Court so orders --

MR. LAPINSKI: Thank you, your Honor.

THE COURT: -- for discovery purposes. And we're only dealing with interrogatory 20 now.

MR. LAPINSKI: Very good, your Honor.

THE COURT: The information has to be provided for all 192 labels, whether or not those particular products were identified in the complaint or not.

MR. LAPINSKI: Yes, your Honor. Thank you.

THE COURT: Okay, we're done with interrogatory 20. What's the next interrogatory?

MR. LAPINSKI: Actually, if I may, your Honor, I don't think you addressed subsection D as far as defense counsel providing plaintiffs with the reason as to why any particular change was made.

THE COURT:  Any objection to providing that?

MR. DONOVAN:  Judge, I believe we answered that, but obviously with respect to each and every product, to the extent -- you know, I'll obviously respond to it.

THE COURT:  I'm sorry, I didn't hear that.

MR. DONOVAN:  We will respond to it, your Honor, with respect to each label.  I understand, your Honor.

THE COURT:  A, B, C, D.  A, B, C, D has to be provided specifically for each of the 192 labels, and presume hopefully this will be provided in some sort of chart or spreadsheet format that will make it easy to understand and read.  It's basic information, basic objective information, I suppose except for D, that's paramount in the case.

All right.  So we're done with interrogatory 20, Mr. Lapinski.  Now, do we go to number 22?

MR. LAPINSKI:  Yes, your Honor.

THE COURT:  Okay.  Let's start with the issues there.

MR. LAPINSKI:  Interrogatory number 22, your Honor, by way of some background, in the initial interrogatories that plaintiff served, defendant responded.  In response to interrogatory number five, defendant's response said that a particular manufacturer of the product pursuant to defendant's instructions does, and then the interrogatory went on.  I served a supplemental interrogatory that asked what those instructions were, and that's the information that I'm looking

for.

THE COURT:  What instructions are you looking for?

MR. LAPINSKI:  It's instructions that deal with the manufacturing of the product and the flavors used in --

THE COURT:  Give me an example.  The recipe?

MR. LAPINSKI:  I think an example would be raspberry ice tea.  I wanted to know what instruction the defendants gave to the manufacturer of the product as far as the ingredients used in the product, the manufacturing process that was used.  Whatever instructions they gave.  In their response they indicated that they provide instructions and I simply asked what are the instructions that you provide, and they have not been provided to me.

THE COURT:  Okay.  Allen Flavors, who are they?

MR. LAPINSKI:  They are a -- my understanding is they are a manufacturer of flavors that are included in the beverages at issue.

THE COURT:  So, give me an example of what they would make.  Would they make the final product or an ingredient that goes into the final product?

MR. LAPINSKI:  I think that defendants are in a better position to be able to answer exactly what they do, your Honor.

THE COURT:  Where did you get the name from?

MR. LAPINSKI:  It was provided to me in discovery.

THE COURT:  Do I have the answer to interrogatory five here?

MR. LAPINSKI:  I don't think you have the entire answer because some of it was -- some of it was for attorney's eyes only so it wouldn't have been put in the briefing papers, your Honor.  Let me -- I'm looking for the supplemental responses.

THE COURT:  Because I have to admit, I really don't understand what you are looking for right now.

MR. LAPINSKI:  Well, the initial interrogatory, your Honor, my initial interrogatory asked defendant to identify all substances, included but not limited to, enzymes, chemicals, solvents and solutions used in the manufacturing of the ingredients contained in the Arizona beverages.

THE COURT:  Okay, hold on now.  All substances used in the Arizona beverages, and those are defined as the products that had the allegedly offending labels?

MR. LAPINSKI:  Correct, your Honor.

THE COURT:  So, we're not holding you to it, approximately 25 products.

MR. LAPINSKI:  Correct, your Honor.

THE COURT:  So you are not asking for the exact formula but you are asking what went into the products.

MR. LAPINSKI:  That initial interrogatory is -- a response to that interrogatory, yes, that's what I was looking

for.

THE COURT:  Okay.  So, you don't have the answer right there, but what did the answer say, the sum and substance of it?

MR. LAPINSKI:  The sum and substance of the answer was that the flavor manufacturer pursuant to the instructions of defendant does the following.  And then I sent a supplemental interrogatory that just said what are the specific instructions that you give to the flavoring manufacturer?

THE COURT:  Is the flavor manufacturer different or the same as the person who makes the final product?

MR. LAPINSKI:  From what -- from the information that I have been piecing together, yes, I think that there is a difference.

THE COURT:  Can you help us, Mr. Donovan?

MR. DONOVAN:  Yes, Judge. And perhaps we could seal that portion of the transcript because it is attorney's eyes only, but it's marked --

THE COURT:  Well, what's going to happen, Mr. Donovan, is after this transcript is prepared, the local rules provide that before it goes on the record you have I think 30 days to make any request to redact any material you believe should be sealed.  Now, if your position is the substances used in the product should be sealed, you know, the Court will

look at that.  We're not talking about the formula here.

Is this any different than what's identified on the label of the product?

MR. DONOVAN: What I'm about to say, Judge, is not.  I will say as backdrop that we have provided formula worksheets, we provided flavor information in discovery, but I'll just answer your Honor's question.  And as I said in the papers, the allegations in the complaint are that Hornell and the defendants manufactured a product, and they do not, and that was the reason for this answer.  And I'll just read an excerpt from it. "Based upon Hornell's instructions, Allen Flavors manufactures the flavoring of Arizona beverage product, independent co-packers then manufacture the beverage product." So there are two steps involved.

THE COURT:  Okay, great.  We understand that now.  So they're asking for what instructions you gave Allen.  Did you provide that?  And if not, why not?

MR. DONOVAN: Judge, the way the question -- well, our initial objection was , and I understand your Honor ruled on the amount of the interrogatories, but also just the scope of the question, Judge.  We're dealing with a 6-year damage period and a number of different products and instructions that may or may not be relevant to the case about product ingredients that don't have anything to do with the case.  The allegations of the complaint now are HFCS is artificial and

citric acid is artificial. They're asking for all instructions for a 6-year period. So, that, you know, from our perspective that was an overbroad question.

Certainly, Judge, you know, I mean that was our position, is our position fundamentally, and we raised that. And obviously there were some supplemental submissions before your Honor that I never raised that issue to them about the excessiveness. I did, Judge. But I'm willing to work it out. And obviously your Honor ruled, and I understand that, and we are willing to answer a question as long as it's tailored specifically to the allegations of the complaint. But, the instructions were raised by way of an answer because we've already stated a number of times we don't manufacture the product.

THE COURT: Okay.

Mr. Lapinski, we have some clarification about who Allen Flavors is. And Mr. Donovan makes a valid point that the complaint only refers to HFCS and citric acid. You are asking for all instructions. Now, suppose, you know, "take a Christmas break, don't work during New Years, don't work on Christmas." Clearly, you are not interested in that sort of instructions. So what is it you are focusing on?

MR. LAPINSKI: Your Honor, the defendant just put a very important point to the Court, and that is they say in our complaint we contend that defendants manufacture a product,

but they don't manufacture the product, someone else manufactures the product.  The instructions that defendant is giving and the direction that defendant is giving will show that they in fact, even if they aren't taking vial A and vial B and putting them together, they're telling somebody else pick up vial A in your hand, pick up vial B in your hand, pour them together into beaker C; don't do anything but that.  I'm looking for the instructions that are being provided by the defendant in order to have their final product manufactured.

THE COURT:  Well, that's not what you are looking for.  You are asking for the instructions that they gave to Allen, first of all --

MR. LAPINSKI:  Correct.

THE COURT:  -- who was the flavor manufacturer. So you are asking for the instructions they gave to Allen only for -- but you are asking it as all instructions given to Allen, not limited to the offending products with the offending labels.

MR. LAPINSKI:  Well, your Honor, their response to the interrogatory, I'm assuming, was in response to offending products.  When they responded to the interrogatory, and Mr. Donovan read you what the response was, it was that Allen Flavors, you know, pursuant to the instructions of Hornell. If they were referring to instructions that aren't relevant, then, you know, they're referring to instruction that aren't

relevant. I asked a simple question, your Honor: You said you gave instructions. What were the instructions you gave? You know, it's a simple question, I would think.

THE COURT: Could we go back to interrogatory five again? And what specifically was asked in that interrogatory five?

MR. LAPINSKI: Interrogatory number five, your Honor, asked to identify all substances, including, but not limited to, enzymes, chemicals, solvents and solutions used in manufacturing each ingredient contained in Arizona beverages.

THE COURT: Okay, hold on. All substances used in the manufacture of each ingredient in Arizona beverages. Is "Arizona beverages" defined as the offending product with the offending label?

MR. LAPINSKI: Yes, your Honor. Let me pull out the --

THE COURT: So it would only be the proximate 25 products that comprise the 192 labels.

MR. LAPINSKI: And, your Honor, I'm willing to wait to receive the information on the 192 product labels and go back and say here, these specific products, now that you have these specific products, if you would respond to interrogatory number 22 focussed just on these specific products here, I'm willing to wait for the response to interrogatory number 22.

THE COURT: Well, okay. Let's assume we're going to

do that.

MR. LAPINSKI:  Right.

THE COURT:  Let's assume we're now limiting interrogatory five, supplemented by number 22, only for the offending products with the offending labels.

MR. LAPINSKI:  Yes, your Honor.

THE COURT:  Okay.  Let's say we identify those 25. You should be able to identify them from the chart, spreadsheet, what have you, that you receive from defendants. Now, what do you want for those 25 products?

MR. LAPINSKI:  The instructions that Hornell provided to the flavor manufacturers in regard to the manufacture of the ingredients that went into that product.

THE COURT:  But only for the time period that the offending labels were used.

MR. LAPINSKI:  Correct.  Just limited to the relevant time period, your Honor.

THE COURT:  Mr. Donovan, in that short time period we have a significant narrowing of what you understood the interrogatory request to request.  Now, what Mr. Lapinski is saying is interrogatory five, as supplemented by interrogatory 22, is one limited to only those products that were sold from '02 to the present with the offending label.  And the only time period at issue is the time period when the offending label was used, in my cranberry hypothetical 2005 to 2007.

And then what the plaintiff wants to know is what instructions were given to the flavor manufacturer that they used for the time period from 2005 to 2007.

Right?

MR. LAPINSKI:  Yes, your Honor.

THE COURT:  And it would seem to the Court, the reason I worded it very carefully was it's possible that they may have been following instructions given to them say in 2003 to make something in 2005.  Right?

MR. LAPINSKI:  Yes, your Honor.

THE COURT:  Okay.

Mr. Donovan, with that clarification and significant narrowing, is there any longer an objection to providing the instructions to Allen that plaintiff is requesting?

MR. DONOVAN: Judge, I would have to ask a question in response to that question.  Maybe I'm just dense.  Probably I am.  The interrogatory number five, which again I didn't understand we were before you on a motion to compel on interrogatory number five, asked:  "Identify all substances, including, but not limited to, enzymes, chemicals, solvents and solutions used in manufacturing each ingredient contained in Arizona beverages whether or not said beverages are contained in the final product."

In answer to that question, Judge, we referred them -- because at that point in time, the only substance that

they've alleged is artificial in this case is HFCS at this point. It wasn't until later on in this case they said citric acid. So in response to that question we provided them letters from the HFCS suppliers and this explanation of how we manufacture and the identity of the HFCS suppliers. They manufacture the HFCS, Judge, and that's clear. I understand plaintiff is not saying we manufacture the product or is alleging that now, but we don't manufacture the HFCS and that was the only product. So, we answered the question. There was never any objection, there is no motion to compel over that interrogatory, not before this Court now. So then they propound interrogatory number 22, and interrogatory number 22 asks for all instructions -- if you give me a moment, your Honor.

(Short Pause)

THE COURT: All instructions referred to in the answer to interrogatory five.

MR. DONOVAN: Right. They're asking for all. But, Judge, that answer was to deal with the question that we don't manufacture the product. So, if your Honor is saying, well, that's relevant, but I think that with respect to that issue I can't get over the hurdle of how can it be relevant other than just HFCS and citric acid? Those are the only two ingredients they say are artificial. And part of the question is, if we're dovetailing with interrogatory number five, they're

asking for information about substances that never ended up in the product.

Because of the scope of the question -- and maybe I'm misunderstanding, maybe it has been narrowed.  Maybe I need it to be repeated to me again of how it's going to be narrowed and then I can address it.  But when I look at the question as currently framed, that's why we made our objection.  So perhaps, your Honor, if I could indulge you as to tell me how it's going to be narrowed and I can address your Honor's question.

THE COURT:  Mr. Lapinski, do you want to address counsel's argument?

MR. LAPINSKI:  I'll just bring up two points, your Honor.  The first point is that during a meet and confer in regard to this I offered to defendant if they were willing to stipulate that any variations in the flavors that were used in the manufacture of the product were not relevant.  If they were willing to stipulate to that, I wouldn't need this information.  From a class certification standpoint, if they were willing to stipulate it had no relevance to commonality or typicality that I wouldn't bother seeking this information, and they refused to do so.

So, you know, now they're saying it's not relevant, they don't understand the relevance.  But when I said hey, as long you're willing to stipulate to the fact there is no

relevance as far as class certification, we can forget about it, I got a loud resounding no way.

THE COURT:  Well, let me tell you what the Court understands that you asked for and what the Court directed had to be produced.  In answer to interrogatory five, the plaintiff refers to instructions given to Allen.  Correct?

MR. LAPINSKI:  Yes, your Honor.

THE COURT:  Instructions given to Allen for the manufacture of the ingredients put into Arizona beverages?

MR. LAPINSKI:  Your Honor, I just wanted to make sure that it's not limited to Allen and that if it doesn't say "Allen" then the response is --

THE COURT:  Well, that's what interrogatory 22 says, "that defendants provided to Allen Flavors."

MR. LAPINSKI:  Okay.  Then their response to interrogatory number five would have said Allen Flavors. That's fine.

THE COURT:  You wanted to identify all substances used in the manufacture of each ingredient in Arizona beverages.  In response to that interrogatory, Hornell answered by referring to the instructions given to Allen. Correct?

MR. LAPINSKI:  Correct.

THE COURT:  And you want to know what those instructions are.

MR. LAPINSKI:  Correct.

THE COURT:  And the Court is directing that those instructions have to be identified for each of the offending products during the time period that they used the offending labels.  That's the Court's direction.

That's what you want, correct?

MR. LAPINSKI:  Yes, your Honor.

THE COURT:  Okay.  Mr. Donovan, the Court doesn't think it can be any clearer than that.

MR. DONOVAN:  I understand, your Honor.

THE COURT:  Are there any other issues, Mr. Lapinski, from the plaintiff's perspective that we need to address on discovery?

MR. LAPINSKI:  On these motions to compel, your Honor, or discovery in general?

THE COURT:  On the motions to compel to start with.

MR. LAPINSKI:  Not on the motions to compel, your Honor, no.

THE COURT:  And let me just add that plaintiff's application for expenses and fees is denied.  The Court does not believe that there is any evidence of bad faith or anything of that sort here.  Good lawyers can have good faith disagreements about what is relevant and responsive and the Court finds that that's what occurred here.  So the request for fees and expenses is denied.

Let's now turn to defendant's motion to compel. And let me just say as a general matter that I think we can go through this I hope fairly rapidly because it seems to the Court that in many, if not most, instances defendant is seeking to protect itself by getting a firm, definitive answer. On the other hand, plaintiff wants to reserve the right to supplement its answer in the future based upon after-acquired information, which is fine. In fact, there is a duty to supplement under Rule 26(e). But Hornell is asking for in many instances, and is entitled to know, that it has a complete answer as of today. So let's go through each interrogatory one by one.

Mr. Donovan, you start with your motion.

MR. DONOVAN: Interrogatory number four, your Honor. There is a question as to identify each Arizona product purchased during six years.

THE COURT: It's just a straight, plain vanilla interrogatory clearly relevant to the case. Hornell wants to make sure that every single one that plaintiff currently knows about, without any caveats, is identified. So why can't plaintiff say that to the best of my knowledge at the present time these are the only ones that I can identify? Why can't plaintiff say that?

MR. LAPINSKI: Your Honor, I thought I did. You know, it asked to identify each product, the date of purchase

of each product, the place of purchase of each product and the purchase price. And it goes through and it says here are the products where I can provide you with all that information, including the purchase price, the date of purchase, where I purchased it. But then, you know what? I also have a general recollection of purchasing another product; I can't tell you the date that I purchased it, I can't tell you where I purchased it, I can't necessarily tell you when I purchased it.

THE COURT: Yes. But in fairness, that's not what the answer says. The answer says "plaintiff generally recalls purchasing, including" and she gives a list.

MR. LAPINSKI: Okay.

THE COURT: She doesn't say -- this is all you have to say: To the best of my knowledge at the present time these are the only Arizona products I recall purchasing, this is where I recall purchasing it, this is how much I recall purchasing, this is what I recall the price was, this is why. And all defendant wants to know is that he's exhausting plaintiff's knowledge as of today. If her recollection is refreshed in the future, fine. Supplement it. And if defendant wants to cross-examine on that, he can.

I think we're splitting hairs here. But to advance the ball, the Court is going to direct plaintiff to give defendant the certainty that they're looking for, not use

words like "generally" and "including."  "To the best of my knowledge, this is all of the responsive information I have right now.  I recall buying this Arizona product, I don't recall when, where or how or how much."  That's fine if she doesn't recall.  But she can't say well, I think these are all of them or these may not be all of them or they possibly could be all of them.  Let's get the certainty that defendant is looking for.  And I don't know what you are worried about because her recollection could be refreshed.

MR. LAPINSKI:  No worries, your Honor.  I believe that the response to the interrogatory provided the information.  I believe defendant would have had an appropriate objection if I said "including but not limited to."  I didn't say that.  The products that she has general recollection of included these products.

THE COURT:  Yes, but that's not good enough.

MR. LAPINSKI:  Okay.

THE COURT:  It has to say "to the best of my recollection, these are the only Arizona products I purchased, used," etcetera.

MR. LAPINSKI:  Sure.  Yes, your Honor.

THE COURT:  Is that what you are looking for, Mr. Donovan?

MR. DONOVAN:  Yes, your Honor.

THE COURT:  You are entitled to it and you are going

to get it.

MR. DONOVAN:  Thank you, your Honor.

THE COURT:  Seventeen.

MR. DONOVAN:  Seventeen, Judge, deals with the factual basis for the allegation -- well, "identify each and every ingredient that you allege is not natural and set forth the factual basis."  Two ingredients have been identified. HFCS, that's not at issue. Citric acid is the issue, Judge. We're relying on two letters, which we've submitted to your Honor, they don't set forth the factual basis for the citric acid that the defendants use is artificial.  The letters refer to other product.  I think the letters are dated in 2001, 2002.  If that's all that they're relying on -- I'm looking for the facts -- if that's all that they know, that's all that they know, Judge.  And, you know, later on we emphasize that, and this is on the certainty angle, that they say oh, right now we're not currently saying you violated federal law. Well, I'm confused.  They're citing an FDA letter.  So again, I guess this is all, in light of your Honor's theme, accurately stated.  I need some certainty as to what they know.

MR. LAPINSKI:  Your Honor, what we know is that in similar situations where a product was labeled as "all natural" and it included citric acid, the FDA did not consider it to be an all natural product.  That's a factual basis.

It's a fact that there was all an natural product; it's a fact that the all natural product contained citric acid; it's a fact that the FDA did not approve of it; and it's a fact that we're dealing with it here.  I don't know what other --

THE COURT:  At the present time is this all the information you are relying upon that defendant's citric acid is not natural?

MR. LAPINSKI:  At the present time, yes, your Honor.

THE COURT:  And do I take it that after you get discovery in this case you are going to supplement your answer pursuant to 26(e)?

MR. LAPINSKI:  Yes, your Honor.

THE COURT:  Okay.

Mr. Donovan, I think that's a fair answer.  Discovery is not at its infancy, but it's early and this is an important issue to the ultimate liability in the case, so plaintiff needs discovery to give a full and complete answer.  But they've represented that they have identified all of the information they are presently relying upon, so what else could we ask plaintiff to identify?

MR. DONOVAN: Well, if that's the extent, your Honor's correct.  This is the first I'm hearing this is all they know, this is all they're relying on.  It's not in the interrogatory answer, Judge.  If this is the only thing they're relying on on citric acid, then your Honor's correct.

THE COURT:  That's what they just represented.

MR. DONOVAN:  That's fair enough, Judge.

MR. LAPINSKI:  Your Honor, I represented it here before the Court today, I represented it during meet and confers, I represented it in our initial response, I represented it in the opposition to the motion to compel.  I don't what --

THE COURT:  Seventeen is complete and does not have to be supplemented.

MR. LAPINSKI: Thank you, your Honor.

THE COURT: Number 23.  What is the problem here?  This may get back to what we did with interrogatory four.  It's a relevant area of inquiry.  If the other HFCS products plaintiff used -- you've said, you know, she doesn't read labels, etcetera, etcetera, or doesn't always read labels.  All she can do is give the best information she has at the present time.

MR. LAPINSKI:  I agree, your Honor.

THE COURT:  And you've represented that the only products at the present time she knows contained HFCS is Smucker's jam and some sodas, is that right?

MR. LAPINSKI:  That is correct, your Honor.

THE COURT:  Can she identify the brand or type of Smucker's jam and the type of soda?  Like was it Coke, was it Pepsi, was it Sprite; was it blueberry, cranberry, strawberry?

Can she be any more specific?

MR. LAPINSKI:  Your Honor, she had a recollection of Smucker's jam and she had a recollection of some sodas and that's information I provided to opposing counsel.

THE COURT:  Are you representing that she has no further information at the present time responsive to this interrogatory?

MR. LAPINSKI:  That is correct, your Honor.

THE COURT:  And that if she was sitting here today and the Court asked her what type of Smucker's jam she ate, she wouldn't recall?

MR. LAPINSKI:  Yes, your Honor, that's what I'm representing.

THE COURT:  Same thing for what kind of soda or whose soda it was?

MR. LAPINSKI:  That is correct, your Honor.

THE COURT:  And obviously if you learn that she does have additional information, you'll supplement your answer. Right?

MR. LAPINSKI:  I will, your Honor, yes.

THE COURT:  Mr. Donovan, can we ask for anything else?

MR. DONOVAN: Judge, when we had the dispute after the answer, there is so many sodas out there we'd like to know the brand names.  I found it --

THE COURT:  I agree with you.  If she knew it,  I'd order her to produce it.  Counsel has represented she's produced everything she knows.

MR. DONOVAN:  But the answer to the question was plaintiff does recall Smucker's jams and some sodas.  So I said all right, give me the names of them.  Right?  I don't know the names.  I don't have that.

THE COURT:  Okay.  I'm ordering plaintiff to supplement the answer to interrogatory 13 to represent that at the present time plaintiff has no further information concerning the identity of Smucker's jam or the sodas that she's referring to in interrogatory 23.

Twenty-eight.

MR. DONOVAN:  Twenty-eight, Judge, it deals with the certainty issue again.  I don't know what this plaintiff has done to make a determination.  She's the only one who will know if she continued to purchase -- or rather she personally consumed the product each time she purchased it.  She said she doesn't know.  So if she doesn't have the sufficient knowledge or information, I believe the rules require her to say that she's tried to do that and she's made sufficient inquiry.  And if that's going to be their answer, then that's going to be their answer.  But this is a type of question where she's going to be likely the only person to know whether she personally consumed the product every time she purchased it.

So that was my point.  It's technical, I admit it's technical, because ultimately if they're going say she doesn't know, she doesn't remember, she still has to make diligent inquiry and say that in the response to the request.

THE COURT:  All right.  Federal Rule of Civil Procedure 36(a)(2)(iv) provides "that if an answering party asserts lack of knowledge or information as a reason for failing to admit or deny, that's only appropriate if the party states  'that it has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny.' "  So if that's plaintiff's answer to request for admission 28, she has to supplement it with the language referred to in the rule of procedure that the court referenced.  And undoubtedly when she is deposed, defendants' counsel is more than likely going to question her about what inquiry she made.

Does that that care of Hornell's issues?

MR. DONOVAN:  Yes, it does, your Honor.

THE COURT:  Okay.

Let's go to BMU.  Now, who is BMU?

MR. DONOVAN:  BMU is the parent of Hornell, your Honor.  They own the Arizona trademark.

THE COURT:  Okay.

MR. DONOVAN:  This is again on your Honor's theme of certainty.

THE COURT:  Right.  Number four.

MR. DONOVAN:  Yes.  You know, not to belabor a dead horse, and it's pretty basic.  Currently.  I mean, I need to know, Judge, for obviously reasons.

THE COURT:  It's clearly relevant.  Plaintiff is ordered to represent whether at the present time she is contending that she suffered any personal injuries.  If the answer is yes, say yes; if the answer is no, say no.

MR. LAPINSKI:  Your Honor, in our response we did say she's not currently or presently contending that she suffered any personal injury.

THE COURT:  What's the specific language that's used?

MR. LAPINSKI:  My specific language is, subject to general objections, "plaintiff responds that she does not currently contend that she suffered any personal injury and/or bodily harm as a result of the alleged conduct by defendant."

THE COURT:  What more can the plaintiff say, Mr. Donovan?

MR. DONOVAN:  Well, Judge, they filed a complaint in the case.  If the form of damages they are seeking in the case is personal -- if she's saying that she suffered personal injury and damages --

THE COURT:  She just said no.

MR. DONOVAN:  She said currently, Judge.

THE COURT:  Right. So what happens, hypothetically?

Hypothetically.  Six months from now plaintiff gets a doctor's report that says I suffered a neurological injury from HFCS.  This is hypothetical.  Then she has to supplement her answers.  But can she say now that forever she won't contend she suffered personal injuries?  How can we do that if plaintiff doesn't know what's going to happen in the future?  The chances that she's going to make that allegation?  Probably very, very slim.  But how can we ask plaintiff to represent now what's going to happen in the future?

So the Court rules that as to number four, it's complete as stated and doesn't have to be supplemented.  But obviously, if that ever changes, the supplement has to be provided.  And if the Court finds that it wasn't timely supplemented, it won't permit the amendment.

MR. LAPINSKI:  Understood, your Honor.

THE COURT:  Clearly, we're not going to have a situation where we go through discovery and at the eleventh hour we have a personal injury claim.  That's not going to happen in this case.

Number five.

MR. DONOVAN:  Five is I presume your Honor's same approach, however this deals with a legal contention.  I would submit it's somewhat different.  We are in a case where they've alleged that we violated the law, defendants have violated the law.  We're entitled to know are you saying we

violated any federal law?

Again, from our perspective we think it's an equivocal answer to say "currently," so we would like to know whether or not, yes or no, whether you are saying the defendant violated federal law, and, if so, cite it.

THE COURT:  What does the answer state?

MR. LAPINSKI:  The answer, your Honor, after several specific objections says "subject to the foregoing general objections, plaintiff responds that she does not currently contend that any conduct by defendants violated any federal laws, federal statute, federal regulation, federal rule and/or federal policy."

THE COURT:  All right.  The Court's ruling is for the time being that's an appropriate answer.  Plaintiff doesn't know what discovery is going to show.  It's a contention interrogatory.  Plaintiff can only answer based on current information.  And if plaintiff's position changes in the future based on discovery, they have a duty to make a timely supplement.  And if the supplement isn't timely, the Court does not have to permit it.  So the Court rules that number five does not have to be supplemented.

Number 6.

MR. DONOVAN:  Number 6 is moot by virtue of that order, your Honor.

THE COURT:  Five and six is the same.

MR. DONOVAN: Seven, Judge, deals with identifying -- in the complaint they referred to competitive products of the defendants and they refer to in the answers to -- plaintiff, after objecting, they identify three products as alleged competitors, Nestea, Lipton and Wawa Ice Tea. Plaintiff further states defendants have previously stated their beverages are marketed in a uniquely tall container so that it stands 'head and shoulders' above of the rest. Accordingly, defendants are in possession of the identity of additional competitors that Arizona Ice Tea beverages stand head and shoulders above."

Again for the certainty, if that's all they're claiming, if that's all they know of competitors, I don't read that answer to mean that.

THE COURT: Let's find out from the plaintiff. Is plaintiff representing that at the present time these are the only three competitors they can identify?

MR. LAPINSKI: That plaintiff can identify? Yes, your Honor.

THE COURT: Correct, that plaintiff can identify.

MR. LAPINSKI: Yes, your Honor.

THE COURT: But there might be other competitors who have a taller container, but plaintiff at the present time doesn't know if there are any; and if there are any, who they are.

MR. LAPINSKI:  That is correct, your Honor.

THE COURT:  It sounds likes a complete answer, Mr. Donovan, with that representation.

MR. DONOVAN: Yes, your Honor, with the representation.

THE COURT:  So, the Court rules number 7 doesn't have to be supplemented.

Number 8.

MR. DONOVAN:  Number 8, Judge, deals with the allegation of the claim for disgorgement.  There is a claim in the case the defendants not be allowed to retain enormous profits, and we've asked for what facts do they know that the defendants have gained enormous profits from the labeling of the product as "all natural."

This was discussed before Judge Simandle during the motion to dismiss.  You know, putting aside the fact that disgorgement of profits is a dubious claim to begin with, we believe likely not cognizable, in pursuing it they're not entitle to disgorge all the profits of defendants, they would have to narrow it down to what alleged profits stemmed from the alleged unlawful labeling, and I don't view that answer to deal with that specific.  They refer to Mr. Vultaggio's affidavit, but they also refer to allegations in the complaint.  Those aren't facts, Judge.  We're just looking for facts known for that allegation.

THE COURT:  Mr. Lapinski.

MR. LAPINSKI:  Your Honor, as I indicated in my opposition, I listed ten different facts that we think support the claim and are responsive to the interrogatory.  I think this goes back to the issue we addressed with citric acid and what facts we have available to us.  I can only give what I have.  I can't make stuff up, I can't ask defendant to draft a response and then have me submit it.

THE COURT:  Are you representing that at the present time you have identified all the facts that the plaintiff knows about that is responsive to this interrogatory?

MR. LAPINSKI:  That the plaintiff knows about, yes, your Honor.

THE COURT:  And is this also an interrogatory that you might supplement based on discovery in the case?

MR. LAPINSKI:  Pursuant to the rules, yes, your Honor.

THE COURT:  Okay.

So, Mr. Donovan, we now have a representation on the record to the extent that -- I'm not deciding whether it was or was not previously represented, but counsel's standing here in court on the record and representing that he's identified all the responsive facts.  If he obtains additional responsive facts, they'll supplement the answer in the future under the applicable rule, just like defendants will.  It seems to the

Court there is nothing else that we can ask or order plaintiff to produce.  So the Court's order is that this answer number 8 does not have to be supplemented at the present time.

MR. DONOVAN:  Understood, your Honor.

THE COURT:  Okay.

Number 9.

MR. DONOVAN:  Number 9, Judge, deals with the issue of identifying products purchased for healthfulness reasons. During the meet and confer we understood that the plaintiff was objecting to providing any of this information on grounds of -- the healthfulness part of the answer on grounds of relevance.

We now understand that the plaintiff's position is they did answer the question.  I don't see any answer to this question where plaintiff has said with respect to this list of products that I have purchased, these are the products I purchased for healthfulness reasons.  In fact, I don't see the word "healthfulness" in the answer.

So, if the plaintiff has purchased any products related -- the products she's identified for reasons related to healthfulness, we would like to know.

MR. LAPINSKI:  Your Honor, in our response we stated our objection.  During the meet and confer we indicated we didn't believe it was relevant.  Subject to those objections, we still provided an answer.  We provided an answer listing

the beverages and to the extent any of those beverages she purchased for reasons of healthfulness we so indicated next to it.  To the extent that we didn't indicate anywhere, then that means she didn't purchase it for reasons of healthfulness.

THE COURT:  Have you identified for the relevant time period all products plaintiff currently recalls that she purchased for reasons related to healthfulness?  And if you are not certain, Mr. Lapinski, that's fine, we'll just say you have to supplement it if you are not comfortable making that representation.

MR. LAPINSKI:  You know, my knee-jerk reaction is that I am comfortable, your Honor, but I'll take the opportunity to supplement it.  I'll go back again to the client.  I don't think there is any need for me to supplement it, but I'll take the opportunity to do so.

THE COURT:  Let's double check with the client whether she identified all of the responsive information to interrogatory number 9.  It's a broad question, it's a broad time period, so let's just make doubly sure.

MR. LAPINSKI:  I'm assuming defendant wants me to for each beverage identified state no, I didn't purchase this for healthfulness.  That's not what the question asked plaintiff to do, though.

THE COURT:  Is the interrogatory just asking plaintiff to identify -- the letter says products purchased

for reasons related to healthfulness.  Is that what you are asking for, Mr. Donovan?

MR. DONOVAN:  The interrogatory says, your Honor, identify by brand and product name every beverage you purchased for personal consumption since April 21, 2002. Identify which such beverages you purchased, if any, for reasons related to product healthfulness.

THE COURT:  Okay.  So defendant wants to know all the beverages she purchased and all that she purchased for healthfulness.

MR. LAPINSKI:  To the extent she identifies a beverage, your Honor, and she didn't purchase it for reasons of healthfulness, am I supposed to say she did not purchase this one for reasons of healthfulness?  That's not what the interrogatory asked me to do.  It doesn't say for each beverage state yes, she did purchase for healthfulness; no, she didn't.  You know, I provided all the beverages that she recalled purchasing.  And then it says to identify which beverages you purchased, if any, for reasons relating to healthfulness, and I didn't identify any.

THE COURT:  That's what you have to do.  But let's make doubly sure that her answer is complete.

MR. LAPINSKI:  That's fine, your Honor.  Thank you.

THE COURT:  Number ten. All reasons for purchasing defendant's product --

MR. DONOVAN: All reasons for purchasing the product alleged in the complaint on March 30, 2008. And this is the certainty issue.

THE COURT: Okay. You believe there is some equivocation in the answer?

MR. DONOVAN: Yes, your Honor. Plaintiff qualifies her answer by stating she does not have a specific recollection. "She does not have a specific recollection of all reasons why she purchased the product." Before answering the question, plaintiff qualified the answer with words in part implying there are other reasons not disclosed.

THE COURT: Okay, that's fair.

So, plaintiff is directed to supplement her answer to interrogatory ten by stating that at the present time the only reason she can identify for why she purchased the product are X, Y, Z. And again, if plaintiff later recalls something else, she'll supplement her answer. So, number ten has to be supplemented.

Number 12.

MR. DONOVAN: Twelve, Judge, "Identify all defendant's marketing advertising and/or promotional activity that you observed or otherwise became aware of at any time before the filing of the complaint."

THE COURT: And what's the alleged deficiency?

MR. LAPINSKI: The deficiency again goes to the

qualification. "Plaintiff does not have a specific recollection as to the date on which she became aware of representations on defendant's product packaging but recalls observing the packaging at retail establishments."  If that is the sum and substance -- if all they're relying on are the labels and the packaging, and the allegations of the complaint dealt with marketing and promotional activity, if they're going to say well, that's it, she hasn't looked at anything else other than that, that I would like the certainty of that, Judge.

THE COURT:  Mr. Lapinski, can you represent that there is no additional responsive information to interrogatory 12?

MR. LAPINSKI:  I can represent that, your Honor.

THE COURT:  Okay.  So we now have that representation.  So the answer to 12 is complete and does not have to be supplemented.

Last request for admission, four.

MR. DONOVAN:  Ditto from the prior one, your Honor, dealing with the reasonable inquiry.

THE COURT:  Was this one of those where they said they couldn't identify it or --

MR. DONOVAN:  I'm sorry, your Honor, I don't mean to short change.  Yes, they said they don't have sufficient knowledge and information to determine whether she consumed

food that contained citric acid since the filing of the complaint.

THE COURT:  So the Court's ruling on request for admission four for BMU is the same as the direction for request for admission number 28 for Hornell.  Plaintiff, if that's her answer, has to add the language required under the cited rule.

Okay.  That takes care of the two motions.  So both motions are granted in part and denied in part.  The Court's directing that each side supplement its answers within 30 days and by then hopefully each side's paper discovery will be if not complete, very close to being complete.

Mr. Lapinski, are we ready now to proceed to depositions?

MR. LAPINSKI:  Yes, your Honor, we are.

THE COURT:  Okay.

MR. LAPINSKI:  Just for clarification, if I may, your Honor.  When we initially started discovery, discovery was started following a status conference in your chambers where we addressed the issue that there was not a formal bifurcation of discovery, however discovery would proceed with a focus initially on class certification.

THE COURT:  Agreed.

MR. LAPINSKI:  Okay, I just wanted to make sure.

THE COURT:  Agreed.

MR. LAPINSKI:  Thank you.

THE COURT:  Agreed.  The Court's goal is to get the motion for certification filed as soon as is reasonably possible.

Mr. Lapinski, do you know how many depositions you want in order to get ready to file your motion?

MR. LAPINSKI:  Your Honor, I would think that we're not going to need any more than five depositions.

THE COURT:  Are any of those going to be 30(b)(6) depositions?

MR. LAPINSKI:  Yes, your Honor.

THE COURT:  Have you served your 30(b)(6) deposition notices yet?

MR. LAPINSKI:  We have not served any deposition notices but will be doing so now that we've reached a point where you said we're going to move to depositions.

THE COURT:  So today is December 17th.  So by January 19th the parties are going to supplement their answers to written discovery.

Do you need those answers to serve your 30(b)(6) depositions notices, Mr. Lapinski?

MR. LAPINSKI:  Your Honor, I don't need the answers in order to serve deposition notices, I do need the answers in order to be able to effectively take a deposition, though.

THE COURT:  Understood.  That's easy.

MR. LAPINSKI:  Serving, no.

THE COURT:  What I'd like you to do is by January 11th serve your deposition notices but leave the dates blank for now.  Do you know, are they all going to be 30(b)(6) notices?

MR. LAPINSKI:  No, your Honor, they're not going to be.

THE COURT:  How many 30(b)(6) notices?

MR. LAPINSKI:  Probably three, your Honor.

THE COURT:  All right.  Serve your 30(b)(6) notices -- serve all your notices by January 11th.  By January 19th, defendants serve your objections to the 30(b)(6) notices.  And then I want the parties to meet and confer about any objections.  By February 1st, serve the Court with a joint letter identifying any objections regarding the 30(b)(6) notices.  Once we get those objections resolved, if any, then there should be nothing to prevent us from completing discovery very rapidly.  So I would say you should plan on taking your fact depositions in February and March.  All fact discovery on class certification issues completed by March 31st.

Are you going to have experts, plaintiff --

MR. LAPINSKI:  Yes, your Honor.

THE COURT:  -- on class certification?

MR. LAPINSKI:  We believe we will.  We haven't made a

final decision on that, but we believe that we will.

THE COURT:  Okay.  File your class certification motion on May 3rd.  By May 1st identify the names and subject areas of the experts you are going to use for class cert issues.  The reason for that is I don't want defendants to be surprised when they get your class certification motion about what type of experts you'll be using.  And I want to make sure that if the defendants need time to get a responsive expert or an expert in that area that they don't wait until they receive your brief on May 3rd.

MR. LAPINSKI:  If I can just clarify, your Honor. You said identify by May 1st.

THE COURT:  March 1st.

MR. LAPINSKI:  By March 1st, okay.

THE COURT:  So the schedule would be 30(b)(6) notices January 11th.  Objections, January 19th.  Joint letter regarding objections February 1st.  Complete all depositions on class cert issues by March 31st.  Plaintiff identify the names and subject areas of their experts, you don't have to produce their reports, by March 1st.  And file a class certification motion by May 3rd.

There is no reason why plaintiff's depositions can't be scheduled right away for some time -- you want to do it in January, go ahead; if not, do it in February.

MR. DONOVAN:  We've noticed it, your Honor.

THE COURT:  Good.  And there may not be any reason why the individual deps you are going to take can't be noticed right away.

MR. LAPINSKI:  Your Honor, if I may.  Two individuals that we intended to take a deposition of, Donald and Wesley Vultaggio, in a related case, the Covington matter down in Florida, they were noticed and they are going forward next week, the 22nd and 23rd of December.  Defendant specifically sent a letter to counsel in Covington copying us on the letter saying that we were precluded from being able to attend and/or participate in the deposition.  I just wanted to make that point.  If they're going to go forward next week, that's fine, but when I serve my deposition notices I don't want to hear an argument that we can't take the deposition or that the scope of the deposition is limited in any way.

MR. DONOVAN:  That's correct, Judge, they can take a deposition on their own notice.

THE COURT:  Yes.  I wish they were all that easy, Mr. Lapinski.  If you can't go to the dep, how can you be limited by the dep?

MR. LAPINSKI:  Your Honor, nothing about this litigation would surprise me at this point.

THE COURT:  Okay.

MR. DONOVAN:  Judge, I object to that characterization.

THE COURT:  Is that another case similar to this?

MR. LAPINSKI:  It's an identical case except it's allegations and a claim that looks to represent a class of Florida purchasers.

THE COURT:  Do they have a class certification schedule?

MR. LAPINSKI:  I believe that they do, but I think defendant will be in a better position to answer that.

THE COURT:  All right.  Any other issues for plaintiff before we get to the defendants to see if they have any issues?

MR. LAPINSKI:  Your Honor, one issue that I would like to bring up.  And by way of example, I received a letter from defendant last week saying that they had approximately 80 pages of documents that were responsive to one of my requests but I could get the documents if I were to send them a check for $0.14 per page.

THE COURT:  That didn't come from Mr. Donovan, did it?

MR. LAPINSKI:  I believe that it was his signature at the bottom of the page, your Honor.  And if that's what we're going to be doing --

MR. DONOVAN:  Judge, if I may.  It has to have some context to it.  I'll send the documents over, but we had a dispute before.  We had a document production at the warehouse

in early September.  I asked them -- they have to pay some costs, your Honor, some cost for the photocopying.  There have been, counting the disks, Judge --

THE COURT:  Counsel, both of you have more important --

MR. DONOVAN:  We'll work it out, your Honor.  I'll send the documents.

THE COURT:  All of you have more important things to worry about than the particular issue brought to the Court's attention.  The Court only has this to add.  That the Court has the highest regard for the caliber of the lawyers and the law firms in this case.  And it's a very difficult case and it's a very complex case and we'll get through it.  But given the Court's high regard for the firms and counsel, I'm sure in the future we won't have issues brought to this Court about $11.20 in photocopying costs.  And I won't say anything else about that issue.

Anything else for the plaintiff?

MR. LAPINSKI:  No, your Honor.

THE COURT:  Anything else for the defendant?

MR. DONOVAN:  Judge, Mr. Goldfarb, if he could address your Honor about one issue.

THE COURT: Of course.

MR. GOLDFARB:  Thank you, your Honor.  Since we're talking about scheduling, there is one more item.  I would ask

the Court's indulgence to include in the schedule -- there's been a recent action by the two agencies that have jurisdiction over these specific issues, the FDA and the USDA, and we would like to file a motion to dismiss and have the matter referred to the FDA in light of the fact, if I may, your Honor, that the FDA just in October announced its intention to issue a rule-making on front-of-package labeling and the USDA also announced a proposed rule-making on specifically the use of "natural" on food packaging.

In addition to that, your Honor, Judge Simandle expressed very specific interest in the issue of primary jurisdiction during the hearing back in February and there was a lot of discussion back then about whether it was appropriate.  I think plaintiff's counsel said, you know, going back to 1991, the FDA opened up the issue and then decided it's too busy to deal with this, closed the issue, and ever since then they've been doing it on a case-by-case basis.

Now, the agency has gone public and said we need to address this issue, we're going to issue a proposed rule-making.  It's entirely appropriate, I think it's almost not mandatory, the Court obviously has the discretion, we would like to ask the Court to consider referring this matter to the FDA in light of the fact that they've now opened -- the agency, this isn't a staff issue, this is the agency -- has decide that it intends to issue a proposed rule-making on

front-of-package labeling, which is exactly the issue in this case.

THE COURT:  The good news for your application is that in this Court I've never had an instance, and I've never seen it in this Court, where a party needed leave of court to file a dispositive motion.  So if you believe a dispositive motion is appropriate on this topic, you don't need leave to file it.  I know sometimes in Newark they do that, but we don't do that down in Camden.  So, if you are ready and you believe it's ripe, go ahead and file your motion.  It's not going to stay the case, but go ahead and file your motion.

MR. GOLDFARB:  Thank you, your Honor.  It was our intention to file it by January, we just wanted to include it in the scheduling and give some notice to plaintiffs that we intend to do that.

THE COURT: You can file it whenever you deem it appropriate, counsel.

MR. GOLDFARB:  Thank you, your Honor.

THE COURT:  Thank you for making us aware of it.

Any other issues we need to address?

MR. LAPINSKI:  No, your Honor.

MR. DONOVAN:  Thank you, your Honor, for your time.

THE COURT:  Thank you, counsel.  If I don't see you or hear from you before --

MR. DONOVAN:  Have a good holiday.

THE COURT:  -- I hope you all have a great holiday.

The Court will put the scheduling order in effect. If any issues of a discovery nature, what have you, come up before we're scheduled to get together again, just let us know by letter briefs and we'll set something up either by phone or in-person.

Also, build into the schedule another in-person conference to make sure to stay on track because I would like to see us keep that May 3rd date to file motions for class cert.  Then we'll also discuss, as we go along after those motions are decided, what we want to do.  If there is any remaining discovery in the case, we'll talk about those issues as well.

MR. LAPINSKI:  Very good.

THE COURT:  So the court's rulings, I'm just going to issue a general order granting and denying the motions to compel for the reasons stated on the record.  The court reporter, just make arrangements with him if you need to get a copy of the transcript to see the specifics of the rulings.

MR. DONOVAN:  Thank you, Judge.

MR. LAPINSKI:  Thank you, Judge. Have a nice holiday.

MR. GOLDFARB:  All thank you, very much, your Honor.

(Proceeding then ended)